## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. _____

| | |
|---|---|
| MARK ST. CYR, Individually and on Behalf of All Others Similarly Situated, <br><br><br>                Plaintiff, <br><br>v. <br><br>JONATHAN F. TEAFORD, JOHN C. TEXTOR, JOHN M. NICHOLS, ROTH CAPITAL PARTNERS, LLC and MORGAN JOSEPH TRIARTISAN, LLC, <br><br>                Defendants. | **JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT FOR VIOLATIONS
## OF THE FEDERAL SECURITIES LAWS

### INTRODUCTION

Plaintiff, Mark St. Cyr ( "Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the public documents and announcements issued by Digital Domain Media Group, Inc. ("DDMG" or the "Company"), filings with the Securities and Exchange Commission ("SEC"), wire and press releases published by and regarding the Company, securities analysts' reports and advisories about the Company, and other information readily obtainable on the Internet.

3507 Kyoto Gardens Drive, Suite 200 ▪ Palm Beach Gardens, FL  33410 ▪ Tel: 561-835-9400 ▪ Fax:561-835-0322 ▪ www.bermandevalerio.com

BOSTON       SAN FRANCISCO       PALM BEACH GARDENS

## <u>NATURE OF THE ACTION</u>

1.       This is a federal class action brought individually and on behalf of all other persons and entities who purchased or otherwise acquired DDMG common stock from November 18, 2011, through and including September 6, 2012, (the "Class Period"), seeking to recover damages pursuant to § 10(b) and § 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder (the "Class").

2.       This action also alleges claims under §§ 11 and 15 of the Securities Act of 1933 (the "Securities Act") on behalf of members of the Class that purchased or otherwise acquired DDMG common stock in or traceable to the Company's initial public offering, which commenced on or about November 18, 2011 (the "IPO" or "Offering").

3.       DDMG is a digital production company which was founded in 1993.   The Company provides computer-generated ("CG") animation and digital visual effects ("VFX") for major motion picture studios and advertisers.   The Company also established a partnership with The Florida State University ("FSU") to launch the Digital Domain Institute ("DDI"), a for-profit post-secondary educational institution.

4.       On May 16, 2011, DDMG filed a Registration Statement on Form S-1 with the SEC attempting to register its shares for its IPO.   The Company ultimately filed six amendments to its Registration Statement, the last one being on November 11, 2011 ("Registration Statement").   DDMG filed its prospectus with the SEC on Form 424B4 ("Prospectus") on November 21, 2011.   The Registration Statement and the Prospectus will be referred to collectively as the "Offering Documents."

5.       On Friday, November 18, 2011, the Company commenced its IPO.   The Company sold 4.92 million shares of its common stock at an initial public offering price of $8.50 per share.

2

3507 Kyoto Gardens Drive, Suite 200 ▪ Palm Beach Gardens, FL. 33410 ▪ Tel: 561-835-9400 ▪ Fax:561-835-0322 ▪ www.bermandevalerio.com

BOSTON                    SAN FRANCISCO                    PALM BEACH GARDENS

The gross proceeds received in the offering totaled $41.8 million. Roth Capital Partners LLC ("Roth Capital") and Morgan Joseph TriArtisan LLC ("Morgan Joseph") acted as the managing underwriters.  DDMG raised approximately $38.4 million in net proceeds after deducting underwriting discounts and commissions of approximately $2.9 million and other then unpaid offering expenses of approximately $0.5 million.  The common stock was listed on the New York Stock Exchange under the ticker symbol "DDMG".

6.      During the Class Period and in connection with the Company's IPO, defendants made untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts concerning the Company's financial condition.  In particular, the Offering Documents, filings with the SEC, and other public statements during the Class Period made material misrepresentations and omissions concerning the Company's ability to raise capital and fund its operations. While the Company was faced with a substantial "burn rate" which threatened the DDMG's ability to continue as a going concern, the Company' senior officers falsely reassured shareholders that it would be able to meet its operating expenses.  According to a September 18, 2012, article in the *Palm Beach Post* (the "*Post*") DDMG had a long history of difficulties meeting its payroll which went back to 2010.  According to the *Post*, the Company's Chief Executive Officer ("CEO") "predicted a 'train wreck' in an email to an investor in early 2010."

7.      Moreover, the CEO concealed a Loan Agreement for $10 million which he entered into at the time of the IPO.  The loan was secured by the CEO's DDMG common shares and by the CEO's residences.

8.      The Offering Documents also failed to disclose that Company's CEO had served as chairman and as CEO of BabyUniverse, Inc. which was forced to file for bankruptcy in 2008.

3

3507 Kyoto Gardens Drive, Suite 200 ■ Palm Beach Gardens, FL.  33410 ■ Tel: 561-835-9400 ■ Fax:561-835-0322 ■ www.bermandevalerio.com

BOSTON                    SAN FRANCISCO                    PALM BEACH GARDENS

The Company's Chief Financial Officer ("CFO") also served as a vice president and a member of the board of a company of BabyUniverse, Inc. before it filed for bankruptcy.

9.      The revelation of the DDMG's true financial condition culminated in its filing for Chapter 11 bankruptcy in United States Bankruptcy Court in the District of Delaware on September 11, 2012 (*less than 10 months after its IPO*).

10.     Facts detailing the circumstances concerning defendants' untrue statements and omissions are detailed herein.

## JURISDICTION AND VENUE

11.     The claims alleged herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5), and arise under §§ 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o, and the rules and regulations of the SEC promulgated thereunder.

12.     This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa, § 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and 28 U.S.C. § 1331.

13.     Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa, § 22(a) of the Securities Act, 15 U.S.C. § 77v, and §28 U.S.C. § 1391(b), as a substantial part of the acts events or omissions giving rise to the claims pleaded herein occurred in this District and defendants named herein maintain their residence or principal places of business in this District.

14.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not

3507 Kyoto Gardens Drive, Suite 200 ■ Palm Beach Gardens, Fl. 33410 ■ Tel: 561-835-9400 ■ Fax:561-835-0322 ■ www.bermandevalerio.com

BOSTON                    SAN FRANCISCO                    PALM BEACH GARDENS

limited to, the United States mails, interstate telephone communications and the facilities of the New York Stock Exchange.

## PARTIES

15.     Plaintiff, purchased shares of DDMG common stock, as set forth in the accompanying certification, which is incorporated by reference herein, and has been damaged thereby.

16.     Non-party DDMG is a Florida corporation and maintains its principal executive offices at Port St. Lucie, FL 34987.  Formerly known as Digital Domain Holdings Corporation and Wyndcrest DD Florida, Inc., the Company is a digital production and animation company focused on the creation of original content animation feature films and the development of computer-generated imagery, including three-dimensional stereoscopic ("3D") imagery, for large-scale feature films and transmedia advertising.   The Company filed for Chapter 11 bankruptcy in United States Bankruptcy Court in the District of Delaware on September 11, 2012.  Today, the common stock trades under the symbol "DDMGQ" on the OTC.

17.     Defendant John C. Textor ("Textor") served as Chairman of the Company's Board of Directors and Chief Executive Officer since January 2009. On September 6, 2012, Textor resigned his positions as Chairman of the Board, CEO and director of DDMG, as will as his positions as an officer and director with DDMGS's subsidiaries.   Textor signed the Registration Statement for the Company's IPO.   Textor also signed the Company's Quarterly Report on Form 10-Q filed on December 22, 2011 ("Q3 2011 10-Q"); Annual Report on Form 10-K filed on March 30, 2012 ("2011 10-K"); Quarterly Report on Form 10-Q filed on May 5, 2012 ("1Q 2012 10-Q"); and Quarterly Report on Form 10-Q filed on August 14, 2012 ("2Q 2012 10-Q").  Textor owns a residence in Martin County, Florida.

3507 Kyoto Gardens Drive, Suite 200 ▪ Palm Beach Gardens, FL. 33410 ▪ Tel: 561-835-9400 ▪ Fax:561-835-0322 ▪ www.bermandevalerio.com

BOSTON                    SAN FRANCISCO                    PALM BEACH GARDENS

18.     Defendant Jonathan F. Teaford ("Teaford") began serving as a member of the Company's Board of Directors in March 2009.  Teaford served as President of the Company from January 2009 to May 2011 and as the Company's Chief Financial Officer from March 2009 to February 2012.  Teaford became Chief Executive Officer of Digital Domain Institute, Inc. in February 2012.  Teaford was Executive Vice President and a member of the Board of Directors of BabyUniverse, Inc. from 1998 until its sale in October 2007.   Teaford signed the Registration Statement for the Company's IPO.  Teaford signed the Company's Q3 2011 10-Q.  Teaford owns a residence in Palm Beach County, Florida.

19.     Defendant John M. Nichols ("Nichols") began serving as the Company's Chief Financial Officer in February 2012.  Nichols was appointed to DDMG's Board of Directors on August 14, 2012.  On September 10, 2012, Nichols resigned as a member of DDMG's Board of Directors.  Nichols signed the 2011 Form 10-K; 1Q 2012 10-Q; and 2Q 2012 10-Q.

20.     Defendants Textor, Teaford and Nichols are collectively referred to herein as the "Individual Defendants."

21.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public.  By reason of their management positions and their ability to make public statements in the name of DDMG, the Individual Defendants were and are controlling persons, and had the power and influence to cause (and did cause) DDMG to engage in the conduct complained of herein.

22.     Defendant Roth Capital Partners, LLC ("Roth Capital") was the lead book-running manager and underwriter of the Company's IPO.  Roth Capital was the representative of the underwriters and the sole book-running manager of the IPO.  Roth was allocated 3,690,000

6

3507 Kyoto Gardens Drive, Suite 200 ▪ Palm Beach Gardens, FL. 33410 ▪ Tel: 561-835-9400 ▪ Fax:561-835-0322 ▪ www.bermandevalerio.com

BOSTON                    SAN FRANCISCO                    PALM BEACH GARDENS

of the 4,920,000 of the shares to be sold in the IPO.  Roth Capital assisted in the preparation and dissemination of the Offering Materials.  As an underwriter of the Offering, Roth Capital was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.  Roth Capital maintains its principal executive offices in Newport Beach, California.

23.     Defendant Morgan Joseph TriArtisan LLC ("Morgan Joseph") was managing underwriter of the Company's IPO.  Morgan Joseph was allotted 492,000 of the 4,920,000 shares to be sold.  Morgan Joseph assisted in the preparation and dissemination of the Offering Materials.  As an underwriter of the Offering, Morgan Joseph was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.  Morgan Joseph maintains its principal executive offices in New York, New York.

24.     Defendants Roth Capital and Morgan Joseph are collectively referred to herein as the "Underwriter Defendants."

## CLASS ACTION ALLEGATIONS

25.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of all those who purchased or otherwise acquired DDMG common stock from November 18, 2011, through and including September 6, 2012.  This action also alleges claims on behalf of members of the Class that purchased or otherwise acquired DDMG common stock in or traceable to the Company's IPO.  Excluded from the Class are Defendants herein, members of the immediate family of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal

7

3507 Kyoto Gardens Drive, Suite 200 ▪ Palm Beach Gardens, FL. 33410 ▪ Tel: 561-835-9400 ▪ Fax:561-835-0322 ▪ www.bermandevalerio.com

BOSTON                    SAN FRANCISCO                    PALM BEACH GARDENS

representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

26.     The members of the Class are located in geographically diverse areas and are so numerous that joinder of all members is impracticable.  DDMG sold 4,920,000 million shares of common stock in the IPO.  Throughout the Class Period, DDMG securities were actively traded on the NYSE.  Although the exact number of Class members is unknown at this time and can only be ascertained through appropriate discovery, Plaintiff believes there are thousands of members of the Class who traded the Company's common stock during the Class Period.

27.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     Whether Defendants violated federal securities laws based upon the facts alleged herein;

(b)     Whether the Offering Documents issued by Defendants in connection with the IPO omitted or misrepresented material facts about DDMG, its business and its management;

(c)     Whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management;

(d)     Whether the Individual Defendants caused DDMG to issue false and misleading financial statements during the Class Period;

(e)     Whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

8

3507 Kyoto Gardens Drive, Suite 200 ▪ Palm Beach Gardens, FL. 33410 ▪ Tel: 561-835-9400 ▪ Fax:561-835-0322 ▪ www.bermandevalerio.com

BOSTON                    SAN FRANCISCO                    PALM BEACH GARDENS

(f)     Whether the prices of DDMG securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

(g)     Whether the members of the Class have sustained damages and, if so, the proper measure of damages.

28.     Plaintiff's claims are typical of the claims of the members of the Class as Plaintiff and members of the Class sustained damages arising out of Defendants' wrongful conduct in violation of federal laws as complained of herein.

29.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to, or in conflict with, those of the Class.

30.     A class action is superior to alternative methods for the fair and efficient adjudication of this controversy since joinder of all members of this Class is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

31.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

i.   defendants made public misrepresentations or failed to disclose material facts during the Class Period;

ii.   the omissions and misrepresentations were material;

iii.   DDMG securities are traded in an efficient market;

iv.   the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

9

3507 Kyoto Gardens Drive, Suite 200 ▪ Palm Beach Gardens, Fl.  33410 ▪ Tel: 561-835-9400 ▪ Fax:561-835-0322 ▪ www.bermandevalerio.com

BOSTON                    SAN FRANCISCO                    PALM BEACH GARDENS

v.  the Company traded on the NYSE and was covered by multiple analysts;

vi.  the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

vii.  Plaintiff and members of the Class purchased, acquired and/or sold DDMG securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

32.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## FACTUAL ALLEGATIONS

### Background

33.    DDMG has received seven awards issued by the Academy of Motion Picture Arts and Sciences — three Academy Awards® for *Best Visual Effects* and four awards for *Scientific and Technical Achievement*.  DDMG has been involved in the production of major motion pictures including *Thor*, *TRON: Legacy*, the *Transformers* trilogy, *The Curious Case of Benjamin Button*, *Apollo 13* and *Titanic*.  DDMG's digital production capabilities include the creation of CG animated content, performance capture, the conversion of two-dimensional ("2D") imagery into three-dimensional ("3D") imagery and CG visual effects such as fluid simulation, terrain generation and photorealistic animation.

### The Initial Public Offering

34.    On May 16, 2011, DDMG filed an initial registration statement on Form S-1 with the SEC Barclays Capital ("Barclays") and Janney Montgomery Scott ("Janney") were identified as the underwriters of the IPO.

35.    On July 7, 2011, DDMG filed Amendment No. 1 to Form S-1 with the SEC. Barclays and Janney were identified as underwriters of the IPO.

10

3507 Kyoto Gardens Drive, Suite 200 ▪ Palm Beach Gardens, FL. 33410 ▪ Tel: 561-835-9400 ▪ Fax:561-835-0322 ▪ www.bermandevalerio.com

BOSTON                    SAN FRANCISCO                    PALM BEACH GARDENS

36. On July 20, 2011, DDMG filed Amendment No. 2 to Form S-1 with the SEC. Barclays and Janney were identified as underwriters of the IPO.

37. On August 12, 2011, DDMG filed Amendment No. 3 to Form S-1 with the SEC. Barclays and Janney were identified as underwriters of the IPO.

38. On September 20, 2011, DDMG filed Amendment No. 4 to Form S-1 with the SEC. Barclays and Janney were identified as underwriters of the IPO. Barclays and Janney subsequently withdrew as underwriters.

39. On November 4, 2011, DDMG filed Amendment No. 5 to Form S-1 with the SEC. Roth Capital and Morgan Joseph were identified as the underwriters of the IPO.

40. On November 10, 2011, DDMG filed Amendment No. 6 to Form S-1 with the SEC. Roth Capital and Morgan Joseph were identified as the underwriters of the IPO. Amendment No. 6 indicated that 5,500,000 shares would be offered in the IPO. Amendment No. 6 further stated:

> **Liquidity and Capital Resources**
> Our principal sources of liquidity at June 30, 2011 consisted of cash and cash equivalents of $1.3 million, cash held in trust of $9.3 million and accounts receivable and contract receivables of $3.3 million. We had a deficit in working capital of $28.0 million as of June 30, 2011 and a $111.0 million loss attributable to common stockholders and used $15.6 million to fund cash flows from operations for the six months ended June 30, 2011.
>
> In August 2011, DDI received $26.0 million in a private placement of 3,250,000 shares of its common stock. Fees and expenses related to this private placement aggregated $2.7 million, resulting in net proceeds to DDI of $23.3 million.
>
> As described further in "— Financing Transactions," on July 1, 2011 we entered into a credit facility with Comvest that was effective as of June 30, 2011. The credit facility is comprised of a convertible note payable to Comvest in the principal amount of $8.0 million and a revolving credit facility providing us with borrowing capacity of up to $15.0 million of which we drew $7.4 million in July 2011. Concurrent with this transaction, on July 1, 2011, Comvest paid in full all amounts of principal and interest then due from us to our former commercial lender and acquired that lender's rights under its loan agreements with us. In



3507 Kyoto Gardens Drive, Suite 200 ▪ Palm Beach Gardens, FL 33410 ▪ Tel: 561-835-9400 ▪ Fax:561-835-0322 ▪ www.bermandevalerio.com

BOSTON SAN FRANCISCO PALM BEACH GARDENS

connection with this transaction, we issued a replacement promissory note to Comvest in the aggregate principal amount of $12.0 million.

During the six months ended June 30, 2011, we received $19.5 million in a private placement of 2,025,001 shares of our Common Stock. Fees and expenses related to this private placement aggregated $2.5 million, resulting in net proceeds of $17.0 million. In June 2011, Digital Domain sold 1.5 million shares of its common stock for $2.5 million. Additional capital infusions in the first half of 2011 include the receipt of $4.0 million from the State of Florida when we reached an employee count in Florida of 200 employees. In April 2011, PBC Digital Holdings II exercised its right to invest the remaining $2.0 million from the remaining capacity of our Junior Debt agreement. See Note 13 to our Consolidated Financial Statements included elsewhere in this prospectus. In May 2011, we borrowed another $2.0 million from PBC Digital Holdings II for short-term equipment financing. Additionally in May 2011, we received $2.0 million in grant proceeds upon confirmation that our students at DDI will receive degrees that are accredited by a nationally recognized accrediting body.

During the first half of 2011, we entered into a purchase agreement with a major film studio for the purchase of studio and film equipment aggregating $8.5 million. We funded $2.5 million of this purchase from cash, held in trust and the remaining amounts from operating cash and cash equivalents, partially funded by the $2.0 million obtained from equipment financing discussed above. Additionally, we paid $5.0 million in the first half of 2011 to exercise our right to purchase Falcon's Series B Warrants. See Note 14 to our Consolidated Financial Statements included elsewhere in this prospectus.

***We believe that these various sources of cash will be sufficient to support our operations during 2011.***

(Emphasis added).

41.     On November 14, 2011, the Registration Statement was declared effective by the SEC.

42.     On Friday, November 18, 2011, DDMG commenced its IPO offering 4,920,000 shares at $8.50 per share with an over-allotment option of 738,000 shares.  Common stock that was to be outstanding after the offering (excluding shares cover by the over-allotment option) was 39,500,993 shares.   Net proceeds to DDMG was approximately $38.5 million, after

12

3507 Kyoto Gardens Drive, Suite 200 ▪ Palm Beach Gardens, FL. 33410 ▪ Tel: 561-835-9400 ▪ Fax:561-835-0322 ▪ www.bermandevalerio.com

BOSTON                SAN FRANCISCO                PALM BEACH GARDENS

deducting underwriting discounts and commissions and estimated offering expenses payable by DDMG (assuming no exercise of over-allotment option).

43.     On November 18, 2011, DDMG also disclosed that Textor, Teaford, and their affiliated entities have indicated an interest in purchasing an aggregate of up to approximately $10.5 million in shares of common stock in the IPO at the initial public offering price. Based on the initial public offering price of $8.50 per share, these shareholders would purchase up to approximately 1,235,294 of the 4,920,000 shares in the IPO.

44.     On November 21, 2011, DDMG filed the Prospectus on Form 424B4 with the SEC.

45.     On November 22, 2011, Teaford filed a Form 4 with the SEC disclosing that he had purchased 58,825 shares of DDMG common stock in the IPO on November 18, 2011 at $8.50 per share for approximately $500,000.   This increased Teaford's direct holdings to 2,292,146 shares.

46.     On November 22, 2011, Textor filed a Form 4 with the SEC disclosing that he had purchased 1,176,471 shares of DDMG common stock in the IPO on November 18, 2011 at $8.50 per share for approximately $10 million.

47.     On November 23, 2011, Textor filed a Form 4 with the SEC disclosing that he had purchased 7,750 shares at $6.35 per share for approximately $49,212.   This increased Textor's direct holdings to 9,645,838 shares and indirect holdings to 373,832 shares.

48.     Unbeknownst to the public, on November 22, 2011, Textor had entered into a Loan Agreement to raise funds to make his $10 million purchase in the IPO.  According to an SEC filing by Textor on Form Schedule D (*filed nearly a year later on August 29, 2012*):

> Pursuant to the Loan Agreement, the Lenders advanced Mr. Textor $10,000,000 plus an additional amount equal to the closing costs. The Loan Agreement was

13

3507 Kyoto Gardens Drive, Suite 200 ■ Palm Beach Gardens, FL. 33410 ■ Tel: 561-835-9400 ■ Fax:561-835-0322 ■ www.bermandevalerio.com

BOSTON                    SAN FRANCISCO                    PALM BEACH GARDENS

amended on May 3, 2012, pursuant to which the Lenders advanced an additional $2,500,000. ***The cash advanced is secured by (i) a pledge of 8,461,617 shares of the Company's Common Stock and (ii) security interests on certain real estate assets owned by Mr. Textor***. Interest on the loan accrues at 8% per annum for the first ninety days of the term of the Loan Agreement, 10% per annum for the next sixty days of the term of the Loan Agreement, and 12% thereafter. One-half of the interest is payable monthly in cash and one-half of the interest is added to the principal balance of the advance. In the Event of Default (as defined in the Loan Agreement), the interest rate will increase to 19% per annum. Mr. Textor repaid $1,590,000 of the advance on March 29, 2012. The advance is due and payable on August 31, 2012.

(Emphasis added).

49.     The properties securing the Loan included Textor's real estate holdings located at 121 Yellow Brick Road, Mountain Village, CO 81435 (the "Colorado Property") and 2959 SE St. Lucie Blvd., Stuart, FL (together with the contiguous lots, the "Florida Property").  Textor also "agreed to use his best efforts to consummate a margin loan transaction with UBS Financial Services, Inc. or other lender (the 'Margin Transaction') and has agreed to use [sic] prepay the Loans with the net proceeds from Margin Transaction."  On the Termination Date, Textor was required to repay the aggregate principal amount of the Loans with the outstanding interest due and owing on such Loans.  The Termination Date was August 31, 2012.

50.     As described below in more detail below, the Offering Materials contained untrue statements of material fact and material omissions regarding among other things that the Company did not have the ability to raise capital and fund its operations in the short and long term and was facing a substantial "burn rate" which threatened the DDMG's ability to continue as a going concern.  Further, defendants failed to disclose the recent bankruptcy of Textor and Teaford's prior company, BabyUniverse, Inc.

3507 Kyoto Gardens Drive, Suite 200 ▪ Palm Beach Gardens, FL  33410 ▪ Tel: 561-835-9400 ▪ Fax:561-835-0322 ▪ www.bermandevalerio.com

BOSTON                    SAN FRANCISCO                    PALM BEACH GARDENS

## FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

### Third Quarter 2011 Financial Results

51.     On December 20, 2011, DDMG issued a press release announcing its Third Quarter results for 2011.   Textor touted, "Our third quarter financial results are in-line with estimates, representing a confirmation of the headline numbers that were previously disclosed during our recent IPO process . . . [and] [w]e are also pleased to report that our revenue backlog of 2012/2013 film projects, combined with our recently announced strategic and technology-based initiatives provide the company with a ***positive outlook and strong visibility well into 2013***."  (emphasis added).  Textor also stated, "While our growth appetite is aggressive, ***we have mitigated the financial risk of such growth*** through a unique funding model that relies on public and private partnerships.   We have also mitigated the risk of execution by choosing great partners such as Reliance Media in India, Galloping Horse in China and The Florida State University."  (Emphasis added).

52.     Also, on December 20, 2011 (***only one month after its IPO***), DDMG announced that that its Board of Directors has authorized the company to repurchase up to $10 million of its outstanding common stock.  The share repurchase program had an expiration date of June 22, 2012.  The Company further stated that it "intends to pursue a share repurchase program that it believes represents a sound investment of its available cash, is supportive of its fundamental business strategy and also has the potential to address what the company believes are certain market and valuation inefficiencies that resulted from our recent initial public offering process."

53.     On December 20, 2011, DDMG held a conference call to discuss its financial results.  During the call, Textor reassured investors that the Company was not threatened by an excessive burn rate:

3507 Kyoto Gardens Drive, Suite 200 ▪ Palm Beach Gardens, FL  33410 ▪ Tel: 561-835-9400 ▪ Fax:561-835-0322 ▪ www.bermandevalerio.com

BOSTON                    SAN FRANCISCO                    PALM BEACH GARDENS

**<Q>**: Okay, misstated in the entry point. *One of the numbers I'm having a hard time gaining access to is your burn rate. And at the current burn rate of cash that you have, assuming a direct cost of 49% to employee cost, if you don't ramp up your sales, when would you run out of money? Or alternatively, what is your breakeven point in terms of gross revenues?*

**<A - John C. Textor>**: Well, the burn rate discussion I'll tackle in two ways, because it starts with a false premise. It is – let me draw you back to the segment reporting, and a full year is the easiest way to see it, because we do have these gaps at particular points in the year. So let me start with the 2010 example.

Our core business in 2010 in visual effects, and I would like to say our historically core business, did $102 million in revenues and had $17 million of EBIT. So in the core business, you're nicely profitable and you're growing. Yes it's the stair-stepping kind of growth, but you're growing. Now, in that business before you get to any of these other new businesses, that business is very nicely funded by upfront payments that come from studios that on smaller projects or medium-sized projects are often 20% of the value of the contract.

So the industry in visual effects across the board has historically relied on studio capital for working capital. And the studios know it, the companies depend on it, and it's one of the reasons the studios feel comfortable trying to pressure the visual effects industry by and large to accept lesser margins, because they're always feeding the industry with these upfront payments.

In our case, we get those same upfront payments, but we have better margins by and large because of the importance of our work, and the fact that in some cases we're the only guys along with a select few others that can do certain kinds of work. So a 17% EBIT margin on our core business in a business where the studios fund you upfront for the project is a very healthy cash generating business when you're growing, because the deposit for future projects, if those projects are larger, are always building more and more working capital in a normal year. And that shows up as retained earnings.

Now, in a particular quarter, keep in mind, if you finish a project and you don't have another project immediately on its heels, you can show an irregularly large cash burn in that particular quarter, because if you took a 20% payment upfront

**<Q>**: You don't put that in your EBIT analysis then.

**<A - John C. Textor>**: Yes, then you're burning off, you're paying – you're basically paying, funding that film at the end. Now in our case, look at our backlog. Our backlog as disclosed – and was that right at $218 million or $216 million? I'm sorry, I'm -

*** 

3507 Kyoto Gardens Drive, Suite 200 ▪ Palm Beach Gardens, FL. 33410 ▪ Tel: 561-835-9400 ▪ Fax:561-835-0322 ▪ www.bermandevalerio.com

BOSTON                    SAN FRANCISCO                    PALM BEACH GARDENS

**<A - John C. Textor>**: So $216 million in total. But $180 million is in the backlog on feature film projects, which is more visibility than we've ever had in this business going forward. And that's a combination of films that we've already contracted and those films that have been awarded to us that we expect to go to full contract. There is some risk in that latter category, but even the portion that we already have contracted is more backlog than I think we've ever had at the business. And those projects are much larger, like Paradise Lost is an $80 million to $90 million visual effects project TRON was not an anomaly. I mean, the big films are getting more and more like that. So the core business is growing nicely. It is profitable and it's got really favorable characteristic on upfront deposits fixed on working capital. So in that business, there is no burn rate as we go forward.

You might have a difficult quarter if you've got a gap where one is rolling off before deposit is received on the next, but that's one of the benefits to being public and to having lines of credits and to being able to manage that over a multi-quarter period of time.

Now, let me get to the next part of the business, which looks like burn rate, but also in our opinion is not. If you look at the total salaries of the people that we've hired in Florida, these are – we've gone from 0 people to 250 people here by and large pre-revenue, because we've gone into a new market where people weren't ready to walk in and start doing Star Wars-caliber work. Now that's why we went to the state of Florida and said, if you want us to train your local workforce, it's going to cost us a bunch of money. ***If you want a company like ours to come to the state, you have to help us get started. So the burn rate that you see in things like unutilized labor, as you see in this release, our total unutilized labor is less than we received in cash grants. So the timing doesn't always work out, but we're receiving more money than we've laid out.***

(Emphasis added).

54.     On December 22, 2011, DDMG filed its 3Q 2011 10-Q signed by Textor and

Teaford.  The 3Q 2011 10-Q stated:

*Liquidity and Capital Resources*
As of September 30, 2011, we had a deficit in working capital of $38.3 million. This is inclusive of debt principal outstanding on that date and due on September 30, 2012 aggregating $37.1 million.

On November 18, 2011, we conducted the initial public offering ("IPO") of our common stock. We began trading on the New York Stock Exchange under the ticker symbol "DDMG" on November 18, 2011. On that day, we sold 4.92 million shares of our common stock at the IPO offering price of $8.50 per share. The proceeds of the offering were $41.8 million, before payment of commissions and other then unpaid offering costs aggregating $3.4 million. Upon the

17

3507 Kyoto Gardens Drive, Suite 200  ▪  Palm Beach Gardens, FL. 33410  ▪  Tel: 561-835-9400  ▪  Fax:561-835-0322  ▪  www.bermandevalerio.com

BOSTON                    SAN FRANCISCO                    PALM BEACH GARDENS

completion of the IPO, convertible debt and warrants representing $128.4 million in debt and warrant liabilities on our balance sheet were automatically converted or exercised, as applicable, into shares of our common stock.

After the automatic conversion of our debt and warrant exercise upon the completion of the IPO discussed above, the remaining principal of our debt was $27.4 million, of which $19.4 million is due on September 30, 2012.

***We believe, based on our current operating plan, that our existing cash and cash equivalents and available borrowings under our credit facility will be sufficient to meet our anticipated cash needs for at least the next 12 months.***

(Emphasis added).

### Fourth Quarter 2011 Financial Results

55.     On April 2, 2012, DDMG issued a press announcing its fourth quarter financial results.  The Company touted that it had "beat revenue and earnings estimates."   Textor stated, "We are pleased to remain on plan as we report our first full quarter as a public company [and that] [w]e have made significant progress expanding beyond our traditional visual effects business with the opening of our original content family feature animation studio, the beginning of classroom instruction at the Digital Domain Institute and the exciting commencement of our first feature film co-production, the highly anticipated and globally recognized Ender's Game." Textor continued, "Again, we would like to highlight the fact that our grant receipts, which were secured to fund the Florida expansion, have substantially outpaced our Adjusted EBITDA losses, which show the upfront expense of this expansion.  For example, our Adjusted EBITDA loss for all of 2011 was $22.4 million, while we are still holding deferred grant revenue of $32.7 million. This grant revenue paid for our expansion in Florida and will, we believe, be recognized into income, as pure profit flow-through, over the coming years."

56.     On the prior Friday, March 30, 2012, DDMG filed its 2011 10-K signed by Textor and Nichols.  The 10-K stated:

18

3507 Kyoto Gardens Drive, Suite 200 ▪ Palm Beach Gardens, Fl. 33410 ▪ Tel: 561-835-9400 ▪ Fax:561-835-0322 ▪ www.bermandevalerio.com

BOSTON               SAN FRANCISCO               PALM BEACH GARDENS

**Liquidity and Capital Resources**

As of December 31, 2011, we had a deficit in working capital of $18.8 million. After the automatic conversion of our debt and warrant exercise upon the completion of the IPO discussed above, the remaining principal of our debt was $27.4 million, of which $19.4 million is due on September 30, 2012.

Our principal sources of liquidity at December 31, 2011 consisted of cash and cash equivalents of $29.4 million, cash held in trust of $6.7 million and contract receivables of $3.1 million. We had a deficit in working capital of $18.8 million as of December 31, 2011 and a $140.7 million loss attributable to common stockholders, and we used $42.2 million to fund cash flows from operations for the year ended December 31, 2011. As of December 31, 2011 we had $35.9 million in Stockholders' Equity. Much of our use of cash from operations in 2011 stemmed from our implementation of our plans to participate in the ownership of live-action feature films, our development of our animation studio and the preparations for the launch of our school. These businesses did not generate a significant amount of revenue during 2011. It is important to note that a majority of these expenses were funded by our existing grants from the State of Florida, the City of Port St. Lucie, and the City of West Palm Beach. While many of these grant proceeds were received between 2009 and the present, we only record a small amount of these receipts as revenue. As of December 31, 2011 we had received $27.6 million of grant receipts and that we plan to recognize into revenue over the next 5 to 20 years. In addition, we expect to receive $12.5 million in additional grant proceeds over the next several years under our existing grant agreements. See "Grants and Other Incentives from Government Entities".

A key component of our working capital is our deferred revenue. We typically receive a substantial portion of a contract for a Feature Film project up-front. We signed several large Feature Film contracts in the fourth quarter of 2010 that contributed to the generation of over $11.6 million in cash low from operations due to increases in advance payments and deferred revenue during 2010. In 2011, the contracts that we had in hand at the end of the year were significant, but had been entered into earlier in 2011, and therefore, did not generate as significant an amount of cash from operations at the end of the year. In 2011, our advance payments and deferred revenue declined by $7.3 million. We expect new contracts signed during 2012 to generate cash in the form of advance payments and deferred revenue. It is important to note that growth in our revenues is typically associated with signing a larger volume of new Feature Film contracts. As discussed above, these contracts typically include substantial upfront payments that are a source of cash to us. In 2010, when our revenues grew by over 50%, this growth contributed to $11.6 million in cash from operations solely from growth in advance payments and deferred revenue. In 2011, when our revenues were down slightly, we did not enjoy this growth related benefit.

3507 Kyoto Gardens Drive, Suite 200 ▪ Palm Beach Gardens, FL. 33410 ▪ Tel: 561-835-9400 ▪ Fax:561-835-0322 ▪ www.bermandevalerio.com

BOSTON                    SAN FRANCISCO                    PALM BEACH GARDENS

In November 2011, we completed our IPO, raising $41.8 million in gross proceeds before payment of commissions and other unpaid offering costs aggregating $3.4 million.

In August 2011, DDI received $26.0 million in a private placement of 3,250,000 shares of its common stock. Fees and expenses related to this private placement aggregated $2.7 million, resulting in net proceeds to DDI of $23.3 million.

As described further below, on July 1, 2011 we entered into a credit facility with Comvest that was effective as of June 30, 2011. The credit facility is comprised of a convertible note payable to Comvest in the principal amount of $8.0 million and a revolving credit facility providing us with borrowing capacity of up to $15.0 million of which we drew $7.4 million in July 2011. Concurrent with this transaction, on July 1, 2011, Comvest paid in full all amounts of principal and interest then due from us to our former commercial lender and acquired that lender's rights under its loan agreements with us. In connection with this transaction, we issued a replacement promissory note to Comvest in the aggregate principal amount of $12.0 million. Of the total $27.4 million of debt with Comvest, $19.4 million is due on September 30, 2012. We intend to refinance this debt prior to its due date.

During 2011, we received $19.5 million in a private placement of 2,025,001 shares of our Common Stock. Fees and expenses related to this private placement aggregated $2.5 million, resulting in net proceeds to us of $17.0 million. In June 2011, Digital Domain sold 1.5 million shares of its common stock for $2.5 million. Additional capital infusions in 2011 include the receipt of $4.0 million from the State of Florida as we met our an employee milestones in Florida of 200 employees. In April 2011, PBC Digital Holdings II exercised its right to invest the remaining $2.0 million from the remaining capacity of our junior debt agreement with them. See Note 16 to our Consolidated Financial Statements included elsewhere in this Annual Report on Form 10-K. In May 2011, we borrowed another $2.0 million from PBC Digital Holdings II for short-term equipment financing. Additionally in May 2011, we received $2.0 million in grant proceeds upon confirmation that our students at DDI will receive degrees that are accredited by a nationally recognized accrediting body.

Also during 2011, we entered into a purchase agreement with a major film studio for the purchase of studio and film equipment aggregating $8.5 million. We funded $2.5 million of this purchase from cash, held in trust and the remaining amounts from operating cash and cash equivalents, partially funded by the $2.0 million obtained from equipment financing discussed above. Additionally, we paid $5.0 million in 2011 to exercise our right to purchase Falcon's Series B Warrants. See Note 17 to our Consolidated Financial Statements included elsewhere in this Annual Report on Form 10-K.

3507 Kyoto Gardens Drive, Suite 200 ▪ Palm Beach Gardens, FL. 33410 ▪ Tel: 561-835-9400 ▪ Fax:561-835-0322 ▪ www.bermandevalerio.com

BOSTON                    SAN FRANCISCO                    PALM BEACH GARDENS

Our principal sources of liquidity at December 31, 2010, consisted of cash and cash equivalents of $12.0 million, cash held in trust of $31.2 million, and accounts receivable and contract receivables of approximately $2.4 million. The cash held in trust was used for the construction of our facilities in the City of Port St. Lucie, Florida during 2011 and to purchase computer and other equipment to be used in that facility. The amounts held in trust were generated from a bond issuance by the City of Port St. Lucie. We executed a lease agreement with the City of Port St. Lucie calling for us to make lease payments to the City of Port St. Lucie in the amount of their debt service payments on the bonds. Upon the expiration of the lease agreement, we will receive the building, equipment and land for a nominal amount. During 2010, we received an additional $11.5 million under our grant agreements with the State of Florida and the City of Port St. Lucie, as well as, additional loan proceeds of $23.3 million. Our outstanding obligations are described below in "—Contractual Obligations."

As of December 31, 2010, we had a deficit in working capital of $26.6 million. Our current assets as of December 31, 2010 were $16.7 million, comprised largely of $12.0 million of cash and cash equivalents. Our current liabilities were $43.3 million, comprised largely of $15.9 million of advance payments and deferred revenue, $13.2 million of accounts payable and $9.2 million of warrants and other debt-related liabilities. When we evaluate our deferred revenue, we consider the fact that we generally earn a margin on the work that we perform, and that the profit component of this work will reduce deferred revenue without causing us to use cash. When we evaluated our cash, held in trust we consider the fact that this cash was used to construct our primary facility in Port St. Lucie and to acquire substantial amounts of computer and other equipment and that these funds cannot be used to otherwise support our operations.

Our future capital requirements will depend on many factors, including our revenue growth, our ability to obtain advance payments from our customers, the timing and extent of the expansion of our involvement in feature film production and the timing of introductions of new products and enhancements to existing products. Although we currently are not a party to any agreement or letter of intent with respect to potential material investments in, or acquisitions of, complementary businesses, services or technologies, we may enter into these type of arrangements in the future, which could also require us to seek additional capital in the form of debt, film finance facilities, or equity capital. Such funds may not be available on terms favorable to us or at all.

As we continue to build our feature animated film, co-production and education lines of business, we believe we will enter into contracts for our traditional VFX and animation services to feature film and commercials clients which will adequately fund operations for those services and provide additional liquidity to support our newer lines of business. *We also believe that through our revenues from those VFX and animation services contracts; through the re-financing of debt; and through co-production arrangements for our animated feature film*

21

3507 Kyoto Gardens Drive, Suite 200 ▪ Palm Beach Gardens, FL  33410 ▪ Tel: 561-835-9400 ▪ Fax:561-835-0322 ▪ www.bermandevalerio.com

BOSTON                    SAN FRANCISCO                    PALM BEACH GARDENS

*projects as described in "Financing and Co-Production Arrangements," we have sufficient sources of cash to support our operations in 2012.*

(Emphasis added).

57.     On May 8, 2012, DDMG issued a press release disclosing that the Company had completed a $35 million senior convertible note offering to a group of institutional investors led by Tenor Capital and issued an $8 million subordinated convertible note to Comvest Capital to refinance existing debt held by Comvest Capital.  These transactions retired existing senior notes that would otherwise have been due in 2012.  Textor stated, "[w]e are obviously pleased to complete this transaction, which represents an attractive refinancing and reduction of our near-term debt obligations, and importantly also comes with a group of high-quality institutional investors." Textor further noted that "*[i]t also provides us with capital* to pursue additional feature film co-production opportunities as we continue move our business to a model driven by ownership of the content that we create."

**First Quarter 2012 Financial Results**

58.     On May 16, 2012, DDMG issued a press release announcing its first quarter financial results for 2012 again touting how it had "beat revenue and earnings estimates." ("May 16, 2012 Press Release").  Textor stated that "[i]n the first quarter, we made significant progress as we opened Tradition Studios, our original-content family feature animation studio, began classroom instruction at the Digital Domain Institute and started filming on our first feature film co-production, the highly anticipated and globally recognized *Ender's Game*. More recently, the first product of our Virtual Performance business, a virtual Tupac Shakur who performed at the Coachella Music festival, launched an entirely new form of entertainment."  Textor also stated, "With a long list of transformational accomplishments in the first quarter, *we are pleased to remain 'on plan' as we grow our business.  As we continue to deliver on the promises that we*

22

3507 Kyoto Gardens Drive, Suite 200 ▪ Palm Beach Gardens, FL. 33410 ▪ Tel: 561-835-9400 ▪ Fax:561-835-0322 ▪ www.bermandevalerio.com

BOSTON                    SAN FRANCISCO                    PALM BEACH GARDENS

*have made to both taxpayers and shareholders, we look forward to our continued migration to a content ownership business model and the expected near-term impact of exciting new forms of entertainment, such as our virtual performance business*."

59.     Also, in the May 16, 2012 Press Release, Textor reassured, "[a]s we leverage our visual effects work-for-hire business as a platform to engage in other, more lucrative business opportunities, we have also used substantial grant funding from government relationships to mitigate the risk of our business expansion and associated launch expanses."

60.     On May 15, 2012, DDMG filed its 1Q 2012 10-Q signed by Textor and Nichols. The 1Q 2012 Form 10-Q noted that from January 1, 2012 through February 10, 2012, the Company had repurchased 406,630 shares of common stock at around $6.10 per share for a cost of approximately $2.5 million. Further, DDMG disclosed that, as of March 31, 2012, the Company continued to have the control deficiencies it previously disclosed in the 2011 10-K. The 1Q 2012 Form 10-Q also stated:

> **Liquidity and Capital Resources**
> As of March 31, 2012, we had a deficit in working capital of $33.4 million.
>
> Our principal sources of liquidity at March 31, 2012 consisted of cash and cash equivalents of $2.5 million, cash held in trust of $6.6 million, contract receivables of $4.9 million and other receivables of $5.0 million. We had a $15.6 million loss before non-controlling interests, and we used $21.8 million to fund cash flows from operations for the three months ended March 31, 2012. As of March 31, 2012 we had $19.8 million in Stockholders' Equity. Much of our use of cash from operations in the first three months of 2012 stemmed from our implementation of our plans to participate in the ownership of live-action feature films, our development of our animation studio and the launch of our school. These businesses did not generate a significant amount of revenue during the first three months of 2012. A majority of the expenses incurred by these businesses was funded by our existing grants from the State of Florida, the City of Port St. Lucie, and the City of West Palm Beach. While many of these grant proceeds were received between 2009 and the present, we only record a small amount of these receipts as revenue. As of March 31, 2012 we had received $29.9 million of grant receipts that we plan to recognize into revenue over the next 5 to 20 years.

23

3507 Kyoto Gardens Drive, Suite 200 ▪ Palm Beach Gardens, FL. 33410 ▪ Tel: 561-835-9400 ▪ Fax:561-835-0322 ▪ www.bermandevalerio.com

BOSTON                    SAN FRANCISCO                    PALM BEACH GARDENS

In addition, we expect to receive $10.3 million in additional grant proceeds over the next several years under our existing grant agreements.

A key component of our working capital is our deferred revenue. We typically receive a substantial portion of a contract for a feature film project up-front. We signed two large feature film contracts in the first quarter of 2012 that contributed to the generation of $2.6 million in cash flow from operations due to increases in advance payments and deferred revenue during the first quarter of 2012.

Another component of our working capital is our ability to attract finding for the feature film projects that we produce or co-produce.  On April 2, 2012, we collected the $5.0 million from Galloping Horse that was in Contracts and other receivables at March 31, 2012 in exchange for the agreement of Galloping Horse to distribute the animated feature film *The Legend of Tembo* in the PRC.

*Sale and issuance of Convertible Notes and Warrants*

As is more fully described in Note 13 to our Condensed Consolidated Financial Statements contained elsewhere in this Quarterly Report on Form 10-Q, we entered into an agreement (the "Purchase Agreement") on May 6, 2012 with a group of institutional investors (the "Purchasers") pursuant to which we issued and sold to the Purchasers senior secured convertible notes in the aggregate amount of $35.0 million (the "Senior Notes") and warrants (the "Warrants") to purchase up to 1,260,288 shares of our Common Stock for an aggregate purchase price of $35.0 million (the "Offering").  Such issuance and sale were consummated on May 7, 2012.

The Senior Notes bear interest at 9.0% per annum and mature on the fifth anniversary of the issuance date.  Upon the occurrence of an Event of Default (as such term is defined in the Senior Notes), the interest rate shall be adjusted to a rate of 15.0% per annum.  The Purchasers may require us to redeem all or any portion of the Senior Notes upon the occurrence of an Event of Default of a Change of Control (as such terms are defined in the Senior Notes)

The Senior Notes will amortize in equal monthly installments commencing on the earlier of (i) the effective date of the initial registration statement filed in accordance with the terms of the Registration Rights Agreement (see Note 13 to our Condensed Consolidated Financial Statements contained elsewhere in this quarterly report) or (ii) the six-month anniversary of the closing date.  The Senior Notes may be converted into shares of our common stock, at the option of the holders thereof, at any time following issuance of the Senior Notes.  The Senior Notes are redeemable at our option if our common stock trades at a level equal to 175% of the initial conversion price for any 30 consecutive trading days commencing on the date of issuance of the Senior Notes.  The initial conversion price of the Senior Notes is $9.72, subject to adjustment as provided in the Senior

3507 Kyoto Gardens Drive, Suite 200 ▪ Palm Beach Gardens, FL. 33410 ▪ Tel: 561-835-9400 ▪ Fax:561-835-0322 ▪ www.bermandevalerio.com

BOSTON                    SAN FRANCISCO                    PALM BEACH GARDENS

Notes.  We have agreed to pay each amortization payment in shares of our common stock, assuming certain conditions are met.

Under the terms of the Warrants, the holders thereof are entitled to exercise the Warrants to purchase up to an aggregate of 1,260,288 shares of our common stock at an initial exercise price of $9.72 per share, during the five-year period beginning on the closing date.

*Exercise of Outstanding Debt with Existing Lender*

As is more fully described in Note 13 to our Condensed Consolidated Financial Statements contained elsewhere in this Quarterly Report on Form 10-Q, we entered into an agreement on May 6, 2012 (the "Omnibus Agreement") with Comvest, pursuant to which, among other things, we agreed to (i) use a portion of the proceeds received from the Senior Notes described above to make payments to Comvest with respect to the outstanding loans to us by Comvest, such that the aggregate outstanding principal balance thereof was reduced to $8.0 million (the aggregate outstanding principal for these loans on that date was $27.7 million), and (ii) repurchase all but 145,000 shares (the "Retained Shares" of our common stock received by Comvest upon full exercise of an outstanding warrant to purchase shares of our common stock held by Comvest.  The aggregate amount paid to Comvest in satisfaction of outstanding indebtedness and in repurchasing such shares, as described above, was $22.5 million, plus certain fees and expenses were agreed to pay.

In connection with the foregoing, we entered into an agreement with Comvest (the "Debt Exchange Agreement") pursuant to which, among other things, we exchanged the remaining outstanding original principal balance under its outstanding loans held by Comvest for a new secured convertible note in favor of Comvest with an original principal amount of $8.0 million (the "Subordinated Note"),
which Subordinated Note, inclusive of any and all accrued interest of the Subordinated Note and other fees, costs and amounts owing thereunder, is convertible into shares of our common stock.

The Subordinated Note bears interest at 10.0% per annum and matures on June 30, 2016.  Upon the occurrence of an Event of Default (as such term is defined in the Subordinated Note), the interest rate shall be adjusted to a rate of up to 21.0% per annum, with the actual rate of such penalty interest to be contingent upon the nature of the Event of Default.  Comvest may require us to redeem all or any portion of the Subordinated Note upon the occurrence of an Event of Default.

The initial conversion price under the Subordinated Note is (i) $2.50 per share for payment of any portion of the original principal amount and (ii) $5.50 per share for payment of any other amounts owing thereunder, subject to adjustment as provided in the Subordinated Note.

3507 Kyoto Gardens Drive, Suite 200 ■ Palm Beach Gardens, FL. 33410 ■ Tel: 561-835-9400 ■ Fax:561-835-0322 ■ www.bermandevalerio.com

BOSTON                    SAN FRANCISCO                    PALM BEACH GARDENS

*Registration Rights Agreements*

In connection with the Purchase Agreement and the Omnibus Agreement, we entered into registration rights agreements whereby we agreed to file a registration statement with the Securities and Exchange Commission within 30 days of the closing date and to use our reasonable and best efforts for such registration statement to be declared effective 90 days after the closing date.

*Future Liquidity*

Our future capital requirements will depend on many factors, including our revenue growth, our ability to obtain advance payments from our customers, the timing and extent of the expansion of our involvement in feature film production and the timing of introductions of new products and enhancements to existing products. Although we currently are not a party to any agreement or letter of intent with respect to potential material investments in, or acquisitions of, complementary businesses, services or technologies, we may enter into these type of arrangements in the future, which could also require us to seek additional capital in the form of debt, finance facilities, or equity capital.  Such funds may not be available on terms favorable to us or at all.

As we continue to build our feature animated film, co-production and education line of business, we believe we will enter into contracts for our traditional VFX and animation services to feature film and commercials clients which will adequately fund operations for those services and provide additional liquidity to support our newer lines of business.  ***We also believe that through our revenues from those VFX and animation services contracts; through the re-financing of debt; and through co-production arrangements for our animated feature film projects, we have sufficient sources of cash to support our operations in 2012.***

(Emphasis added).

## <u>THE TRUTH BEGINS TO BE REVEALED</u>

61.     On August 1, 2012, DDMG issued a press release announcing that the Company

would pursue strategic alternatives:

> ***The company is formally announcing its plans to evaluate a broad range of strategic and financial alternatives to support the company's growth initiatives and its efforts to maximize shareholder value.*** DDMG will engage in discussions with various parties that have contacted the company on an unsolicited basis. The company will also work with its investment bankers and advisors to pursue strategies, and develop relationships, with segment-specific capital sources and

3507 Kyoto Gardens Drive, Suite 200 ▪ Palm Beach Gardens, FL  33410 ▪ Tel: 561-835-9400 ▪ Fax:561-835-0322 ▪ www.bermandevalerio.com

BOSTON                    SAN FRANCISCO                    PALM BEACH GARDENS

strategic partners that have a desire to support the growth initiatives and maximize the shareholder value contribution of the company's specific business segments.

The company will evaluate a variety of alternatives including, but not limited to, a strategic minority investment in the company or in a specific business segment, joint ventures and/or business combinations with strategic partners and industry participants, the sale or spin-off of certain of the company's assets or operating subsidiaries into publicly traded or privately held corporations, the outright sale of certain of the company's assets or operating subsidiaries, or the outright sale of the company. DDMG also intends to be responsive to proposals received that seek to maximize the value of major operating subsidiaries through spin-offs into, or combinations with, publicly traded companies listed on major foreign exchanges that reflect the company's previously announced international expansion plans.

"While we see our businesses as driven and inspired by the fabric of our high-level digital visual effects capability, we do not believe that the market value of our company reflects the sum of its parts," said John Textor, CEO and chairman of DDMG. "We are pleased to formalize a process to pursue our most attractive strategic alternatives in recognition both of unsolicited expressions of interest as well our own belief that a focus on the opportunities and valuations of our individual business segments may provide a more compelling argument for a greater total company valuation and shareholder value. We continue to believe strongly in a business model that focuses on the pursuit of lucrative new business opportunities that are inspired by our award winning visual effects business. However, it does seem clear that a plan to align capital and strategic partnerships directly with areas of interest and expertise will be more effective in supporting the growth and value of our individual businesses."

(Emphasis added).

62.     On August 1, 2012, shares closed down 2.3% to close at $4.14 per share.

63.     On August 13, 2012, DDMG issued a press release that it had retained Wells Fargo Securities, LLC as its exclusive financial advisor to assist the Company with its evaluation of strategic alternatives.

**Second Quarter 2012 Financial Results**

64.     On August 15, 2012 (before the market opened), DDMG issued a press release announcing its second quarter financial results.  Textor stated, "On the revenue side, we are extremely pleased with continuing growth in our visual effects business, a growing backlog of

27

3507 Kyoto Gardens Drive, Suite 200 ▪ Palm Beach Gardens, FL. 33410 ▪ Tel: 561-835-9400 ▪ Fax:561-835-0322 ▪ www.bermandevalerio.com

BOSTON                    SAN FRANCISCO                    PALM BEACH GARDENS

traditional feature film business and a quickly expanding list of clients for our new virtual performance business."   Textor continued, "On the expense side, we achieved a major milestone as we closed the second quarter by announcing the elimination of extraordinary unutilized labor in connection with our new studio launches.  This means that we have delivered on our promises to both communities and shareholders by converting start-up economic development grants into highly productive human resources that are now actively engaged in the production of revenue-producing, high-end animation and visual effects projects."

65.     On August 14, 2012, DDMG filed its 2Q 2012 10-Q signed by Textor and Nichols.  DDMG disclosed that:

***Liquidity and Capital Resources***

As of June 30, 2012, we had a deficit in working capital of $42.8 million.

*Sale and issuance of Convertible Notes and Warrants*

As is more fully described in Note 13 to our Condensed Consolidated Financial Statements contained elsewhere in this quarterly report, we entered into a securities purchase agreement (the "May 2012 Purchase Agreement") with a group of institutional investors (the "May 2012 Purchasers") pursuant to which we issued and sold to the May 2012 Purchasers senior secured convertible notes in the aggregate original principal amount of $35.0 million (the "Senior Notes") and warrants (the "May 2012 Warrants") to initially purchase up to 1,260,288 shares of our Common Stock, for an aggregate purchase price of $35.0 million. The initial conversion price of the Senior Notes was $9.72 per share, subject to adjustment as provided in the Senior Notes. The initial exercise price of the May 2012 Warrants was $9.72 per share, subject to adjustment as provided in the May 2012 Warrants. Such issuance and sale were consummated on May 7, 2012.

On June 7, 2012, in connection with the PIPE offering (see Note 15) to our Condensed Consolidated Financial Statements contained elsewhere in this quarterly report, each of the May 2012 Purchasers entered into a Consent and Waiver pursuant to which the Company and each of the May 2012 Purchasers agreed that, notwithstanding any contrary provisions of the Senior Notes and the May 2012 Warrants, immediately after giving effect to the issuance and sale of securities pursuant to the PIPE offering, the conversion price of the Senior Notes and the exercise price of the May 2012 Warrants were each adjusted so as to equal $6.00. As of June 30, 2012, the Senior Notes, inclusive of estimated future

28

3507 Kyoto Gardens Drive, Suite 200 ▪ Palm Beach Gardens, FL. 33410 ▪ Tel: 561-835-9400 ▪ Fax:561-835-0322 ▪ www.bermandevalerio.com

BOSTON                    SAN FRANCISCO                    PALM BEACH GARDENS

interest, and the May 2012 Warrants were convertible or exercisable, as applicable, into 8,491,233 and 2,041,666 shares of our Common Stock, respectively.

The Senior Notes bear interest at 9.0% per annum and mature on the fifth anniversary of the issuance date.  Upon the occurrence of an Event of Default (as such term is defined in the Senior Notes), the interest rate shall be adjusted to a rate of 15.0% per annum.  The Purchasers may require us to redeem all or any portion of the Senior Notes upon the occurrence of an Event of Default or a Change of Control (as such terms are defined in the Senior Notes)

The Senior Notes will amortize in equal monthly installments commencing on the earlier of (i) the effective date of the initial registration statement filed in accordance with the terms of the Registration Rights Agreement (see Note 13 to our Condensed Consolidated Financial Statements contained elsewhere in this quarterly report) or (ii) the six-month anniversary of the closing date.  The Senior Notes may be converted into shares of our common stock, at the option of the holders thereof, at any time following issuance of the Senior Notes.  The Senior Notes are redeemable at our option if our common stock trades at a level equal to 175% of the initial conversion price for any 30 consecutive trading days commencing on the date of issuance of the Senior Notes.  The initial conversion price of the Senior Notes is $9.72, subject to adjustment as provided in the Senior Notes.

*Exchange of Outstanding Debt with Existing Lender*

As is more fully described in Note 13 to our Condensed Consolidated Financial Statements contained elsewhere in this quarterly report, we entered into an agreement on May 6, 2012 (the "Restructuring Agreement") with Comvest, pursuant to which, among other things, we agreed to (i) use a portion of the proceeds received from the Senior Notes described above to make payments to Comvest with respect to the outstanding loans to us by Comvest, such that the aggregate outstanding principal balance thereof was reduced to $8.0 million (the aggregate outstanding principal for these loans on that date was $27.7 million), and (ii) repurchase all but 145,000 shares (the "Retained Shares") of our common stock received by Comvest upon full exercise of an outstanding warrant to purchase shares of our common stock held by Comvest.

The aggregate amount paid to Comvest in satisfaction of outstanding indebtedness and in repurchasing such shares as well as the borrowing of the Subordinated Note of $8.0 million, as described above, was $22.5 million, plus certain fees and expenses we agreed to pay.

In connection with the foregoing, we entered into an agreement with Comvest (the "Debt Exchange Agreement") pursuant to which, among other things, we exchanged the remaining outstanding original principal balance under the

29

3507 Kyoto Gardens Drive, Suite 200  ▪  Palm Beach Gardens, FL. 33410  ▪  Tel: 561-835-9400  ▪  Fax:561-835-0322  ▪  www.bermandevalerio.com

BOSTON                    SAN FRANCISCO                    PALM BEACH GARDENS

outstanding loans held by Comvest for a new secured convertible note in favor of Comvest with an original principal amount of $8.0 million (the "Subordinated Note"), which Subordinated Note, inclusive of any and all accrued interest of the Subordinated Note and other fees, costs and amounts owing thereunder, is convertible into shares of our common stock.

The Subordinated Note bears interest at 10.0% per annum and matures on June 30, 2016.  Upon the occurrence of an Event of Default (as such term is defined in the Subordinated Note), the interest rate shall be adjusted to a rate of up to 21.0% per annum, with the actual rate of such penalty interest to be contingent upon the nature of the Event of Default.  Comvest may require us to redeem all or any portion of the Subordinated Note upon the occurrence of an Event of Default.

The initial conversion price under the Subordinated Note is (i) $2.50 per share for payment of any portion of the original principal amount and (ii) $5.50 per share for payment of any other amounts owing thereunder, subject to adjustment as provided in the Subordinated Note.

The Senior Notes and the Subordinated Note contain provisions that can require cash settlement in the event that the Company cannot deliver common shares as required by the provisions of these agreements.

As further described in Note 13 to the condensed consolidated financial statements, the  Senior Notes and Subordinated Note are redeemable at the option of the holders, all or in part, in the event of default.  In addition, the Senior Notes, May 2012 Warrants and June 2012 Warrants are redeemable by the Holder in the event of a Change of Control (as defined).

For the Senior Notes, such redemption amounts would be based on the then outstanding principal, accrued interest, and foregone interest (the "Make Whole Amount"), collectively referred to as the "Conversion Amount", except in certain situations, the amount subject to redemption in the event of default shall be redeemed at a price adjusted for changes in stock prices and other factors.

The redemption amount in regard to a Change of Control for the Senior Notes is based on the trading prices on our common stock and other factors.

In addition, the Senior Note Purchasers can redeem the Senior Notes starting at the 30 month anniversary of the inception date (the "30 Month Put Right").  The 30 Month Put Right, if exercised, would result payment of the then outstanding principal, accrued interest and the then Make-Whole Amount.

So long as the Senior Notes are outstanding, the Company's Available Cash, as defined, shall as of (a) July 2, 2012 equal or exceed $7.5 million, (b) the last Trading Day in each calendar month in the Fiscal Quarter ending September 30, 2012 shall equal or exceed $7.5 million, (c) September 30, 2012 shall equal or

30

3507 Kyoto Gardens Drive, Suite 200 ▪ Palm Beach Gardens, FL. 33410 ▪ Tel: 561-835-9400 ▪ Fax:561-835-0322 ▪ www.bermandevalerio.com

BOSTON                    SAN FRANCISCO                    PALM BEACH GARDENS

exceed $10 million and (d) the last Trading Day in each calendar month in the Fiscal Quarter ending December 31, 2012 and each Fiscal Quarter thereafter shall equal or exceed $10 million (the "Available Cash Test").

In addition, so long as this Note is outstanding, the Company's Free Cash Flow, as defined (a) in the aggregate for the Fiscal Quarters ending June 30, 2012 and September 30, 2012 shall not be less than $3.0 million, (b) in the aggregate for the Fiscal Quarters ending June 30, 2012, September 30, 2012 and December 31, 2012 shall not be less than $5 million and (c) in any Fiscal Quarter thereafter, shall be greater than or equal to zero (the "Free Cash Flow Test").

*Registration Rights Agreements*

In connection with the Purchase Agreement and the Restructuring Agreement, we entered into registration rights agreements whereby we agreed to file a registration statement with the Securities and Exchange Commission within 30 days of the closing date and to use our reasonable and best efforts for such registration statement to be declared effective 90 days after the closing date.

*Issuance of Common Stock*

As is more fully described in Note 15 to our Condensed Consolidated Financial Statements contained elsewhere in this quarterly report, we entered into a Private Investment in Public Entity (the "PIPE") on June 8, 2012 with a group of institutional investors.  In connection with this PIPE, we issued 1,500,000 shares of its common stock at a price of $7.00 per share for gross proceeds of $10.5 million.  We incurred $0.9 million of offering expenses related to this transaction. We issued 600,000 of warrants to these investors to purchase our common stock at an exercise price of $8.05 that expire in five years.  We recognized the fair value of these warrants at date of issue of $8.1 million as long-term warrant liabilities.  The net infusion to stockholders' equity for the PIPE was $1.5 million.

*Future Liquidity*

On May 21, 2012, we entered into an agreement with an entity wholly owned by the government of Abu Dhabi to develop and operate a production studio and institute in the Media Zone of Abu Dhabi.  Under the terms of this agreement, we are required to place into escrow $19.0 million by no later than 180 days from that date.  These funds will be released to our operating cash over a five-year period beginning at the commencement of the fourth year of the agreement.

Other known uses of cash other than for operations within one year subsequent to June 30, 2012 include $8.1 million of debt principal payments (of which $5.1 million may be paid in stock), $5.0 million of litigation settlement payments and a $1.5 million payment on our lease obligation to the City of Port St. Lucie.

3507 Kyoto Gardens Drive, Suite 200 ▪ Palm Beach Gardens, FL. 33410 ▪ Tel: 561-835-9400 ▪ Fax:561-835-0322 ▪ www.bermandevalerio.com

BOSTON                    SAN FRANCISCO                    PALM BEACH GARDENS

Our future capital requirements will depend on many factors, including our revenue growth, our ability to obtain advance payments from our customers, the timing and extent of the expansion of our involvement in feature film production and the timing of introductions of new products and enhancements to existing products. Although we currently are not a party to any agreement or letter of intent with respect to potential material investments in, or acquisitions of, complementary businesses, services or technologies, we may enter into these type of arrangements in the future, which could also require us to seek additional capital in the form of debt, finance facilities, or equity capital.  Such funds may not be available on terms favorable to us or at all.  In addition, the Company announced that it will evaluate a variety of alternatives including, but not limited to, a strategic minority investment in the Company or in a specific business segment, joint ventures and/or business combinations with strategic partners, the sale or spin-off of the Company's assets or operating subsidiaries, or the outright sale of the Company.

As we continue to build our feature animated film, co-production and education line of business, we believe we will enter into contracts for our traditional VFX and animation services to feature film and commercials clients which will adequately fund operations for those services and provide additional liquidity to support our newer lines of business. *We also believe that through our revenues from those VFX and animation services contracts; through the re-financing of debt; through the strategic alternatives discussed above; and through co-production arrangements for our animated feature film projects as described in "Financing and Co-Production Arrangements, as filed in our Annual Report as of December 31, 2011, we have sufficient sources of cash to support our operations in 2012.*

(Emphasis added).

66.     On August 29, 2012, Textor filed a Schedule 13D disclosing that since his last

open market acquisition of DDMG shares on May 18, 2012, the

Company announced it was reviewing with its financial advisor a broad range of strategic and financial alternatives to maximize shareholder value, including seeking strategic minority investors in the entire company or various business segments; entering into joint ventures or business combinations; selling or spinning-off subsidiaries or assets; or selling the Company. The Reporting Persons strongly support the Company's strategic review process because they believe it is likely to create additional value for the Company's shareholders. However, because the Reporting Persons believe (i) that the process is likely to take a few months and (ii) that the current market capitalization of the Company is significantly less than the value of its underlying assets, both of which are currently detrimental to the Company*, the Reporting Persons will likely engage legal and financial advisors to assist the Reporting Persons in determining*

32

3507 Kyoto Gardens Drive, Suite 200 ▪ Palm Beach Gardens, FL  33410 ▪ Tel: 561-835-9400 ▪ Fax:561-835-0322 ▪ www.bermandevalerio.com

BOSTON                    SAN FRANCISCO                    PALM BEACH GARDENS

*whether a plan to acquire the Company by a group led by the Reporting Persons can be formulated in an attempt to increase shareholder value.*

(Emphasis added).

67.     On August 30, 2012, shares closed down 21% or ($0.62) to close at $2.31 per share on heavy volume.  On August 31, 2012, shares fell 10% ($.24) to close at $2.07 per share on heavy volume.

68.     On September 4, 2012, DDMG filed a Form 8-K disclosing that the Company had violated a covenant requiring the Company to maintain certain minimum levels of available cash. As a result of the Company's failure to maintain the minimum level of cash, the holders declared a default which accelerated the amount due under $35 million in senior notes:

As previously disclosed on a Current Report on Form 8-K filed by Digital Domain Media Group, Inc. (the "Company") with the Securities and Exchange Commission (the "SEC") on May 8, 2012, the Company issued, on May 7, 2012, a total of six senior secured convertible notes, in the aggregate original principal amount of $35 million (collectively, the "Senior Notes"), to a group of institutional investors.  ***The Senior Notes contain a number of affirmative and negative covenants, including a covenant (the "Available Cash Covenant") requiring the Company to maintain certain minimum levels of Available Cash (as defined in the Senior Notes) as of certain specified measurement dates (collectively, the "Measurement Dates").***

In a Current Report on Form 8-K filed by the Company with the SEC on August 15, 2012, the Company disclosed that it had, on August 14, 2012, effective as of July 31, 2012, entered into  separate Second Amendment Agreements with each of the holders of the Senior Notes (collectively, the "Second Amendment Agreement").  Pursuant to the terms of the Second Amendment Agreement, the Company and the holders of the Senior Notes amended the Senior Notes to change the second Measurement Date from July 31, 2012 to August 20, 2012.

***On August 21, 2012, each of the holders of the Senior Notes severally notified the Company in writing that the Senior Notes were in default, asserting, inter alia, that the Company had failed to satisfy the terms of the Available Cash Covenant applicable as of August 20, 2012, resulting in an immediate acceleration of all amounts owing under the Senior Notes, consisting of (i) aggregate outstanding principal of $35 million, and (ii) accrued interest, make-whole amounts (representing the amount of future interest payments foregone as the result of such acceleration), and other amounts owing thereunder***

33

3507 Kyoto Gardens Drive, Suite 200 ▪ Palm Beach Gardens, FL. 33410 ▪ Tel: 561-835-9400 ▪ Fax:561-835-0322 ▪ www.bermandevalerio.com

BOSTON                    SAN FRANCISCO                    PALM BEACH GARDENS

*aggregating an additional minimum amount of approximately $16 million, for a total minimum amount due thereunder of approximately $51 million.* Simultaneously with the delivery of these notices of default, the holders of the Senior Notes severally advised the Company in writing that they were electing to forbear from collecting any amounts owing under the Senior Notes until such time as those elections were withdrawn.  Each of those elections was withdrawn as of August 28, 2012.  *The Company and the holders of the Senior Notes are continuing to negotiate the terms of an extended forbearance arrangement, while the Company explores its options with respect to refinancing all or a portion of its obligations under the Senior Notes.*  There can be no assurance that the Company will be successful in its attempt to secure extended forbearance agreements with the holders of the Senior Notes; in the event that the Company were not to be successful in this regard, the holders of the Senior Notes may elect to pursue all of their available remedies under the Senior Notes arising as the result of an Event of Default (as defined therein), including, without limitation, foreclosing on the first-priority security interest in all of the personal property of the Company and its subsidiaries held by the Collateral Agent (as defined in the Senior Notes) for the benefit of the holders of the Senior Notes.

The Company is currently evaluating (i), in conjunction with the holders of the Senior Notes, a term sheet received from an institutional investor proposing a senior secured debt financing transaction that would potentially refinance the Company's obligations under the Senior Notes as well as provide operating funds to the Company, and (ii) a term sheet received from a business partner of the Company relating to a significant equity investment in an operating subsidiary of the Company; there can be no assurance, however, that either of these transactions will be consummated, or, if consummated, that they will be on terms satisfactory to the Company.

(Emphasis added).

69.     Also, in the September 4, 2012, Form 8-K filed by DDMG, the Company disclosed that it was forced to establish a special committee review and evaluate strategic alternatives:

*On August 22, 2012, the Board voted unanimously to establish a special committee of the Board, consisting solely of disinterested and independent members thereof, to review and evaluate the full range of strategic alternatives available to maximize the value of the Company* (the "Special Committee"). . . . The resolutions of the Board establishing the Special Committee expressly authorize and empower the Special Committee to take any and all actions, in connection with the Special Committee's review and evaluation of such strategic alternatives, that it may determine to be necessary, advisable or appropriate, and, to the full extent permitted by applicable law and the Company's Amended and

<div align="center">34</div>

Restated Articles of Incorporation and Amended and Restated Bylaws, to exercise the full authority of the Board in respect thereof.  In addition, the Board authorized the Special Committee to retain, at the sole cost and expense of the Company, such financial, legal, accounting, investment banking, consulting or other advisors as the Special Committee may select to assist the Special Committee in its review and evaluation of strategic alternatives and to advise and assist it in connection with all other matters relating to the strategic alternative review process as the Special Committee determines to be necessary, advisable or appropriate. . . .

(Emphasis added).

70.     The Company further revealed that it was in crisis and that it had significant liquidity issues which threatened its ability to continue:

*Liquidity Update*

As previously disclosed in its public filings with the SEC, the Company has been operating, and continues to operate, with substantial negative working capital. ***The Company is working to locate additional external sources of debt and/or equity capital, while it continues to negotiate with the holders of the Senior Notes the terms of an extended forbearance agreement (as described in Item 2.04 of this Current Report on Form 8-K).*** The Company is currently evaluating (i), in conjunction with the holders of the Senior Notes, a term sheet received from an institutional investor proposing a senior secured debt financing transaction that would potentially refinance the Company's obligations under the Senior Notes as well as provide operating funds to the Company, and (ii) a term sheet received from a business partner of the Company relating to a significant equity investment in an operating subsidiary of the Company; there can be no assurance, however, that either of these transactions will be consummated, or, if consummated, that they will be on terms satisfactory to the Company***. In addition to its ongoing attempts to raise additional capital, the Company is considering a broad set of solutions to improve its liquidity, including, in consultation with its newly appointed Interim Chief Operating Officer, measures to reduce costs and improve efficiency.*** The Company and the Special Committee are also currently evaluating a number of other strategic alternatives that would potentially generate cash, including, without limitation, the sale of all or a portion of certain operating units, and the sale of non-core assets such as the Company's patent portfolio. Although the Company's intent is to improve its operating efficiencies and to obtain additional financing during the period that it is evaluating these strategic alternatives, there can be no assurance that it will be able to obtain such financing on satisfactory terms, if at all, or to sufficiently reduce costs so that it is in a position to fund its operating expenses with revenues from operations. ***An inability to quickly access additional sources of liquidity to fund the Company's***

35

3507 Kyoto Gardens Drive, Suite 200 ▪ Palm Beach Gardens, FL. 33410 ▪ Tel: 561-835-9400 ▪ Fax:561-835-0322 ▪ www.bermandevalerio.com

BOSTON                SAN FRANCISCO                PALM BEACH GARDENS

*current operating cash needs would materially adversely affect its financial condition and would require it to seek relief or protection from its creditors.*

(Emphasis added).

71.     On September 5, 2012, DDMG issued a press release announcing:

PORT ST. LUCIE, Fla., September 5, 2012 — Digital Domain Media Group, Inc. (NYSE: DDMG) (the "Company") today announced that each of the holders of its six senior secured convertible notes in the aggregate original principal amount of $35 million issued by the Company on May 7, 2012 (collectively, the "Senior Notes") has agreed to forbear (each, a "Forbearance") from enforcing its remedies under its Senior Note (and the security and other agreements relating thereto) until such time as it elects to withdraw such Forbearance on not less than 48 hours' advance notice to the Company.

As previously announced, the Company is continuing to evaluate its alternatives, including (i), in conjunction with the holders of the Senior Notes, a term sheet received from an institutional investor proposing a senior secured debt financing transaction that would potentially refinance the Company's obligations under the Senior Notes as well as provide operating funds to the Company, and (ii) a term sheet received from a business partner of the Company relating to a significant equity investment in an operating subsidiary of the Company. There can be no assurance, however, that any transaction, will be consummated, or, if consummated, that any transaction will be on terms satisfactory to the Company. As previously disclosed, an inability to quickly access additional sources of liquidity to fund the Company's current operating cash needs would materially adversely affect its financial condition and would require it to seek relief or protection from its creditors.

As previously disclosed by the Company in a Current Report on Form 8-K filed by the Company with the Securities and Exchange Commission on September 4, 2012, each of the holders of the Senior Notes advised the Company on August 21, 2012 that its Senior Note is in default. In the event that any holder of the Senior Notes withdraws its Forbearance, such holder may elect to pursue all of its available remedies under its Senior Note (and the security and other agreements relating thereto) arising as the result of an Event of Default (as defined in such Senior Note), including, without limitation, foreclosing on the first-priority security interest in all of the personal property of the Company and its subsidiaries held by the Collateral Agent (as defined in such Senior Note) for the benefit of the holders of the Senior Notes.

3507 Kyoto Gardens Drive, Suite 200 ▪ Palm Beach Gardens, Fl. 33410 ▪ Tel: 561-835-9400 ▪ Fax:561-835-0322 ▪ www.bermandevalerio.com

BOSTON                    SAN FRANCISCO                    PALM BEACH GARDENS

72.    On September 4, 2012, shares fell 32% ($0.66) to close at $1.41 per share on heavy volume.  Shares fell further on September 5, 2012, closing at $0.98 per share (a decline of 30% or $0.43), on heavy volume.

73.    On September 6, 2012, DDMG issued a press release disclosing that its Florida studio operations would close down and that Textor had resigned:

> PORT ST. LUCIE, Fla.—September 7, 2012— Digital Domain Media Group, Inc. (NYSE: DDMG) today announced that it has initiated a strategic realignment that will enable it to focus its resources on its core business, Digital Domain Productions, Inc., a company focused on creating digital visual effects, CG animation and digital production for the entertainment and advertising industries. As a key part of this strategic realignment, DDMG has begun the cessation of its Port St. Lucie operations by reducing virtually its entire Port St. Lucie workforce, retaining approximately 20 employees who will remain as part of the wind-down.
>
> DDMG's studios in California and Vancouver intend to continue to operate without interruption, as will the Digital Domain Institute, based in West Palm Beach, Florida. Long-time Digital Domain executive Ed Ulbrich has been promoted to Chief Executive Officer of Digital Domain Productions.
>
> Digital Domain Productions is working closely with its clients, vendors and other critical constituencies throughout this process.
>
> DDMG is implementing this important operational change and will continue to evaluate various restructuring alternatives, as previously disclosed, as part of its effort to reduce its overhead and restructure its long-term debt.
>
> As previously announced, DDMG is continuing to work with the holders of its senior secured convertible notes, each of whom has agreed to forbear temporarily from exercising its remedies under such senior notes until such time as it elects to withdraw such forbearance on not less than 48 hours' advance notice to DDMG. An inability by DDMG to quickly access additional sources of liquidity to fund its current operating cash needs would materially adversely affect its financial condition and would require it to seek relief or protection from its creditors.
>
> John C. Textor has resigned, effective immediately, from his positions as Chief Executive Officer and Chairman of the Board of Directors of DDMG, as a member of the Board of Directors of DDMG, and from all positions as an officer and director with all subsidiaries of DDMG.

74.    On September 7, 2012, DDMG disclosed in a Form 8-K filed with the SEC:

3507 Kyoto Gardens Drive, Suite 200  ▪  Palm Beach Gardens, FL  33410  ▪  Tel: 561-835-9400  ▪  Fax:561-835-0322  ▪  www.bermandevalerio.com

BOSTON                    SAN FRANCISCO                    PALM BEACH GARDENS

Digital Domain Media Group, Inc. (the "Company") wishes to clarify certain statements made by John C. Textor, the Company's former Chairman and Chief Executive Officer, during a media interview on September 4, 2012. Portions of the interview appeared on a local Port St. Lucie, FL, television newscast and were referenced in a news article posted on the same date on the television station's website. During the interview, Mr. Textor expressed his personal views concerning the Company's financial situation including his views concerning the possibility of a bankruptcy filing on behalf of the Company. In the interview, Mr. Textor also provided his personal interpretation and characterization of the Company's obligations under its agreements with the holders of its senior secured convertible notes (the "Senior Notes") and his view on the materiality of any amounts that may be due to such holders. Mr. Textor's remarks do not reflect the views of the Company, its Board of Directors or the Special Committee of the Board of Directors. While it is correct that the Company has not missed any payments due under the Senior Notes, as previously disclosed by the Company, each of the holders of the Senior Notes advised the Company on August 21, 2012 that its Senior Note is in default and has agreed to forbear from enforcing its remedies until such time as it elects to withdraw such forbearance on not less than 48 hours' advance notice to the Company. As previously announced, any inability by the Company to quickly access additional sources of liquidity to fund the Company's current operating cash needs would materially adversely affect its financial condition and would require it to seek relief or protection from its creditors, which could include a bankruptcy filing. The Company is evaluating certain proposals for transactions that would potentially provide liquidity to the Company, including through a reorganization under Chapter 11 of the U.S. Bankruptcy Code or otherwise.

75.     On September 7, 2012, shares fell 38% (or $0.38) to close at $0.6 per share, on

heavy volume.

**DDMG Files For Bankruptcy**

76.     On September 12, 2012, DDMG filed a Form 8-K disclosing that it had filed for

bankruptcy:

On September 11, 2012, Digital Domain Media Group, Inc. (the "Company") and all of its subsidiaries filed voluntary petitions for relief (the "Chapter 11 Filing") under Chapter 11 of Title 11 of the United States Bankruptcy Code, as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware in Wilmington, Delaware (the "Bankruptcy Court"), Case No. Ch-11 12-12568. The Company and its subsidiaries will continue to operate their businesses as "debtors-in-possession" under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and the orders of the Bankruptcy Court.

38

3507 Kyoto Gardens Drive, Suite 200 ▪ Palm Beach Gardens, FL. 33410 ▪ Tel: 561-835-9400 ▪ Fax:561-835-0322 ▪ www.bermandevalerio.com

BOSTON                    SAN FRANCISCO                    PALM BEACH GARDENS

Separately, on September 11, 2012, the Company brought a motion before the Supreme Court of British Columbia, Vancouver Registry, to seek creditor protection (the "CCAA Proceeding") under the Companies' Creditors Arrangement Act.

In connection with the Chapter 11 Filing, the Company is seeking an interim financing order from the Bankruptcy Court to enter into a debtor-in-possession financing facility (the "DIP Facility") with the Company's senior noteholders, led by Hudson Bay Master Fund Ltd., consisting of up to $20 million.

The Company also entered into a purchase agreement (the "Purchase Agreement") with Searchlight Capital Partners L.P. ("Searchlight") pursuant to which Searchlight agreed to acquire the businesses of Digital Domain Productions, Inc. and its operating subsidiaries in the United States and Canada ("DDPI"), subject to the receipt of higher and better offers and approval by the Bankruptcy Court. Under the terms of the Purchase Agreement, Searchlight will acquire the assets of DDPI free and clear of all claims and encumbrances pursuant to Section 363 of the Bankruptcy Code for the purchase price of $15 million. The sale will be subject to a public auction, and the Company is required to engage in a process of seeking the highest and best bid for these assets in accordance with the proposed bid procedures as filed with the Bankruptcy Court.

77.     On September 11, 2012, the Company received a letter from the staff of NYSE Regulation, Inc. indicating that it had determined to commence proceedings to delist the common stock of the Company and that the Company's common stock would be immediately suspended from trading on the New York Stock Exchange ("NYSE"). The Staff indicated that this decision was reached as a result of the Company's announcement of the Chapter 11 Filing which is sufficient grounds for the commencement of delisting procedures under Section 802.01D of the NYSE's Listed Company Manual. Currently, the stock trades on the OTC under the symbol "DDMGQ".

78.     The Offering Documents contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the applicable rules and regulations. Further, the Company's subsequent statements in its SEC filings, press releases and conference calls with investors contained

3507 Kyoto Gardens Drive, Suite 200 ▪ Palm Beach Gardens, FL. 33410 ▪ Tel: 561-835-9400 ▪ Fax:561-835-0322 ▪ www.bermandevalerio.com

BOSTON                    SAN FRANCISCO                    PALM BEACH GARDENS

materials misleading misstatements and omissions.   First, the Company did not have the ability to raise capital and fund its operations and was facing a substantial "burn rate" which threatened the DDMG's ability to continue as a going concern.  Second, defendants failed to disclose the recent bankruptcy of its CEO and CFO's prior company.  Third, defendants failed to disclose that the CEO had entered into a short-term loan to purchase over $10 million in additional securities which was secured by the CEO's stock and residences.

## ADDITIONAL *SCIENTER* ALLEGATIONS

79.     The Individual Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public. The ongoing fraudulent scheme described herein could not have been perpetrated over a substantial period of time without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.  The Individual Defendants were motivated to materially misrepresent the true nature of the Company's business, operations, and financial affairs to the public and regulators in order to keep the Company's share price artificially high.

80.     In particular, Textor purchased more DDMG common stock than he was financially equipped to purchase and was forced to take a massive $10 million short term loan which was due in less than ten months.  The loan was secured by Textor's homes and his DDMG stock.  Textor was motivated to artificially inflate DDMG shares during the Class Period because a falling stock price would place not only his homes in jeopardy, but could result in him losing his entire equity stake in the Company.

3507 Kyoto Gardens Drive, Suite 200 ■ Palm Beach Gardens, Fl.  33410 ■ Tel: 561-835-9400 ■ Fax:561-835-0322 ■ www.bermandevalerio.com

BOSTON                    SAN FRANCISCO                    PALM BEACH GARDENS

## LOSS CAUSATION / ECONOMIC LOSS

81.     During the Class Period, as detailed herein, the Individual Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the Company's common stock price, and operated as a fraud or deceit on acquirers of the Company's common stock.  As detailed above, when the truth about DDMG's financial situation was revealed, the Company's common stock declined as the prior artificial inflation came out of its common stock price.  That decline in DDMG's common stock price was a direct result of the nature and extent of the fraud finally being revealed to investors and the market.  The timing and magnitude of the common stock price decline negates any inference that the loss suffered by Plaintiff and other members of the Class was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the fraudulent conduct.  The economic loss, *i.e.,* damages, suffered by the Plaintiff and other Class members was a direct result of the fraudulent scheme to artificially inflate the Company's common stock price and the subsequent significant decline in the value of the Company's common stock when the prior misrepresentations and other fraudulent conduct were revealed.

82.     At all times relevant, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Plaintiff and other Class members.  Those statements were materially false and misleading because they failed to disclose a true and accurate picture of DDMG's business, operations and financial condition, as alleged herein.  Throughout the Class Period, Defendants publicly issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing DDMG's common stock price to be artificially

3507 Kyoto Gardens Drive, Suite 200 ■ Palm Beach Gardens, FL.  33410 ■ Tel: 561-835-9400 ■ Fax:561-835-0322 ■ www.bermandevalerio.com

BOSTON                    SAN FRANCISCO                    PALM BEACH GARDENS

inflated.   Plaintiff and other Class members purchased DDMG's common stock at those artificially inflated prices, causing them to suffer the damages complained of herein.

## NO SAFE HARBOR

83.   The statutory safe harbor under the Private Securities Litigation Reform Act of 1995, which applies to forward-looking statements under certain circumstances, does not apply to any of the allegedly false and misleading statements pled in this complaint.   The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.   In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not adequately identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.   Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker had actual knowledge that the particular forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of DDMG who knew that those statements were false, misleading or omitted necessary information when they were made.

42

3507 Kyoto Gardens Drive, Suite 200 ■ Palm Beach Gardens, Fl. 33410 ■ Tel: 561-835-9400 ■ Fax:561-835-0322 ■ www.bermandevalerio.com

BOSTON                SAN FRANCISCO                PALM BEACH GARDENS

**COUNT I**
**(Against Textor, Teaford and the Underwriter Defendants)**
**Violations of Section 11 of the Securities Act**

84.     Plaintiff repeats and re-alleges each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein.

85.     This Count is asserted against Textor, Teaford and the Underwriter Defendants for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all members of the Class who purchased or otherwise acquired DDMG shares issued in or traceable to the IPO.

86.     The Registration Statement for the IPO contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading.

87.     Textor and Teaford each signed the Registration Statement and were directors of when the Registration Statement became effective and are liable pursuant to 15 U.S.C. § 77k(a)(1)(2) and (3).  The Underwriter Defendants were underwriters of the IPO Offering and are liable pursuant to 15 U.S.C. § 77k(a)(5). This Count is not based on and does not sound in fraud. Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count. For purposes of asserting this claim under the Securities Act, Plaintiff does not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.

88.     DDMG was the Registrant for the IPO, while Textor, Teaford and the Underwriter Defendants were responsible for the contents and dissemination of the Registration Statement.  Further, the Textor and Teaford signed the Registration Statement.   Consequently, said defendants issued, caused to be issued, and participated in the issuance of the Registration Statement and are subject to liability for violations of Section 11 of the Securities Act.

3507 Kyoto Gardens Drive, Suite 200 ▪ Palm Beach Gardens, FL. 33410 ▪ Tel: 561-835-9400 ▪ Fax:561-835-0322 ▪ www.bermandevalerio.com

BOSTON                    SAN FRANCISCO                    PALM BEACH GARDENS

89.     Underwriter Defendants were underwriters of the IPO. The Underwriter Defendants acted negligently and are liable to members of the Class who purchased or otherwise acquired DDMG securities issued in the IPO.

90.     None of these defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and the Prospectus were true and without omissions of any material facts and were not misleading.

91.     Plaintiff and other members of the Class who acquired the securities in the IPO pursuant to the Registration Statement did not know of the misrepresentations alleged herein or of the facts concerning the untrue statements of material fact and omissions alleged herein, and could not have reasonably discovered such facts or conduct.

92.     Less than one year elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that the first complaint was filed asserting claims arising out of the falsity of the Registration Statement. Less than three years elapsed from the time that the securities upon which this Count is brought were bona fide offered to the public to the time that the first complaint was filed asserting claims arising out of the falsity of the Registration Statement.

93.     Plaintiff and the other members of the Class have sustained damages.  The value of DDMG's shares sold in the IPO has declined substantially subsequent to and due to Defendants' violations of Section 11 of the Securities Act.

94.     By reason of the foregoing, the Defendants named in this Count are liable for violations of Section 11 of the Securities Act to Plaintiff and the other members of the Class who purchased or otherwise acquired DDMG shares in or traceable to the IPO pursuant to the Registration Statement.

3507 Kyoto Gardens Drive, Suite 200  ▪  Palm Beach Gardens, FL. 33410  ▪  Tel: 561-835-9400  ▪  Fax:561-835-0322  ▪  www.bermandevalerio.com

BOSTON                    SAN FRANCISCO                    PALM BEACH GARDENS

## COUNT II
### (Against the Underwriter Defendants)
### Violations of Section 12(a)(2) of the Securities Act

95.     Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

96.     This Count is asserted against the Underwriter Defendants for violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of all members of the Class who purchased or otherwise acquired DDMG shares issued in the IPO.

97.     The Underwriter Defendants were sellers, offerors, and/or solicitors of sales of securities offered pursuant to the Prospectus.

98.     The Prospectus contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts, as set forth above.

99.     The Underwriter Defendants owed to the purchasers of DDMG common stock, including Plaintiffs and the other Class members, the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were accurate and that they did not contain any misstatement or omission of material fact.   The Underwriter Defendants, in the exercise of reasonable care, should have known that the Prospectus, contained misstatements and omissions of material fact.

100.    The Underwriter Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the Prospectus were true and without omissions of any material facts and were not misleading.   By virtue of the conduct alleged herein, the Underwriter Defendants violated Section 12(a)(2) of the Securities Act.

3507 Kyoto Gardens Drive, Suite 200 ▪ Palm Beach Gardens, FL. 33410 ▪ Tel: 561-835-9400 ▪ Fax:561-835-0322 ▪ www.bermandevalerio.com

BOSTON                    SAN FRANCISCO                    PALM BEACH GARDENS

101.    Plaintiff and other members of the Class who purchased or otherwise acquired securities in the IPO pursuant to the materially untrue and misleading Prospectus did not know or, in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Prospectus.

102.    Plaintiff, individually and on behalf of the Class, hereby offers to tender to the Underwriter Defendants those shares of common stock that Plaintiff and the other Class members continue to own, in return for the consideration paid for those shares together with interest thereon.  Class members who have sold their shares are entitled to rescissory damages.

103.    By virtue of the conduct alleged herein, the Underwriter Defendants violated Section 12(a)(2) of the Securities Act.

<div align="center">

**COUNT III**
**(Against Textor and Teaford)**
**Violations of Section 15 of the Securities Act**

</div>

104.    Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.  This Count is asserted against Textor and Teaford for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Plaintiff and the other members of the Class who purchased or otherwise acquired DDMG shares in or traceable to the IPO.

105.    At all relevant times, Textor and Teaford were controlling persons of the Company within the meaning of Section 15 of the Securities Act.  Textor and Teaford each served as an executive officer or director of DDMG prior to and at the time of the IPO.  Textor and Teaford at all relevant times participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of DDMG's business affairs.  As officers and directors of a publicly-owned company, Textor and Teaford each had a

<div align="center">46</div>

3507 Kyoto Gardens Drive, Suite 200  ▪  Palm Beach Gardens, FL. 33410  ▪  Tel: 561-835-9400  ▪  Fax:561-835-0322  ▪  www.bermandevalerio.com

BOSTON                    SAN FRANCISCO                    PALM BEACH GARDENS

duty to disseminate accurate and truthful information with respect to DDMG's financial condition and results of operations.

106.    By reason of the aforementioned conduct, Textor and Teaford each were culpable participant in the violation of Section 11 of the Securities Act alleged in Count I above by virtue of signing the registration statement and having otherwise participated in the process which allowed the IPO to be successfully completed.  Thus, Textor and Teaford each is liable under Section 15 of the Securities Act, jointly and severally with, and to the same extent as the Company is liable under Sections 11 and 12(a)(2) of the Securities Act, to Plaintiff and the other members of the Class who purchased securities in the IPO.

<div style="text-align:center">

**COUNT IV**
**(Against Textor, Teaford and Nichols For Violations of**
**Section 10(b) And Rule 10b-5 Promulgated Thereunder)**

</div>

107.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

108.    This Count is asserted against Textor, Teaford and Nichols and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

109.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of these defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for the Company's securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material

<div style="text-align:center">47</div>

3507 Kyoto Gardens Drive, Suite 200 ■ Palm Beach Gardens, FL. 33410 ■ Tel: 561-835-9400 ■ Fax:561-835-0322 ■ www.bermandevalerio.com

BOSTON                    SAN FRANCISCO                    PALM BEACH GARDENS

adverse information and misrepresented the truth about the Company's finances and business prospects.

110.     By virtue of their positions at the Company, Textor, Teaford and Nichols had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, these defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to these defendants.  Said acts and omissions of Textor, Teaford and Nichols were committed willfully or with reckless disregard for the truth.  In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

111.     Information showing that these defendants acted knowingly or with reckless disregard for the truth is within these defendants' knowledge and control.  As the senior managers and/or directors of the Company, Textor, Teaford and Nichols each had knowledge of the details of the Company's internal affairs.

112.     Textor, Teaford and Nichols are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, Textor, Teaford and Nichols were able to and did, directly or indirectly, control the content of the statements of the Company.  As officers and/or directors of a publicly-held company, Textor, Teaford and Nichols had a duty to disseminate timely, accurate, and truthful information with respect to the Company's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of the Company's securities was artificially inflated throughout the

48

3507 Kyoto Gardens Drive, Suite 200  ▪  Palm Beach Gardens, FL. 33410  ▪  Tel: 561-835-9400  ▪  Fax:561-835-0322  ▪  www.bermandevalerio.com

BOSTON                    SAN FRANCISCO                    PALM BEACH GARDENS

Class Period.  In ignorance of the adverse facts concerning the Company's business and financial condition which were concealed by these defendants, Plaintiff and the other members of the Class purchased or otherwise acquired the Company's securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by these defendants, and were damaged thereby.

113.    During the Class Period, the Company's securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which these defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of the Company's securities at prices artificially inflated by these defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of the Company's securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of the Company's securities declined upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

114.    By reason of the foregoing, Textor, Teaford and Nichols knowingly or recklessly, directly or indirectly violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes and artifices to defraud; (b) failed to disclose material information; or (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Lead Plaintiff and the other members of the Class in connection with their purchases of DDMG common stock during the Class Period.

3507 Kyoto Gardens Drive, Suite 200  ▪  Palm Beach Gardens, FL  33410  ▪  Tel: 561-835-9400  ▪  Fax:561-835-0322  ▪  www.bermandevalerio.com

BOSTON                    SAN FRANCISCO                    PALM BEACH GARDENS

115.     As a direct and proximate result of Textor, Teaford and Nichols' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

<div align="center">

**COUNT V**
**(Violations of Section 20(a) of the**
**Exchange Act Against Textor, Teaford and Nichols)**

</div>

116.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

117.     During the Class Period, Textor, Teaford and Nichols participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.  Because of their senior positions, they knew the adverse non-public information about the Company's misstatement of income and expenses and false financial statements.

118.     As officers and/or directors of a publicly owned company, Textor, Teaford and Nichols had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

119.     Because of their positions of control and authority as senior officers, the Textor, Teaford and Nichols were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations.  Throughout the Class Period, the Textor, Teaford and Nichols exercised their power and authority to cause the Company to

<div align="center">50</div>

3507 Kyoto Gardens Drive, Suite 200 ▪ Palm Beach Gardens, FL  33410 ▪ Tel: 561-835-9400 ▪ Fax:561-835-0322 ▪ www.bermandevalerio.com

BOSTON                    SAN FRANCISCO                    PALM BEACH GARDENS

engage in the wrongful acts complained of herein. Textor, Teaford and Nichols therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company securities.

120.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on his own behalf and on behalf of the Class, prays for judgment as follows:

(a)     Determining this action to be a proper class action and certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, for the damages sustained as a result of the wrongdoings of Defendants, together with interest thereon;

(c)     Awarding Plaintiff the fees and expenses incurred in this action including reasonable allowance of fees for Plaintiff's attorneys and experts;

(d)     Granting extraordinary equitable and/or injunctive relief as permitted by law, equity and federal and state statutory provisions sued on hereunder;

(e)     Awarding rescission damages as to claims under the Securities Act; and

(f)     Granting such other and further relief as the Court may deem just and proper.

3507 Kyoto Gardens Drive, Suite 200 ▪ Palm Beach Gardens, FL 33410 ▪ Tel: 561-835-9400 ▪ Fax:561-835-0322 ▪ www.bermandevalerio.com

BOSTON                    SAN FRANCISCO                    PALM BEACH GARDENS

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  September 20, 2012                    **BERMAN DEVALERIO**

By:    /s/Jay W. Eng
                                                      Jay W. Eng, Esq.
                                                      Fla. Bar No. 146676
                                                      Kyle DeValerio, Esq.
                                                      Fla. Bar No. 18565
                                                      3507 Kyoto Gardens Drive, Suite 200
                                                      Palm Beach Gardens, FL 33410
                                                      Telephone: (561) 835-9400
                                                      Facsimile: (561) 835-0322
                                                      jeng@bermandevalerio.com
                                                      kdevalerio@bermandevalerio.com

*Of Counsel*
Glen DeValerio
Leslie R. Stern
BERMAN DEVALERIO
One Liberty Square
Boston, MA  02109
Telephone:  (617) 542-8300
Facsimile:  (617) 542-1194
gdevalerio@bermandevalerio.com
lstern@bermandevalerio.com

*Attorneys for Plaintiff Mark St. Cyr*

3507 Kyoto Gardens Drive, Suite 200 ▪ Palm Beach Gardens, Fl. 33410 ▪ Tel: 561-835-9400 ▪ Fax:561-835-0322 ▪ www.bermandevalerio.com

BOSTON                    SAN FRANCISCO                    PALM BEACH GARDENS