UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Ft. Pierce Division

Case No. 12-14333-CIV-MARTINEZ-LYNCH

CLASS ACTION

In re Digital Domain Media Group
Securities Litigation _____ /    JURY TRIAL DEMANDED

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

I.      NATURE OF THE ACTION ................................................................................. 2

II.     JURISDICTION AND VENUE ........................................................................... 5

III.    THE PARTIES ...................................................................................................... 6

        A.      Lead Plaintiffs ........................................................................................... 6

        B.      The Individual Defendants ......................................................................... 7

        C.      The Director Nominee Defendants ............................................................. 8

        D.      The Underwriter Defendants .................................................................... 10

        E.      Palm Beach Capital Defendants ............................................................... 11

        F.      SingerLewak ............................................................................................ 12

        G.      Non-Party DDMG .................................................................................... 13

IV.     FACTUAL BACKGROUND ............................................................................. 13

        A.      DDMG's Background ............................................................................... 13

        B.      DDMG's First Attempt to go Public Fails .............................................. 15

        C.      Digital Domain Expands to Florida .......................................................... 15

        D.      DDMG's "Dire" Financial Situation ....................................................... 16

        E.      DDMG's 2011 IPO .................................................................................. 20

        F.      Textor's Secret $10 Million Loan from the Palm Beach Capital Defendants ...... 24

        G.      Textor's Sale of DDMG Stock on the Eve of Bankruptcy ...................... 27

        H.      The IPO Failed to Cure DDMG's Continuing Liquidity Problems .......... 28

V.      FACTUAL ALLEGATIONS RELATED TO THE SECURITIES ACT CLAIMS ........ 30

        A.      The Offering Documents Contain Materially Untrue Statements and Omissions 30

        B.      Co-Lead Plaintiff's Purchase ................................................................... 39

VI.     FACTUAL ALLEGATIONS RELATED TO THE EXCHANGE ACT CLAIMS ......... 39

A.     Defendants' False and Misleading Statements and Omissions in the Offering Documents ........................................................................................... 39

B.     Defendants' Further Materially False and Misleading Statements and Omissions........................................................................................................ 41

    1.     Third Quarter 2011 Financial Results ................................................... 41

    2.     Fourth Quarter and Full Year 2011 Financial Results........................... 46

    3.     First Quarter 2012 Financial Results .................................................... 51

VII.     THE TRUTH BEGINS TO BE REVEALED ................................................... 54

A.     Second Quarter 2012 Financial Results................................................ 55

B.     DDMG Files For Bankruptcy ............................................................... 66

VIII.     ADDITIONAL FACTUAL ALLEGATIONS RELATED TO THE EXCHANGE ACT CLAIMS ........................................................................................................ 67

A.     Additional Scienter Allegations............................................................. 67

B.     Fraudulent Scheme and Course of Business......................................... 71

C.     Loss Causation ...................................................................................... 72

D.     Applicability of Presumption of Reliance:  Fraud on the Market Doctrine.......... 76

IX.     CLASS ACTION ALLEGATIONS ................................................................. 77

X.     NO SAFE HARBOR ...................................................................................... 79

COUNT I - VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT .............................. 80

COUNT II - VIOLATIONS OF SECTION 12(A)(2)OF THE SECURITIES ACT.................... 83

COUNT III - VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT........................... 85

COUNT IV - VIOLATIONS OF SECTION 10(B) AND RULE 10B-5 PROMULGATED THEREUNDER ...................................................................................... 87

COUNT V - VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT........................ 90

PRAYER FOR RELIEF ............................................................................................... 92

Court-appointed Lead Plaintiffs the Patricof Family Limited Partnership ("Patricof Family LP"), Edward Nusblatt ("Mr. Nusblatt"), and Robert Dziedzic ("Mr. Dziedzic") (collectively, "Lead Plaintiffs"), individually and on behalf of all other persons and entities who purchased the common stock of Digital Domain Media Group, Inc. ("DDMG" or the "Company") in an initial public offering completed on November 21, 2011 (the "IPO") and/or on the public market during the period between November 18, 2011 through September 6, 2012, inclusive (the "Class Period") and who were damaged thereby, allege the following based upon personal knowledge as to themselves and their own acts, and upon information and believe as to all other matters.

Lead Plaintiffs' allegations are based on Lead Counsel's investigation, which included, among other things:  (a) a review and analysis of DDMG's public filings with the United States Securities and Exchange Commission ("SEC"); (b) a review and analysis of certain wire and press releases, public statements, and other publications disseminated by or concerning the DDMG and the Defendants (as defined below) named herein and related parties; (c) a review and analysis of DDMG's press conferences, analyst conference calls, conferences, and DDMG's corporate website; (d) a review and analysis of other publicly available information concerning DDMG and the Defendants named herein; and (e) interviews with individuals possessing specific, personal knowledge of the facts alleged herein, including former DDMG employees (individually "Confidential Witness" or "CW" and collectively the "Confidential Witnesses" or "CWs").  Lead Plaintiffs believe that substantial additional evidentiary support exists for the allegations set forth in this Complaint that will be revealed after a reasonably opportunity for discovery.

## I.     NATURE OF THE ACTION

1.     This case is about the collapse of DDMG, a digital effects and computer generated animation company, which filed for bankruptcy on September 11, 2012 – *less than 10 months* after its IPO on November 21, 2011.  While the Company was touting itself as a competitor to Disney/Pixar and DreamWorks studios, it failed to disclose material problems concerning its ability to continue to fund its operations both in its IPO offering documents and throughout the Class Period.

2.     Lead Plaintiffs assert claims pursuant to the Securities Act of 1933 (the "Securities Act") arising from materially untrue statements and omissions made in the Registration Statement, Offering Documents (as defined below), and other documents filed and distributed in connection with the public offering of shares of its common stock by DDMG in its IPO.  Co-Lead Plaintiff Mr. Dziedzic asserts the Securities Act claims on behalf of a class of all purchasers of shares of DDMG common stock (i) in the IPO or (ii) on the public markets during the Class Period and traceable to the IPO.

3.     Lead Plaintiffs also assert fraud claims pursuant to the Securities Exchange Act of 1934 (the "Exchange Act") based on material misrepresentations and omissions made by the Individual Defendants in connection with DDMG shares during the Class Period.  Lead Plaintiffs assert these fraud claims on behalf of all purchasers of shares of DDMG common stock on public markets during the Class Period.

4.     On May 16, 2011, DDMG filed a Registration Statement on Form S-1 with the SEC attempting to register its shares for its IPO.  The Company ultimately filed six amendments to its Registration Statement, the last one being on November 11, 2011 (the "Registration Statement"). On Friday November 18, 2011, DDMG filed a free writing prospectus ("FWP") with the SEC. DDMG filed its prospectus with the SEC on Form 424B4 ("Prospectus") on November 21, 2011.

The Registration Statement, November 18, 2011 FWP, and the Prospectus will be referred to collectively as the "Offering Documents."

5.   On Friday, November 18, 2011, the Company commenced its IPO.  The Company sold 4.92 million shares of its common stock at an initial public offering price of $8.50 per share. The gross proceeds received in the offering totaled $41.8 million.  Defendants Roth Capital Partners LLC and Morgan Joseph TriArtisan LLC were lead and managing underwriters of the IPO.  DDMG raised approximately $38.4 million in net proceeds after deducting underwriting discounts and commissions of approximately $2.9 million and other then unpaid offering expenses of approximately $0.5 million.  The common stock was listed on the New York Stock Exchange under the ticker symbol "DDMG"

6.   In the Registration Statement and other Offering Documents filed and distributed in connection with the November 2011 offering, Defendants Textor and Teaford made untrue statements of material fact and omitted other facts necessary to make the statements not misleading concerning the Company's financial condition.   In particular, the Offering Documents made material misrepresentations and omissions concerning the Company's ability to raise capital and fund its operations.  While the Company was faced with a substantial "burn rate," which threatened DDMG's ability to continue as a going concern, the Company's senior officers falsely reassured shareholders that it would be able to meet its operating expenses for the next 12 months and fund its growth strategy.  In fact, according to a September 18, 2012 article in *The Palm Beach Post* (the "Sept. 18 Post Article"), DDMG had a long history of difficulties of meeting its operating expenses going back to 2010.  According to *The Palm Beach Post* (the "*Post*"), the Company's Chief Executive Officer ("CEO"), Defendant John C. Textor ("Textor"), "predicted a 'train wreck'" in an internal email to colleague in early 2010.  Interviews with CWs

3

working at DDMG in 2011 and 2012 confirm that severe cash flow problems persisted throughout the Class Period and that DDMG continued to spend money at an unsustainable rate. CWs also confirm that the financial reports and projections used to support the Offering Documents were developed by Defendant Jonathan E. Teaford ("Teaford") and were not consistent with reports generated by DDMG's business units.

7.   Moreover, Textor concealed a loan agreement (the "Loan Agreement") for $10 million which he entered into at the time of the IPO.  The loan was secured by Textor's DDMG common shares and by his residences.  Textor used the proceeds of this Loan Agreement to purchase DDMG shares in the IPO and the terms of the Loan Agreement imply a value for Textor's DDMG shares far below the IPO offering price of $8.50.

8.   DDMG could not hide its dire financial condition forever and, in August 2012, it revealed it was exploring possible strategic alternatives.  Even at this time, Textor insisted to investors that DDMG "was in very good shape."  On September 5, 2012, the Company disclosed that it was attempting to restructure its debt arrangements with its creditors and on September 7, 2012 it disclosed that it was closing its Florida facility and Textor had resigned.  The revelation of the DDMG's true financial condition culminated in its filing for Chapter 11 bankruptcy in United States Bankruptcy Court in the District of Delaware on September 11, 2012 (*less than 10 months after its IPO*).

9.   Even after the IPO, the Individual Defendants continued to make misrepresentations regarding DDMG and its business.  The Individual Defendants and DDMG continued to state that it had sufficient capital to fund operations for the short and long term and that it was able to execute its growth strategy.  These representations about DDMG were false because its burn rate

meant that it would not be able to continue operations over the short or long term and its funds were certainly not sufficient to fund a growth strategy.

10. Defendants Textor, Teaford, and John M. Nichols ("Nichols") knew or recklessly disregarded that their IPO Offering Documents were untrue and that their post-IPO representations regarding DDMG during the Class Period were false as they regularly received reports setting forth the Company's current financial position and projections of future performance.  These reports included reports regarding the Company's cash flow, and all presented a dire financial position, far different from the rosy image presented to investors during the Class Period.

11. As a result of these misrepresentations, DDMG's stock price reached a Class Period high of over $9.00 per share on May 1, 2012.  Once the truth of DDMG's financial condition was revealed, culminating in its bankruptcy filing, DDMG's shares traded at $0.08, a decline of over 99%.

## II.   JURISDICTION AND VENUE

12. The claims alleged herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5), and arise under §§ 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o, and the rules and regulations of the SEC promulgated thereunder.

13. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and under § 27 of the Exchange Act, 15 U.S.C. § 78aa, and § 22(a) of the Securities Act, 15 U.S.C. § 77v(a).

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), § 27 of the Exchange Act, 15 U.S.C. § 78aa, and § 22(a) of the Securities Act, 15 U.S.C. § 77v, as a substantial part of

the acts events or omissions giving rise to the claims pleaded herein occurred in this District or defendants named herein maintain their residence or principal places of business in this District.

15. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of the New York Stock Exchange ("NYSE").

## III.   THE PARTIES

### A.   Lead Plaintiffs

16. On March 11, 2013, this Court appointed Patricof Family LP, Mr. Nusblatt, and Mr. Dziedzic to serve as Lead Plaintiffs for the Class in this consolidated class action pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA").

17. Patricof Family LP purchased DDMG common stock in reliance on Defendants' false and misleading statements and omissions of material facts and/or the integrity of the market for DDMG securities at artificially inflated prices during the Class Period, and suffered economic loss and damages when the truth about DDMG that was misrepresented and omitted during the Class Period was revealed to the market.  The certification for Patricof Family LP, with a detailed listing of transactions, was filed with this Court on November 19, 2012 and is adopted by reference herein.  (Dkt. No. 12.)

18. Mr. Nusblatt purchased DDMG common stock in reliance on Defendants' false and misleading statements and omissions of material facts and/or the integrity of the market for DDMG securities at artificially inflated prices during the Class Period, and suffered economic loss and damages when the truth about DDMG that was misrepresented and omitted during the Class Period was revealed to the market.  The certification for Mr. Nusblatt, with a detailed

listing of transactions, was filed with this Court on November 19, 2012 and is adopted by reference herein.  (Dkt. No. 12.)

19.     Mr. Dziedzic purchased DDMG common stock in reliance on Defendants' false and misleading statements and omissions of material facts and/or the integrity of the market for DDMG securities at artificially inflated prices during the Class Period, and suffered economic loss and damages when the truth about DDMG that was misrepresented and omitted during the Class Period was revealed to the market.  The certification for Mr. Dziedzic, with a detailed listing of transactions, was filed with this Court on November 19, 2012 and is adopted by reference herein.   (Dkt. No. 10-2.) As set forth in his certification, Mr. Dziedzic purchased DDMG common stock in the IPO pursuant to the deficient and false and misleading Offering Documents.

### B.     The Individual Defendants

20.     Defendant John C. Textor served as Chairman of the Company's Board of Directors and Chief Executive Officer from January 2009 to September 6, 2012, when Textor resigned as Chairman, CEO and director of DDMG, as well as his positions as an officer and director with DDMG's subsidiaries.  Textor was Chairman of BabyUniverse, Inc., a leading e-tailer of baby-related products to new and expectant parents, from November 2002 and its Chief Executive Officer from April 2005 until its sale in October 2007.  Textor signed the Registration Statement for the Company's IPO.  Textor also signed the Company's Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2011, filed on December 22, 2011 ("3Q 2011 10-Q"); Annual Report on Form 10-K for the fiscal year ended December 31, 2011, filed on March 30, 2012 ("2011 10-K"); Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2011, filed on May 5, 2012 ("1Q 2012 10-Q"); and Quarterly Report on Form 10-Q

for the quarterly period ended June 30, 2012, filed on August 14, 2012 ("2Q 2012 10-Q"). Textor also signed the undisclosed Loan Agreement and Security and Pledge Agreement (as defined herein). During the Class Period, Defendant Textor co-owned real estate holdings located in Mountain Village, Colorado and in Martin County, Florida.

21.     Defendant Jonathan F. Teaford began serving as a member of the Company's Board of Directors in March 2009. Teaford served as President of the Company from January 2009 to May 2011 and as the Company's Chief Financial Officer from March 2009 to February 2012. Teaford became Chief Executive Officer of Digital Domain Institute, Inc. in February 2012. Teaford was Executive Vice President and a member of the Board of Directors of BabyUniverse, Inc. from 1998 until its sale in October 2007. Teaford signed the Registration Statement for the Company's IPO. Teaford signed the Company's 3Q 2011 10-Q. Teaford owns a residence in Palm Beach County, Florida.

22.     Defendant John M. Nichols began serving as an advisor to DDMG on financial related matters in October 2011. Nichols became the Company's Chief Financial Officer in February 2012. Nichols was appointed to DDMG's Board of Directors on August 14, 2012. On September 10, 2012, Nichols resigned as a member of DDMG's Board of Directors. Nichols signed the 2011 Form 10-K; 1Q 2012 10-Q; and 2Q 2012 10-Q.

23.     Defendants Textor, Teaford and Nichols are collectively referred to herein as the "Individual Defendants."

### C.     The Director Nominee Defendants

24.     Defendant Kevin C. Ambler ("Ambler") was listed in Registration Statement and the Prospectus as a nominee to DDMG's Board of Directors, and became a Director upon consummation of the IPO. Mr. Ambler served as a director of DDMG from November 2011

through the time of DDMG's bankruptcy on or about September 11, 2012.  Mr. Ambler was a member of the Audit Committee of the Board of Directors.

25.     Defendant Jeffrey W. Lunsford ("Lunsford") was listed in Registration Statement and the Prospectus as a nominee to DDMG's Board of Directors, and became a Director upon consummation of the IPO.  Mr. Lunsford served as a member of DDMG's Board of Directors from November 2011 until October 17, 2012 when he resigned his Director position effective immediately.  Mr. Lunsford is the brother of Ed Lunsford, Senior Vice President and General Counsel of DDMG.

26.     Defendant Casey Cummings ("Cummings") was listed in Registration Statement and the Prospectus as a nominee to DDMG's Board of Directors, and became a Director upon consummation of the IPO.  Mr. Cummings served as a director of DDMG from November 2011 through the time of DDMG's bankruptcy on or about September 11, 2012.  Mr. Cummings was the chairman of the Audit Committee of the Board of Directors.

27.     Defendant Kaleil Isaza Tuzman ("Tuzman") was listed in Registration Statement and the Prospectus as a nominee to DDMG's Board of Directors, and became a Director upon consummation of the IPO.  Mr. Tuzman served as a director of DDMG from November 2011 through the time of DDMG's bankruptcy on or about September 11, 2012.  Mr. Tuzman was a member of the Audit Committee of the Board of Directors.

28.     Defendant John Kluge, Jr. ("Kluge") was listed in Registration Statement and the Prospectus as a nominee to DDMG's Board of Directors, and became a Director upon consummation of the IPO.  Mr. Kluge served as a director of DDMG from November 2011 through the time of DDMG's bankruptcy on or about September 11, 2012.

9

29.      Defendants Ambler, Lunsford, Cummings, Tuzman and Kluge are collectively referred to herein as the "Director Nominee Defendants."   As stated in the Prospectus and Registration Statement, the Director Nominee Defendants all agreed to become members of DDMG's Board of Directors upon consummation of the IPO.

### D.      The Underwriter Defendants

30.      Defendant Roth Capital Partners, LLC ("Roth Capital") was an underwriter of the IPO, and acted as the representative of the underwriters and the sole book running manager for the IPO.  Roth was allocated 3,690,000 of the 4,920,000 of the shares to be sold in the IPO.  Roth Capital assisted in the preparation and dissemination of the Offering Documents.   As an underwriter of the Offering, Roth Capital was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.  Roth Capital maintains its principal executive offices in Newport Beach, California.

31.      Defendant Morgan Joseph TriArtisan LLC ("Morgan Joseph") was an underwriter of the IPO and acted as co-manager for the IPO.  Morgan Joseph was allotted 492,000 of the 4,920,000 shares to be sold.  Morgan Joseph assisted in the preparation and dissemination of the Offering Materials.   As an underwriter of the Offering, Morgan Joseph was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.  Morgan Joseph maintains its principal executive offices in New York, New York.

32.      Defendants Roth Capital and Morgan Joseph are collectively referred to herein as the "Underwriter Defendants."

### E.   Palm Beach Capital Defendants

33.     Defendant Palm Beach Capital is a private equity investment firm with offices in West Palm Beach, Florida and Tampa, Florida.

34.     Defendants PBC Digital Holdings, LLC, PBC Digital Holdings II, LLC, PBC MGPEF DDH, LLC, PBC DDH Warrants, LLC and PBC GP III, LLC (the "PBC Investment Vehicles," together with Palm Beach Capital, the "Palm Beach Capital Defendants" or the "PBC Defendants") are investment vehicles owned and/or controlled by Defendant Palm Beach Capital.  The PBC Investment Vehicles were solely managed by Defendant PBC GP III, LLC.

35.     As disclosed in Amendment No. 6 to Form S-1, filed on November 10, 2011, prior to the IPO, the PBC Defendants were the beneficial owner of 16,508,552 shares of DDMG common stock and common stock equivalents, comprised of 1,405,469 shares of common stock, and warrants and other convertible securities that were convertible into 15,103,083 share of common stock, which amounted to approximately 47.7% of DDMG's common stock.

36.     According to Amendment No. 6, "[u]pon consummation of this offering [the IPO], all convertible securities and warrants issued or issuable to [the PBC Defendants] will be automatically converted and exercised, as applicable, into an aggregate of 15,103,083 shares of our Common Stock."   After the IPO, the PBC Defendants would own or control 41.2% of DDMG's common stock.

37.     On November 28, 2011, the PBC Defendants filed a Form 3 with the SEC which disclosed that the PBC Defendants held at least 10% of DDMG's common stock, and further disclosed that the PBC Defendants directly and indirectly owned 1,405,469 shares of DDMG common stock, and warrants and convertible securities, equal to approximately another 15,103,083 shares of DDMG common stock.

38.     According to the 2011 10-K, as of December 31, 2011, the PBC Defendants had beneficial ownership of 16,497,383 shares, or 40.2%, of DDMG's common stock.

39.     As of August 14, 2012, the PBC Defendants reported holding in the aggregate 37.7% of DDMG's shares (or 39.2% pursuant to Rule 13d-3 of the Exchange Act).

40.     In addition, the PBC Defendants had the right to appoint one member of the DDMG Board of Directors.  As stated in Amendment No. 6 (and the Prospectus):

> Pursuant to an Investor Rights Agreement, dated November 24, 2010, that we entered into with affiliates of Palm Beach Capital, after the effective date of the registration statement of which this prospectus forms a part, Palm Beach Capital has the right to elect one of our directors as long as it owns shares of our Common Stock.  The director may be removed with or without cause only by the affirmative vote of Palm Beach Capital.

41.     On August 14, 2012, the PBC Defendants exercised that right and appointed Defendant Nichols.

42.     Finally, as alleged herein, the PBC Defendants loaned Defendant Textor over $10 million to help him purchase shares in the IPO, a fact not disclosed in the Offering Documents, and not revealed until August 29, 2012.

**F.     SingerLewak**

43.     SingerLewak LLP ("SingerLewak") is public accounting and consulting firm with offices in six cities in California.  SingerLewak has approximately 32 partners that work in the areas of Assurance & Advisory, Tax, Litigation & Valuation Services, Business Management, and Business Risk and Technology Services.   On January 13, 2010, DDMG engaged SingerLewak to be DDMG's independent auditor.

44.     SingerLewak was listed as an "Expert" in the Prospectus and Registration Statement for its audit of DDMG's financial statements, which were included in the Prospectus and Registration Statement, for the years ended December 31, 2010 and December 31, 2009, as

well as for its audit of Digital Domain's financial statements for the period January 7, 2009 through December 31, 2009, which were also included in the Prospectus and Financial Statement.  SingerLewak's May 13, 2011 "Report of Independent Registered Public Accounting Firm" was part of the Registration Statement and Prospectus.  SingerLewak executed a "Consent of Independent Registered Public Accounting Firm" that was attached as Exhibit 23.1 to the Registration Statement, which consented to the use in the Registration Statement and Prospectus of its May 13, 2011 report "relating to [its] audit of the consolidated financial statements" and "to the reference to our firm under the caption 'Experts' in such" Prospectus and Registration Statement.

45.     The Underwriter Defendants, the Individual Defendants, the Individual Director Nominee Defendants, SingerLewak, and the Palm Beach Capital Defendants are referred to collectively herein as the "Defendants."

### G.     Non-Party DDMG

46.     DDMG is a Florida corporation with its principal place of business located at 10250 SW Village Parkway, Port St. Lucie, Florida 34987 during the Class Period.  It provided digital visual effects and production services, animation services, and education services through various subsidiaries including Digital Domain Productions Inc., Tradition Studios, and Digital Domain Institute.  During the Class Period, DDMG common stock traded and was listed on the NYSE under the symbol "DDMG."

### IV.     FACTUAL BACKGROUND

### A.     DDMG's Background

47.     Digital Domain, Inc. was formed in 1993, and purchased in 2006 by a group of investors that included Textor, film director Michael Bay, former Microsoft, Inc. executive Carl

Stork ("Stork") and former Miami Dolphins quarterback Dan Marino.  The Textor-lead investment group purchased Digital Domain, Inc. for $34.5 million.  The purchase was financed with $3 million from outside investors, $1.4 million of Digital Domain, Inc.'s cash and a $30 million loan from Falcon Investments.  Textor, Stork and Teaford formed Wyndcrest DD Holdings, Inc. to effectuate the purchase of Digital Domain, Inc.  At closing, Digital Domain Inc. became a wholly-owned subsidiary of Wyndcrest DD Holdings, Inc.

48.     Digital Domain has received seven awards issued by the Academy of Motion Picture Arts and Sciences — three Academy Awards® for *Best Visual Effects* and four awards for *Scientific and Technical Achievement*.  Digital Domain has been involved in the production of major motion pictures including *Thor*, *TRON: Legacy*, the *Transformers* trilogy, *The Curious Case of Benjamin Button*, *Apollo 13* and *Titanic*.  Digital Domain's digital production capabilities include the creation of CG animated content, performance capture, the conversion of two-dimensional ("2D") imagery into 3D imagery and CG visual effects such as fluid simulation, terrain generation and photorealistic animation.

49.     DDMG was incorporated in Florida on January 7, 2009.  DDMG was the majority owner of Digital Domain (formerly known as Wyndcrest DD Holdings, Inc.) and its wholly-owned subsidiary Digital Domain Productions, Inc. (formerly known as Digital Domain, Inc.).  DDMG also established Tradition Studios, Inc. ("Tradition Studios"), an animated film production studio.  Tradition Studios was incorporated in the State of Florida and wholly-owned by DDMG.

50.     In October 2006, only months after taking over, Digital Domain, Textor, Teaford and Stork were sued by the company's former Chief Operating Officer and President, Bradley Call ("Call"), in connection with his discharge from the company.  According to Call's

complaint, Call was pressured by Textor to supply inaccurate revenue projections to a third-party lender from whom the company was seeking $30 million in financing.  Call was allegedly terminated for refusing to participate in this scheme.  In September 2009, a jury found, among other things, that Call's "efforts to prevent the [company] from providing fraudulent information to a potential lender" was a motivating factor for his discharge and awarded him $1,275,075 in damages on this claim.

### B.   DDMG's First Attempt to go Public Fails

51.   In December 2007, the Company decided to undertake an IPO.  On December 11, 2007, "Digital Domain" (as it was then called) filed a Form S-1 with the SEC, seeking to raise $100 million dollars through an offering.  Thomas Weisel Partners LLC, CIBC World Markets Corp., William Blair & Company, Merriman Curhan Ford & Co., and GunnAllen Financial, Inc. were listed as underwriters for this offering.

52.   However, Digital Domain never consummated the offering.  The IPO was abandoned in April 2008 after a lukewarm market response, and on May 11, 2011, Digital Domain filed a Registration Withdrawal Request with the SEC related to the 2007/2008 public offering.

### C.   Digital Domain Expands to Florida

53.   In June 2008, Textor began negotiating with government officials in Florida for funds to create a visual effects studio and school in that state.  Textor approached Enterprise Florida, a nonprofit organization that deals with requests for job incentives, as well as officials in Palm Beach, Broward, Martin and Miami-Dade counties, as well as Sarasota.

54.   In February 2009, Enterprise Florida offered an $11.4 million incentive package to Textor in exchange for creating 300 jobs and DDMG's spending $77 million on land, a new

building and equipment.  Textor turned this offer down as insufficient.  Instead, Textor turned to State Representative Kevin Ambler (Defendant Ambler), who drafted a budget amendment to provide $42 million in incentives, of which $20 million went to DDMG.  After receiving the $20 million grant from the state of Florida, Textor next secured almost $60 million in incentives from Port St. Lucie.  Digital Domain also received $20 million in tax credits.

55.     After receiving $7 million of $20 million in state incentives, Textor sold Wyndcrest DD Holdings to DDMG for $8.5 million.  DDMG assumed an $8 million loan held by Textor and then paid him $500,000 in cash.

56.     In September 2009, Florida State University announced that it had plans to partner with DDMG.  DDMG launched the Digital Domain Institute, Inc. ("DDI") as part of this partnership, a for-profit post-secondary media institution.  DDI was a wholly-owned subsidiary of DDMG.  In August 2010, it was announced that West Palm Beach would turn over a downtown property valued at $10 million, issue $15 million in bonds and provide $10 million in cash for Florida State University to open a site in that city for the Digital Domain film school.

### D.     DDMG's "Dire" Financial Situation

57.     According to an investigative report by *The Post* published on June 16 and 23, 2013 (the "Post Report"), after the failed IPO attempt in 2008, the Company turned to private equity in an attempt to raise capital.  However, the offers received were low after the private equity firms realized that the company was running on "fumes," according to former President Mark Miller.  During a deposition that took place in 2011, Miller stated:  "All through late 2008 and 2009, it became a week-to-week, month-to-month, of 'Can we make payroll? Can we stay out of the Falcon default'?"  Former Chief Financial Officer Kevin Weston testified that "[e]very payroll was scary" because of the Company's finances.  Former CEO Cliff Plumer testified in a

2011 deposition that in 2009, "[i]t was to the point of sometimes waking up Friday morning not even knowing if we can make payroll."

58.     In June 2009, Deloitte & Touche LLP ("Deloitte") submitted its auditors' report for Digital Domain.  Deloitte qualified its audit opinion stating that "the Company's recurring losses from operations and negative cash flows from operating activities, and negative working capital and stockholders' deficiency as of December 31, 2008, *raise substantial doubt about its ability to continue as a going concern*."  In January 2010, Deloitte was terminated as Digital Domain's independent auditor and replaced by SingerLewak, who was engaged as independent auditor for DDMG and its subsidiaries.

59.     That was not the first time that the Company had received a "going concern" letter.  Soon after Wyndcrest DD Holdings's purchase of Digital Domain, Inc. in June 2006, its auditor, PricewaterhouseCoopers LLP ("PwC") issued an audit opinion with a going concern qualification, which signaled the auditors' questions over the Company's finances.  PwC was terminated as the company's auditor in February 2007.

60.     According to the Sept. 18 Post Article, the Company needed to raise $6 million by July 30, 2009 or else default on its loan from Falcon Investments, which had loaned Wyndcrest DD Holdings, Inc. cash for the purchase of Digital Domain, Inc.  To raise money, a division was sold for $10.5 million.  Rafael Fogel, a partner at Falcon Investments, called the financial situation "dire," stating in a 2011 deposition that Falcon Investments had funded $800,000 of payments in the summer of 2009 to help DDMG make payroll. "And in this industry, with the fact that you have contractors, if you don't make payroll, you're not in business.  So that sounds pretty dire to me," he further testified.

61.     According to the Sept. 18 Post Article, in an email from early 2010, Textor predicted a "train wreck." On February 9, 2010, Textor wrote an email to Stork stating that "At this point, I am fairly certain that a train wreck is coming . . . . I have no choice but to deal with it because of the promises I have made to the state of Florida.  I HAVE to deliver jobs."

62.     Numerous CWs have noted the dire financial situation of the Company.  CW1 is the former Director of Recruiting for DDMG in Florida and held that role from November 2009 until September 2012.  CW1 reported directly to Textor.  CW1 stated that DDMG was having serious financial issues prior to the IPO, including not having enough money to pay its AT&T bill and barely being able to make payroll.  CW1 recalled Textor complaining that the Florida office had to send money to the California office because California was losing money.

63.     CW4 is a former Head of Operations for Digital Domain Productions in California and held that role from October 2007 until October 2012.  CW4 reported directly to former CEO Cliff Plumer, and after Plumer left reported directly to Textor.  CW4 stated that weekly and monthly reports were produced about the California operations and sent to Florida, and these reports included information on cash flow, labor, actual costs, profits and losses and capital spending.  No similar reports from the Florida office were sent to California according to CW4.  CW4 stated that Textor and Teaford handled financial reports for DDMG, including quarterly financial reports.  CW4 stated that Digital Domain Productions, Inc. was the only revenue-generating part of DDMG.  Digital Domain Productions, Inc. typically earned a 35% margin on its VFX projects.  However, in 2011, Textor and Teaford decided that Digital Domain Productions, Inc. would co-produce a film, *Ender's* Game, which gave up this 35% margin, costing Digital Domain Productions more than $10 million and draining Digital Domain Productions, Inc. of any revenues that were coming in.  The money being earned on the project

was not enough to cover costs because of the lack of margins, and there were not enough funds available from elsewhere in the Company to cover the costs of *Ender's Game*.  CW4 stated that the financial reports filed with the IPO were produced by Teaford without input from Digital Domain Productions, Inc.  In order to cover costs, DDMG gave Digital Domain Productions, Inc. $4 million in December 2011 to cover payroll according to CW4.

64.     CW5 is a former Manager of Financial Analysis at DDMG and held that position from April 2010 until December 2012.  CW5 reported to Bernie Vanderfin (Corporate Controller), Teaford and Nichols.  CW5 also reported to the general counsel concerning risk management.  One of CW5's responsibilities was to prepare weekly cash forecasts for DDMG's senior management.  CW5 stated that there was a liquidity crisis when DDMG's Florida operations opened in 2009, and that there was no revenue generated in Florida other than state and city grant receipts (see below).

65.     CW6 is a former Director of Production Accounting for DDMG in Florida and held that role from May 2010 until September 2012.  CW6 reported to Teaford and then Bernie Vanderfin.  CW6 noticed that DDMG was unable to pay bills within months of being hired. According to CW6, Textor received reports from the California offices and the Florida office that showed revenues and spending.

66.     CW7 is a former Head of Studio for DDMG in Florida and held that role from May 2010 until November 2011.  CW7 reported directly to Textor.  CW7 stated that DDMG exceeded the hiring quotas set by the State of Florida as part of the grants DDMG received, but that Textor had no intention of keeping the hires on staff.  CW7 stated that DDMG had serious financial difficulties during CW7's tenure at DDMG such that employees had to buy toilet paper for the studio with their own money.

67.     Textor stated in an interview on CNBC in 2010 that DDMG was being considered for a large contract with the Defense Department.  In a 2010 Interview with *The Post*, Textor claimed that DDMG was "absolutely going to be No. 1 in military simulation." According to CW6, Textor was considering other projects to fund the visual effects products, including military or medical projects.  According to CW6, at that point, the Company was under-bidding on projects just to get work.  However, no revenue was ever stated as received from military contracts.

68.     In 2009, DDMG replaced the loan from Falcon Investments with one from Lydian Private Bank, which itself was replaced with a loan from Comvest Partners.  Comvest Partners claimed the loan was in default after the IPO in 2011, and Textor secured financing from Tenor Capital Management.

### E.     DDMG's 2011 IPO

69.     On May 16, 2011, DDMG filed an initial registration statement on Form S-1 with the SEC.  Not a single underwriter who participated in the company's failed 2007/2008 public offering participated in this second attempt.  Instead, Barclays Capital ("Barclays") and Janney Montgomery Scott ("Janney") were identified as the underwriters of the IPO.  The May 16, 2011 filing announced that the proposed maximum aggregate offering price of the IPO would be $115 million dollars.

70.     On July 1, 2011, DDMG filed Amendment No. 1 to Form S-1 with the SEC.  In Amendment No. 1, Barclays and Janney were identified as underwriters of the IPO.  Amendment No. 2 was filed with the SEC on July 20, 2011, Amendment No. 3 was filed with the SEC on August 12, 2011, and Amendment No. 4 was filed with the SEC on September 20, 2011.

71.     Barclays and Janney subsequently withdrew as underwriters after Amendment No. 4 was filed.  On November 4, 2011, DDMG filed Amendment No. 5 to Form S-1 with the SEC, which identified Defendant Roth Capital and Defendant Morgan Joseph as the underwriters of the IPO.  The filing further disclosed that DDMG had lowered the intended maximum aggregate offering price to $75.9 million from $115 million, and that DDMG intended to sell 5.5 million shares of common stock, plus an option to the underwriters to purchase 825,000 shares on the IPO terms and conditions, at a price between $10.00 per share and $12.00 per share.  Amendment No. 5 further disclosed that DDMG expected to receive approximately $54.8 million from the sale of 5.5 million shares, assuming an IPO price of $11.00 per share, after deducting unpaid expenses, underwriting discounts, and commissions.  If the underwriters exercised the option to purchase 825,000 shares of DDMG common stock, DDMG expected net proceeds to be approximately $63.2 million.

72.     Amendment No. 5 disclosed that 40,080,993 shares of DDMG common stock would be issued and outstanding after the IPO, including 19,477,910 shares of DDMG common stock outstanding and 15,103,083 shares issuable upon the automatic conversion and exercise of certain securities in connection with the consummation of the IPO.  As detailed herein, those "certain securities" were owned and/or controlled by the PBC Defendants.

73.     On November 10, 2011, DDMG filed Amendment No. 6 to Form S-1 with the SEC.  Roth Capital and Morgan Joseph were identified as the underwriters of the IPO. Amendment No. 6 contained substantially the same disclosures concerning number of shares offered, pricing, and expected net proceeds as Amendment No. 5.

74.     On November 14, 2011, the Registration Statement was declared effective by the SEC.

75.     On November 15, 2011, the NYSE provided the SEC with a Form CERTNYS, which certified approval of listing and registration of DDMG's common stock under the Securities Act, and gave a tentative listing date of November 18, 2011.

76.     On Friday November 18, 2011, at approximately 1:49 p.m., DDMG filed a FWP with the SEC, which altered the terms of the IPO.  The FWP changed the number of shares offered through the IPO and the per-share price contained in Amendments No. 5 and 6.  The FWP lowered the number of shares to be offered to 4.92 million shares, from 5.5 million shares, and lowered the over-allotment option to 738,000 shares, from 825,000 shares.  The FWP also lowered the per share IPO price, from a range between $10.00 per shares and $12.00 per share, to $8.50 per share.  The FWP also lowered the expected revenues from the IPO to $38.5 million (after payment of expenses, underwriting discount, and commissions), not including the over-allotment option.  After the IPO, DDMG would have 39,500,993 shares issued and outstanding (not including the over-allotment option).

77.     The FWP further disclosed that Defendant Textor, DDMG's CEO, and Defendant Teaford, DDMG's CFO,

> and their affiliated entities have indicated an interest in purchasing an aggregate of up to approximately $10.5 million in shares of common stock in this offering at the initial public offering price.  Based on the initial public offering price of $8.50 per share, these shareholders would purchase up to approximately 1,235,294 of the 4,920,000 shares in this offering.

This represented approximately 25% of the shares to be offered in the IPO.

78.     The FWP further disclosed the following:

> **Use of proceeds**:  As disclosed in the Preliminary Prospectus, we intend to use the net proceeds from this offering (i) to facilitate our growth strategy by, among other things, advancing our development and production of animated and VFX-driven feature films and building our for-profit education business through development of the Digital Domain Institute, to the extent not funded from third-party sources as we currently anticipate, as well as (ii) for working capital and other general corporate purposes.

**Pro forma as adjusted balance sheet data**:  Based on the initial public offering price of $8.50 per share, as of June 30, 2011, on a pro forma as adjusted basis, cash and cash equivalents would have been approximately $64.2 million, working capital would have been approximately $27.9 million, total assets would have been approximately $227.3 million and total stockholders' equity would have been approximately $77.1 million.

**Pro forma as adjusted capitalization**:  Based on the initial public offering price of $8.50 per share, as of June 30, 2011, on a pro forma as adjusted basis, additional paid-in capital would have been approximately $255.9 million, total stockholders' equity would have been approximately $77.1 million and total capitalization would have been approximately $122.1 million.

* * *

**Future capital requirements**:  We expect that the net proceeds from this offering and our existing cash and cash equivalents, in conjunction with other anticipated sources of revenue, will be sufficient to fund our operations and capital requirements, including payment obligations under our outstanding debt, for the next 12 to 24 months.  However, changing circumstances may cause us to expend cash significantly faster than we currently anticipate, and we may need to spend more cash than currently expected because of circumstances beyond our control.

79.     On Friday, November 18, 2011, DDMG commenced its IPO.

80.     On November 21, 2011, at approximately 6:02 a.m., DDMG filed the Prospectus on Form 424B4 with the SEC.

81.     The Prospectus disclosed that DDMG expected to receive approximately $36.8 million (after expenses, underwriting discounts, and commissions) from the sale of 4.92 million shares at $8.50 per share, lower than the previously announced expected revenues of $38.5 million.

82.     On November 22, 2011, Teaford filed a Form 4 with the SEC disclosing that he had purchased 58,825 shares of DDMG common stock in the IPO on November 18, 2011 at $8.50 per share for approximately $500,000.  This increased Teaford's holdings of DDMG securities to 2,292,146 shares, which were held by Elk River Investments, LLLP, an entity wholly owned by Teaford and his wife.

**F.      Textor's Secret $10 Million Loan from the Palm Beach Capital Defendants**

83.      On November 22, 2011, Textor filed a Form 4 with the SEC disclosing that he had purchased 1,176,471 shares of DDMG common stock in the IPO on November 18, 2011 at $8.50 per share for approximately $10 million.   This increased Textor's direct holdings of DDMG securities to 9,638,088.   In addition, Textor held 373,832 shares indirectly, through Wyndcrest DD Investment Holdings, LLC.   According to the Form 4, "The managing member of Wyndcrest DD Investment Holdings, LLC is Wyndcrest Holdings, LLC, and the managing member of Wyndcrest Holdings, LLC is Textor Ventures, Inc.   Mr. Textor, as the president and sole director of Textor Ventures, Inc., holds voting power and investment power of the shares of common stock beneficially owned by Wyndcrest DD Investment Holdings, LLC and disclaims beneficial ownership of such securities except to the extent of any pecuniary interest therein."

84.      On November 23, 2011, Textor filed a Form 4 with the SEC disclosing that on November 21, 2011, he had purchased 7,750 shares at an average price of $6.35 per share, for approximately $49,212 total.   This increased Textor's direct holdings of DDMG securities to 9,645,838 shares.

85.      According to the 2011 10-K, as of December 31, 2011, Textor had beneficial ownership over 10,379,670, or 25.1%, of DDMG's common stock.   As of that same date, the PBC Defendants had beneficial ownership of 16,497,383, or 40.2%, of DDMG common stock.

86.      Unbeknownst to the public, and undisclosed in the Offering Documents or Form 4s, Textor borrowed the more than $10 million he needed to purchase the 1,176,471 shares of DDMG common stock in the IPO and the 7,750 shares purchased soon after the IPO.   Textor entered into the Loan Agreement with several entities, including certain of the PBC Defendants.

87.      The Loan Agreement, however, went undisclosed until August 29, 2012.   On that date, Textor filed a Schedule 13D with the SEC, which disclosed for the first time the Loan

24

Agreement, and attached copies of the Loan Agreement, dated November 22, 2011, and the First

Amendment to the Loan Agreement, dated May 3, 2012. The May 3, 2012 amendment allowed

Textor to borrow an additional $2.5 million for the purchase of an additional 63,000 shares on

DDMG common stock on May 17 and 18, 2012 (collectively, with the November 2011 loan, the

"Loans").

88.     The Schedule 13D stated:

On November 22, 2011, Mr. Textor entered into a Loan Agreement (the "Loan Agreement") with PBC Digital Holdings II, LLC, a Delaware limited liability company ("PBC"), Thomas J. Morrison Article IX, a trust dated 12/10/2002, Thomas J. Morrison Trust dated 1/11/76, Glenmore Enterprise, Inc., and Carlos Morrison (the "Lenders") and PBC JT, LLC, a Delaware limited liability company, as administrative agent for the Lenders. PBC is an affiliate of Palm Beach Capital Fund III, L.P. and PBC III Principals Fund, L.P., which are private equity funds that have reported in a Schedule 13D/A filed on August 21, 2012 that *they are beneficial owners of 37.7% of the Company's Common Stock*. Mr. Textor used the proceeds from the Loan Agreement to purchase shares of the Company's Common Stock on November 18, 2011.

*Pursuant to the Loan Agreement, the Lenders advanced Mr. Textor $10,000,000 plus an additional amount equal to the closing costs. The Loan Agreement was amended on May 3, 2012, pursuant to which the Lenders advanced an additional $2,500,000. The cash advanced is secured by (i) a pledge of 8,461,617 shares of the Company's Common Stock and (ii) security interests on certain real estate assets owned by Mr. Textor.* Interest on the loan accrues at 8% per annum for the first ninety days of the term of the Loan Agreement, 10% per annum for the next sixty days of the term of the Loan Agreement, and 12% thereafter. One-half of the interest is payable monthly in cash and one-half of the interest is added to the principal balance of the advance. In the Event of Default (as defined in the Loan Agreement), the interest rate will increase to 19% per annum. Mr. Textor repaid $1,590,000 of the advance on March 29, 2012. The advance is due and payable on August 31, 2012. Mr. Textor and the Lenders have agreed in principle to extend the due date of the Loan Agreement and are currently negotiating an extension of the Loan Agreement.

(Emphasis added).

89. The properties securing the Loans included Textor's real estate holdings located in Mountain Village, Colorado (the "Colorado Property") and Stuart, Florida (together with the contiguous lots, the "Florida Property").

90. Textor also "agreed to use his best efforts to consummate a margin loan transaction with UBS Financial Services, Inc. or other lender (the 'Margin Transaction') and has agreed to use [sic] prepay the Loans with the net proceeds from Margin Transaction." On the Termination Date, Textor was required to repay the aggregate principal amount of the Loans with the outstanding interest due and owing on such Loans. The Termination Date was August 31, 2012.

91. The "Security and Pledge Agreement" executed by Textor and his wife, Deborah Textor, on November 22, 2011 in connection with the Loan Agreement, was not disclosed until October 11, 2012, when the PBC Defendants filed a Form SC 13D/A with the SEC and revealed that on August 31, 2012, Textor defaulted on the Loan Agreement.

92. Failing to disclose the Loan Agreement led members of the Class to believe that Textor was investing $10 million of his own money in DDMG when in fact Textor was investing borrowed money. Further, purchasing the $10 million in DDMG common stock through the IPO fulfilled all demand, ensuring that the IPO would be fully subscribed.

93. The failure to disclose the Loan Agreement was also a material omission because by virtue of the PBC Defendants' large holdings in DDMG common stock, coupled with Defendant Textor's holdings in DDMG common stock, the PBC Defendants and Defendant Textor were in control of a majority of the shares of the Company. The PBC Defendants' were in a manifest position of power over Defendant Textor due to the Loan Agreement, seat on the DDMG Board, and large shareholdings.

26

94.     If the Loan Agreement and its security terms had been disclosed, the members of the Class would have learned that DDMG's common stock was not worth anywhere close to $8.50 per share IPO price, and was in fact worthless.  The $10 million loan was secured not by the shares Textor purchased in the IPO, but rather by the 8,461,617 shares of DDMG that Textor owned before the IPO and by Textor's Colorado Property and Florida Property.  Had the Loan Agreement and Security and Pledge Agreement been disclosed, DDMG shareholders would have learned that the PBC Defendants, a major shareholder and investor in DDMG, believed more than 8 million shares of DDMG common stock (plus the shares Textor purchased in the IPO) would not be able to secure the $10 million loan, and that Textor's property was necessary as security.

95.     Textor ultimately defaulted on the loan, and sold the Florida Property for $2.75 million, and listed the Colorado Property for $9.9 million, to cover the loan.  Thus the Florida and Colorado Properties provided most of the security under the Security and Pledge Agreement, the DDMG shares were ascribed almost no value by the single largest investor in DDMG.

### G.     Textor's Sale of DDMG Stock on the Eve of Bankruptcy

96.     According to a complaint filed by Eastside Holdings, Inc. ("Eastside"), in late August 2012, Textor contacted Seth Fireman, a representative of Eastside, in an attempt to solicit a sale of Textor's personally held DDMG securities to Eastside.  When asked about the basis for DDMG's declining stock price, Textor advised Fireman and another Eastside representative that the stock price had dropped because of margin call sales.  Textor also advised the Eastside representatives that a meeting with institutional investors would stabilize DDMG's stock price.  Based on this representation, Eastside purchased 200,000 of Textor's shares for $448,000 (for $2.24 per share) on August 30, 2012.  Less than two weeks later, DDMG filed for bankruptcy.

**H.**     **The IPO Failed to Cure DDMG's Continuing Liquidity Problems**

97.     According to the Post Report, DDMG's largest shareholder, the PBC Defendants, contacted FTI Consulting, a restructuring expert, in August 2012.   The PBC Defendants informed FTI Consulting that it "had no faith in the numbers that were coming from the company or in its ability to attract capital[.]" FTI Consulting discovered that the Company was spending more than $700,000 a day and described DDMG's financial statements as "insanely cash-flow negative." Indeed, on August 16, 2012, DDMG took a $5 million loan from the PBC Defendants in order to make payroll.  FTI Consulting stated that DDMG had little choice but to declare bankruptcy based on its financial situation. "You had a wasting asset," stated FTI Consulting Chairman Dennis Shaughnessy. "There was no way they could meet their obligations."

98.     This fact is further corroborated by several CWs.  CW2 is a former administrative assistant to Ed Lunsford, Vice President and General Counsel, and worked at the Company from August 2012 until September 2012.  CW2 also stated that DDMG's cash flow was not enough to pay for the projects the Company was working on.

99.     CW3 is a former Production Department Manager for DDMG in Florida, and held that position from January 2012 until September 2012.  CW3 stated that DDMG could not order office supplies or have the copier fixed because bills were not paid.

100.     CW4 stated that FTI Consulting met with Digital Domain Productions, Inc. in August 2012 to value DDMG's assets for bankruptcy.   At that time, FTI Consulting was provided with the monthly and weekly forecasts of Digital Domain Productions, Inc. that had been prepared and sent to DDMG.  According to CW4, while the California office kept regular financial records, the Florida office's record keeping was sparse to nonexistent.  In the words of CW4, "at the end of the day, no one had a complete picture."  For example, FTI Consulting had

28

been told by Defendant Textor that Digital Domain Productions, Inc. had not made any money, but upon visiting the its Venice, California, FTI Consulting learned that was not always true. CW4 stated that the documents and models provided to FTI Consulting were not based on reports produced by Digital Domain Productions, Inc.

101.   CW5 stated that IPO proceeds were exhausted by February 2012 or earlier and DDMG had a severe cash issue.  After that the Company received financing from Tenor Capital, $10 million in private investment/private equity and $5 million from the PBC Defendants in August 2012.  CW5 stated that DDMG's liquidity crisis began when the Florida office opened. The Florida office did not generate revenue according to CW5, and the only cash from the Florida office came from the state incentives.  At the beginning of 2012, monthly payroll for the Florida office was $1 million; by the time DDMG filed for bankruptcy that number had swelled to $2.2 million, according to CW5.  The monthly payroll for the California and Vancouver offices stayed about the same during that same time period.

102.   CW5 prepared weekly cash flow forecasts for senior management that was reviewed with the CFO who said he would show the report to the CEO.  Both Teaford and Nichols informed CW5 that these reports had been discussed with the CEO.  Beginning in September or October 2011, the weekly reports included actual numbers along with forecasts, according to CW5.  CW5 stated that these reports included information from each DDMG location.  CW5 also stated that the CEO and CFO would provide him with different financial scenarios to apply to his forecasts, such as potential private placement transactions or putting off a certain payable.  In the first half of 2012, CW5 understood that the Board was supposed to receive the reports.

103.     On September 4, 2012, the Company announced that it was in default with its $35 million loan with Tenor Capital and hinted at bankruptcy.  In an interview with WPTV-Channel 5 on September 4, 2012, Textor stated that "this is a very small amount of money" and downplayed the chance of bankruptcy.

104.     Just three days later, however, on September 7, 2012, DDMG announced that it was closing the Florida studio.  CW1 stated that Textor held a company-wide meeting at the Florida studio days before the staff was fired, and told them that the Company was stable and the staff should not worry.  CW2 stated that Textor told employees at the Company-wide meeting that they had no reason to worry and that the Company would be fine.  CW3 also recalled the Company-wide meeting held by Textor and his reassurances that everything was fine.

## V.     FACTUAL ALLEGATIONS RELATED TO THE SECURITIES ACT CLAIMS

105.     The Securities Act claims arising from the IPO are strict liability and/or negligence claims against the Defendants.  Lead Plaintiffs expressly exclude and disclaim, in connection with the Securities Act claims, any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as these claims are based solely on claims of strict liability and/or negligent under the Securities Act.

### A.     The Offering Documents Contain Materially Untrue Statements and Omissions

106.     On November 10, 2011, the Company filed Amendment 6 to its S-1.  Amendment No. 6 stated:

**Liquidity and Capital Resources**

Our principal sources of liquidity at June 30, 2011 consisted of cash and cash equivalents of $1.3 million, cash held in trust of $9.3 million and accounts receivable and contract receivables of $3.3 million.  We had a deficit in working capital of $28.0 million as of June 30, 2011 and a $111.0 million loss attributable

to common stockholders and used $15.6 million to fund cash flows from operations for the six months ended June 30, 2011.

In August 2011, DDI received $26.0 million in a private placement of 3,250,000 shares of its common stock.  Fees and expenses related to this private placement aggregated $2.7 million, resulting in net proceeds to DDI of $23.3 million.

As described further in "— Financing Transactions," on July 1, 2011 we entered into a credit facility with Comvest that was effective as of June 30, 2011.  The credit facility is comprised of a convertible note payable to Comvest in the principal amount of $8.0 million and a revolving credit facility providing us with borrowing capacity of up to $15.0 million of which we drew $7.4 million in July 2011.  Concurrent with this transaction, on July 1, 2011, Comvest paid in full all amounts of principal and interest then due from us to our former commercial lender and acquired that lender's rights under its loan agreements with us.  In connection with this transaction, we issued a replacement promissory note to Comvest in the aggregate principal amount of $12.0 million.

During the six months ended June 30, 2011, we received $19.5 million in a private placement of 2,025,001 shares of our Common Stock.  Fees and expenses related to this private placement aggregated $2.5 million, resulting in net proceeds of $17.0 million.  In June 2011, Digital Domain sold 1.5 million shares of its common stock for $2.5 million.  Additional capital infusions in the first half of 2011 include the receipt of $4.0 million from the State of Florida when we reached an employee count in Florida of 200 employees.  In April 2011, PBC Digital Holdings II exercised its right to invest the remaining $2.0 million from the remaining capacity of our Junior Debt agreement.  See Note 13 to our Consolidated Financial Statements included elsewhere in this prospectus.  In May 2011, we borrowed another $2.0 million from PBC Digital Holdings II for short-term equipment financing.  Additionally in May 2011, we received $2.0 million in grant proceeds upon confirmation that our students at DDI will receive degrees that are accredited by a nationally recognized accrediting body.

During the first half of 2011, we entered into a purchase agreement with a major film studio for the purchase of studio and film equipment aggregating $8.5 million.  We funded $2.5 million of this purchase from cash, held in trust and the remaining amounts from operating cash and cash equivalents, partially funded by the $2.0 million obtained from equipment financing discussed above.  Additionally, we paid $5.0 million in the first half of 2011 to exercise our right to purchase Falcon's Series B Warrants.  See Note 14 to our Consolidated Financial Statements included elsewhere in this prospectus.

***We believe that these various sources of cash will be sufficient to support our operations during 2011.***

(Emphasis added).  These statements were repeated in the Prospectus on a Form 424B4 filed

with the SEC on November 21, 2011.

107.    DDMG's November 10, 2011 Amendment No. 6 also stated:

**Use of Proceeds**

*We intend to use the net proceeds from this offering (i) to facilitate our growth strategy by, among other things, advancing our development and production of animated and VFX-driven feature films and building our for-profit education business through development of DDI, to the extent not funded from third-party sources as we currently anticipate (as described below in "Business — Business Evolution" and "Business — Education"), as well as (ii) for working capital and other general corporate purposes.*

\* \* \*

*Following this offering, we believe that our available funds will be sufficient to allow us to advance our growth strategy.*  However, it is possible that we will not achieve the progress that we expect because the actual costs, timing of development and effects of competition are difficult to predict and are subject to substantial risks and delays.  We have no committed external sources of funds.  To the extent that the net proceeds from this offering and our other capital resources are insufficient to serve the purposes stated herein, we will need to finance our cash needs through public or private equity offerings, debt financings, corporate collaboration and licensing arrangements or other financing alternatives.

(Emphasis added).  These statements were repeated in the Prospectus on a Form 424B4 filed

with the SEC on November 21, 2011.

108.    Defendants Textor and Teaford signed the November 10, 2011 Amendment No. 6

as CEO and Principal Executive Officer (Textor) and CFO and Principal Financial and

Accounting Officer (Teaford).

109.    The statements in ¶¶106-108 were untrue statements of material fact and failed to

disclose that the Company knew (i) it did not have the ability to raise capital and fund its

operations in the short and long terms, (ii) it was facing a substantial "burn rate" which

threatened DDMG's ability to continue as a going concern, and (iii) the proceeds raised as a

result of the IPO would not be sufficient to allow the Company to invest in a growth strategy. At the time the statement was made, DDMG's senior executives, including Textor and Teaford, knew that DDMG was in liquidity crisis, and could not pay its bills.

110.    In DDMG's November 10, 2011 Amendment No. 6, the Company stated:

**Grants and Other Incentives from Governmental Entities**

\* \* \*

The first stimulus package, signed in June 2009, provides for $20 million in cash grants from the State of Florida. The second stimulus package was awarded to us by the City of Port St. Lucie, Florida in December 2009 and January 2010, providing for us to receive an additional $10 million in cash grants, 15 acres of land appraised at $10.5 million and $39.9 million in low-interest building and equipment lease financing. ***We are deploying these incentives to construct our 500-person animated feature film studio in Port St. Lucie, Florida.*** As of December 31, 2010, a total of $21.5 million has been disbursed to us under the grant agreements in the form of cash grants, $16.0 million from the state of Florida (the "State Cash Grant"), and $5.5 million from the City of Port St. Lucie (the "City Cash Grant"), collectively, the "Cash Grants."

The third stimulus package, signed in November 2010 with the City of West Palm Beach, Florida Community Redevelopment Agency, provides for grants of $10 million in cash, title to 2.4 acres of land appraised at $9.8 million and $15 million in low-interest financing. These grants are designed to incentivize us to build our educational facility at a site in the City of West Palm Beach. The cash grant will be released in the future as our educational institute achieves various benchmarks including the obtaining of construction financing, commencement of construction, student enrollment targets and other business progress targets. We have received title to the 2.4 acres of land in West Palm Beach and have recorded it as a long-term asset. The agreements provide for the reversion of this land in the event that we do not comply with certain requirements relating to the construction of a building by us as part of our educational business, among other uses. In addition, in the event that we elect not to construct certain additional buildings on the land, we have the option of either returning a portion of the land to the City of West Palm Beach, or paying $3.0 million.

The Cash Grants and the cash grant from the City of West Palm Beach, Community Redevelopment Agency, have been structured to be funded over a three-to-five year period as we meet target thresholds of business initiation, capital investment, job creation and/or student enrollment, as discussed in further detail below. The cash grants are not earmarked for any particular purpose, nor restricted in use with the exception of the West Palm Beach cash grant which contains certain restrictions.

In addition, the Company has entered into a Bachelor of Fine Arts Agreement and related agreements (the "BFA Agreements") with FSU calling for FSU to provide a Bachelor of Fine Arts degree to students of DDI.  The BFA Agreements also call for us to contribute $3.2 million to FSU to fund certain start-up and other costs and for FSU to provide ongoing consulting services to us.

**State of Florida Tax Credits**

We have received notice from the Florida Governor's Office of Film and Entertainment that five of our projects have been certified under the State of Florida's Entertainment Industry Financial Incentive Program, representing a potential total tax credit of $16.9 million.  These tax credits are transferable and range from 20% to 25%.  As of December 31, 2010, no credits related to this notice have been recognized.

These statements were repeated in the Prospectus on a Form 424B4 filed with the SEC on November 21, 2011.

111.    The statements in ¶110 were untrue statements of material fact because they failed to disclose that the Company was using these grants as the sole support for the operations of DDMG.  These statements failed to disclose the Company had always been operating in the "red" and that without the proceeds from these grants, the Company would not have been able to pay payroll in either the Florida or California offices.

112.    DDMG's Amendment No. 6 also stated:

*Expand Our Participation in the Production Process and Ownership of Live-Action Feature Films*.  We believe that our role as a key participant in a number of live-action feature film projects of major film studios and leading filmmakers presents us with opportunities to selectively co-produce large-budget films.  Co-production opportunities allow us to invest in the film's overall production budget, while playing a role in the production of digital content and integrated advertising campaigns.  ***Such opportunities may enhance our overall profit potential from VFX projects through economic participation in the film's profits, as well as the long-term value of our business due to ownership of the film's intellectual property, including ancillary revenue streams.***

(Emphasis added).  These statements were repeated in the Prospectus on a Form 424B4 filed with the SEC on November 21, 2011.

113.    The statements in ¶112 were untrue statements of material fact because they failed to disclose that by entering into the co-production agreement, the Company was sacrificing substantial cash flow that it typically earned in VFX projects and it knew that the payments that would come in would not be sufficient to cover the costs of co-production.

114.    In DDMG's November 10, 2011 Amendment No. 6, the Company provided background information concerning Defendants Textor and Teaford.  The November 10, 2011 Amendment No. 6 stated the following concerning Textor's and Teaford's employment with BabyUniverse, Inc.

> *[Textor] also served as the Chairman of BabyUniverse, Inc., a leading e-tailer of baby-related products to new and expectant parents, from November 2002 and its Chief Executive Officer from April 2005 until its sale in October 2007.*

<p style="text-align:center">* * *</p>

> *Mr. Teaford was Executive Vice President and a member of the board of directors of BabyUniverse, Inc. from 1998 until its sale in October 2007.*

These statements were repeated in the Prospectus on a Form 424B4 filed with the SEC on November 21, 2011.

115.    On October 12, 2007, BabyUniverse completed a merger with eToys Direct pursuant to which the BabyUniverse and eToys Direct businesses were combined, after which the Company changed its name to The Parent Company.  On or about December 29, 2008, The Parent Company filed for Chapter 11 bankruptcy protection.

116.    The statements in ¶114 were untrue statements of material fact and omitted to state a material fact required to be stated in Amendment No. 6 and the Prospectus because they did not disclose that The Parent Company declared bankruptcy in 2008, and such disclosure was required by 17 C.F.R. 229.401 ("Item 401").  Item 401 Section f(1) required that DDMG disclose in a registration statement, prospectus, or annual report (10-K) any "events that occurred

during the past ten years and that are material to an evaluation of the ability or integrity of any director, person nominated to become a director or executive officer of the registrant," including any petition under the Federal bankruptcy laws that was filed by or against "any corporation or business association of which he was an executive officer at or within two years before the time of such filing."

117.    Textor and Teaford were both executive officers of BabyUniverse until October 2007, which was within two years of the time the Parent Corporation filed for Chapter 11 Bankruptcy Protection.   The Chapter 11 filing took place within ten years of DDMG's November 10, 2011 Amendment No. 6.   Therefore, the disclosure of the Bankruptcy was required by Item 401 and its omission was material to an evaluation of the ability or integrity of Textor and Teaford to serve as directors and executive officers of DDMG.

118.    The section titled "Experts" of Amendment No. 6 stated that:

> [t]he consolidated balance sheets of [DDMG] as of December 31, 2010 and 2009 (Successor), and the related consolidated statements of operations, stockholders' equity (deficit) and comprehensive income (loss), and cash flows for the year ended December 31, 2010 and the period from January 7, 2009 [] to December 31, 2009 [] and for the nine months ended September 30, 2009 for Digital Domain and subsidiaries [], included in this prospectus, [were] been audited by SingerLewak."

Further, the "Report of Independent Registered Public Accounting Firm" included in Amendment No. 6 stated:

> [SingerLewak] has audited the accompanying consolidated balance sheets of [DDMG] and subsidiaries [] as of December 31, 2010 and 2009 [], and the related consolidated statements of operations, stockholders' equity (deficit) and comprehensive income (loss), and cash flows for the year ended December 31, 2010, the period from January 7, 2009 [] to December 31, 2009 [] and for the nine months ended September 30, 2009 for Digital Domain[].

> * * *

> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Digital Domain Media

36

> Group, Inc. and subsidiaries as of December 31, 2010 and 2009 (Successor Entity), and the results of their operations and their cash flows for the year ended December 31, 2010 and the period from January 7, 2009 (Inception Date) to December 31, 2009 (Successor Entity) and for the nine months ended September 30, 2009 (Predecessor Entity) in conformity with U.S. generally accepted accounting principles.

These statements were repeated in the Prospectus on a Form 424B4 filed with the SEC on November 21, 2011.

119.    SingerLewak executed a "Consent of Independent Registered Pubic Accounting Firm," which was attached as Exhibit 23.1 to Amendment No. 6.  Exhibit 23.1 stated:

> We consent to the use in this Amendment No. 6 . . . of [DDMG] of our report dated May 13, 2011, relating to our audits of the consolidated financial statements, appearing in the Prospectus, which is part of this Registration Statement.

> We also consent to the reference to our firm under the caption "Experts" in such Prospectus.

120.    SingerLewak's Report of Independent Registered Public Accounting Firm, included in the Prospectus and Amendment No. 6 with SingerLewak's consent, omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading because it did not include a going concern qualification.

121.    Prior to SingerLewak's retention as DDMG's independent auditor in 2010, Deloitte was DDMG's independent auditor.  DDMG audited, "before the addition of loss per share and disclosure of reportable segments," DDMG's (although then known as Digital Domain) consolidated statements of operations, stockholders' deficiency and comprehensive loss, and cash flows for the year ended December 31, 2008.

122.    Deloitte issued its audit opinion for the year ended December 31, 2008 in June 2009.  Deloitte qualified its audit opinion for the year ended December 31, 2008, stating that "the Company's recurring losses from operations and negative cash flows from operating activities,

and negative working capital and stockholders' deficiency as of December 31, 2008, *raise substantial doubt about its ability to continue as a going concern*." In January 2010, Deloitte was terminated as Digital Domain's (as it was then called) independent auditor and replaced by SingerLewak. Deloitte's going concern qualification was for the year ended December 31, 2008 was disclosed in the Registration Statement and Prospectus.

123.   SingerLewak's failure to include a going concern qualification was an omission of a material fact necessary to make its statements in the Prospectus and Amendment No. 6 not misleading because SingerLewak gave false information to public investors that DDMG had resolved its negative cash flow such that it had the ability to continue as a going concern. As alleged herein, DDMG continued to have serious cash flow issues before and after the IPO. In fact, DDMG declared bankruptcy less than ten months after its IPO.

124.   On November 18, 2011, the Company filed its Free Writing Prospectus with the SEC. The November 18, 2011 FWP stated that:

> **Use of proceeds**: As disclosed in the Preliminary Prospectus, we intend to use the net proceeds from this offering (i) to facilitate our growth strategy by, among other things, advancing our development and production of animated and VFX-driven feature films and building our for-profit education business through development of the Digital Domain Institute, to the extent not funded from third-party sources as we currently anticipate, as well as (ii) for working capital and other general corporate purposes.
>
> **Potential purchases by principal shareholders**: John C. Textor, who is our Chief Executive Officer and the Chairman of our Board of Directors, Jonathan Teaford, who is our Chief Financial Officer and a member of our Board of Directors, and their affiliated entities have indicated an interest in purchasing an aggregate of up to approximately $10.5 million in shares of common stock in this offering at the initial public offering price. Based on the initial public offering price of $8.50 per share, these shareholders would purchase up to approximately 1,235,294 of the 4,920,000 shares in this offering. Because indications of interest are not binding agreements or commitments to purchase, these shareholders may elect not to purchase any shares in this offering.
>
> **Future capital requirements**: *We expect that the net proceeds from this offering and our existing cash and cash equivalents, in conjunction with other*

*anticipated sources of revenue, will be sufficient to fund our operations and capital requirements, including payment obligations under our outstanding debt, for the next 12 to 24 months. However, changing circumstances may cause us to expend cash significantly faster than we currently anticipate, and we may need to spend more cash than currently expected because of circumstances beyond our control.*

(Emphasis added).

125.    The statements in ¶124 were untrue statements of material fact because they did not disclose that DDMG was experiencing liquidity concerns, was unable to pay its bills, and that the IPO proceeds would not be sufficient to fund the Company for the next 12 to 24 months or allow it to pursue a growth strategy. These statements failed to disclose that, as early as May 16, 2011, when DDMG announced its IPO, DDMG's liquidity and cash positions were, contrary to what was represented above, precarious, making it unlikely that DDMG could fund its operations through 2012. These statements were also untrue statements of material fact because they failed to disclose that Textor's purchases were subject to the Loan Agreement with the PBC Defendants, and were not purchased with Textor's personal funds.

### B.    Co-Lead Plaintiff's Purchase

126.    Co-Lead Plaintiff Mr. Dziedzic purchased DDMG common stock on November 18, 2011 through DDMG's IPO.

## VI.    FACTUAL ALLEGATIONS RELATED TO THE EXCHANGE ACT CLAIMS

### A.    Defendants' False and Misleading Statements and Omissions in the Offering Documents

127.    As alleged above, statements in November 10, 2011 Amendment No. 6 of DDMG's Form S-1 and repeated in the Prospectus, as detailed in ¶¶106-108, were materially false and/or misleading because they failed to disclose that the Company knew (i) it did not have the ability to raise capital and fund its operations in the short and long terms, (ii) it was facing a

substantial "burn rate" which threatened DDMG's ability to continue as a going concern, and (iii) the proceeds raised as a result of the IPO would not be sufficient to allow the Company to invest in a growth strategy. At the time the statement was made, DDMG's senior executives, including Textor and Teaford, knew that DDMG was in liquidity crisis, and could not pay its bills.

128. As alleged above, statements in November 10, 2011 Amendment No. 6 of DDMG's Form S-1 and repeated in the Prospectus, as detailed in ¶110, were materially false and/or misleading because they failed to disclose that the Company was using these grants as the sole support for the operations of DDMG. These statements failed to disclose the Company had always been operating in the "red" and that without the proceeds from these grants, the Company would not have been able to pay payroll in either the Florida or California offices.

129. As alleged above, statements in November 10, 2011 Amendment No. 6 of DDMG's Form S-1 and repeated in the Prospectus, as detailed in ¶112, were materially false and/or misleading because they failed to disclose that by entering into the co-production agreement, the Company was sacrificing substantial cash flow that it typically earned in VFX projects and it knew that the payments that would come in would not be sufficient to cover the costs of co-production.

130. As alleged above, statements in November 10, 2011 Amendment No. 6 of DDMG's Form S-1 and repeated in the Prospectus, as detailed in ¶114, were materially false and/or misleading because they failed to disclose that The Parent Company declared bankruptcy in 2008, and such disclosure was required by Item 401 and its omission was materially false and misleading because the omission was material to an evaluation of the ability or integrity of Textor and Teaford to serve as directors and executive officers of DDMG.

131.     As alleged above, statements in the November 18, 2011 FWP, as detailed in ¶124, were materially false and/or misleading because they failed to disclose that DDMG was experiencing liquidity concerns, was unable to pay its bills, and that the IPO proceeds would not be sufficient to fund the Company for the next 12 to 24 months or allow it to pursue a growth strategy.   These statements failed to disclose that, as early as May 16, 2011, when DDMG announced its IPO, DDMG's liquidity and cash positions were, contrary to what was represented above, precarious, making it unlikely that DDMG could fund its operations through 2012.   These statements were also untrue statements of material fact because they failed to disclose that Textor's purchases were subject to the Loan Agreement with the PBC Defendants, and were not purchased with Textor's personal funds.

**B.     Defendants' Further Materially False and Misleading Statements and Omissions**

*1.Third Quarter 2011 Financial Results*

132.     On December 20, 2011, DDMG issued a press release announcing its Third Quarter results for 2011.   In the press release, Textor stated:

> Our third quarter financial results are in-line with estimates, representing a confirmation of the headline numbers that were previously disclosed during our recent IPO process . . . [and] [w]e are also pleased to report that our revenue backlog of 2012/2013 film projects, combined with our recently announced strategic and technology-based initiatives provide the company with a ***positive outlook and strong visibility well into 2013***.
>
> * * *
>
> While our growth appetite is aggressive, ***we have mitigated the financial risk of such growth*** through a unique funding model that relies on public and private partnerships.   We have also mitigated the risk of execution by choosing great partners such as Reliance Media in India, Galloping Horse in China and The Florida State University.

133.     Also, on December 20, 2011 (***only one month after its IPO***), DDMG announced in a separate press release that that its Board of Directors has authorized the company to

repurchase up to $10 million of its outstanding common stock.  The share repurchase program had an expiration date of June 22, 2012.  The Company further stated that:

> It is the intent of the company to focus on business fundamentals as its primary strategy to enhance shareholder value.  The company also believes that its publicly traded common stock represents a currency that contributes to its fundamental strategy in a variety of ways, particularly in the area of human resource recruitment.  The company intends to pursue a share repurchase program that it believes represents a sound investment of its available cash, is supportive of its fundamental business strategy and also has the potential to address what the company believes are certain market and valuation inefficiencies that resulted from our recent initial public offering process.

134.    The statements in ¶¶132-133 were materially false and misleading because they failed to disclose that the Company knew (i) it did not have the ability to raise capital and fund its operations in the short and long terms, (ii) it was facing a substantial "burn rate" which threatened DDMG's ability to continue as a going concern, and (iii) that the stock repurchase program was not a sound investment of the Company's cash.  At the time the statement was made, DDMG's senior executives, including Textor and Teaford, knew that DDMG was in liquidity crisis, and could not pay its bills.

135.    On December 20, 2011, DDMG held a conference call to discuss its financial results.  During the call, Textor reassured investors that the Company was not threatened by an excessive burn rate:

> <**Q**>:  Okay, misstated in the entry point.  *One of the numbers I'm having a hard time gaining access to is your burn rate.  And at the current burn rate of cash that you have, assuming a direct cost of 49% to employee cost, if you don't ramp up your sales, when would you run out of money? Or alternatively, what is your breakeven point in terms of gross revenues?*
>
> <**A**> - **John C. Textor**>:  Well, the burn rate discussion I'll tackle in two ways, because it starts with a false premise.  It is – let me draw you back to the segment reporting, and a full year is the easiest way to see it, because we do have these gaps at particular points in the year.  So let me start with the 2010 example.
>
> Our core business in 2010 in visual effects, and I would like to say our historically core business, did $102 million in revenues and had $17 million of EBIT.  So in

the core business, you're nicely profitable and you're growing.  Yes it's the stair-stepping kind of growth, but you're growing.  Now, in that business before you get to any of these other new businesses, that business is very nicely funded by upfront payments that come from studios that on smaller projects or medium-sized projects are often 20% of the value of the contract.

So the industry in visual effects across the board has historically relied on studio capital for working capital.  And the studios know it, the companies depend on it, and it's one of the reasons the studios feel comfortable trying to pressure the visual effects industry by and large to accept lesser margins, because they're always feeding the industry with these upfront payments.

In our case, we get those same upfront payments, but we have better margins by and large because of the importance of our work, and the fact that in some cases we're the only guys along with a select few others that can do certain kinds of work.  So a 17% EBIT margin on our core business in a business where the studios fund you upfront for the project is a very healthy cash generating business when you're growing, because the deposit for future projects, if those projects are larger, are always building more and more working capital in a normal year.  And that shows up as retained earnings.

Now, in a particular quarter, keep in mind, if you finish a project and you don't have another project immediately on its heels, you can show an irregularly large cash burn in that particular quarter, because if you took a 20% payment upfront

**<Q>**:  You don't put that in your EBIT analysis then.

**<A> - John C. Textor>**:  Yes, then you're burning off, you're paying – you're basically paying, funding that film at the end.  Now in our case, look at our backlog.  Our backlog as disclosed – and was that right at $218 million or $216 million? I'm sorry, I'm -

* * *

**<A - John C. Textor>**:  So $216 million in total.  But $180 million is in the backlog on feature film projects, which is more visibility than we've ever had in this business going forward.  And that's a combination of films that we've already contracted and those films that have been awarded to us that we expect to go to full contract.  There is some risk in that latter category, but even the portion that we already have contracted is more backlog than I think we've ever had at the business.  And those projects are much larger, like Paradise Lost is an $80 million to $90 million visual effects project TRON was not an anomaly.  I mean, the big films are getting more and more like that.  So the core business is growing nicely.  It is profitable and it's got really favorable characteristic on upfront deposits fixed on working capital.  So in that business, there is no burn rate as we go forward.

You might have a difficult quarter if you've got a gap where one is rolling off before deposit is received on the next, but that's one of the benefits to being

43

public and to having lines of credits and to being able to manage that over a multi-quarter period of time.

Now, let me get to the next part of the business, which looks like burn rate, but also in our opinion is not. If you look at the total salaries of the people that we've hired in Florida, these are – we've gone from 0 people to 250 people here by and large pre-revenue, because we've gone into a new market where people weren't ready to walk in and start doing Star Wars-caliber work. Now that's why we went to the state of Florida and said, if you want us to train your local workforce, it's going to cost us a bunch of money. *If you want a company like ours to come to the state, you have to help us get started. So the burn rate that you see in things like unutilized labor, as you see in this release, our total unutilized labor is less than we received in cash grants. So the timing doesn't always work out, but we're receiving more money than we've laid out.*

136.     The statements in ¶135 were materially false and/or misleading because Textor and the Company knew that (i) the Company was not receiving more money that it laid out, (ii) that the grants were the only source of funding sustaining the Company, and (iii) the Company's burn rate threatened its ability to continue as a going concern.

137.     On December 22, 2011, DDMG filed its 3Q 2011 10-Q, which was certified by Textor and Teaford, who certified as Principal Executive Officer and Principal Financial and Accounting Officer, respectively, that based on their knowledge, the report did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report," and that the report "fairly present[s] in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."  The 3Q 2011 10-Q stated, in relevant part:

**Chairman and Chief Executive Officer of the Company and Chairman of Digital Domain** — On June 3, 2011, Digital Domain granted Mr. John Textor, the Company's Chairman and Chief Executive Officer and the Chairman of Digital Domain, the option to purchase 1,500,000 shares of Digital Domain's Common Stock.  These options have an exercise price of $.001 per share and were immediately vested.  The grant was immediately exercised, and in July 2011

Mr. Textor exchanged the Digital Domain Common Stock for 934,580 shares of the Company's Common Stock. As this option, exercise and exchange were contemplated prior to June 30, 2011 the Company recorded an additional $6.5 million of stock compensation expense related to the exchange of the shares of Digital Domain Common Stock for the Company's Common Stock as of June 30, 2011. However, the Company did not record the exchange for purposes of determining outstanding common stock until July 2011.

***As part of the initial public offering conducted by the Company on November 18, 2011, Mr. Textor purchased 1,176,471 shares of DDMG common stock at $8.50 per share for a total investment of $10.0 million.***

\* \* \*

### Grant revenues from governmental sources

Grant revenues from governmental sources decreased by $0.2 million during the three months ended September 30, 2011 as compared to the corresponding period of the prior year. During the three months ended September 30, 2011 and September 30, 2010, we recognized $0.4 million each from a grant from the State of Florida. During the three months ended September 30, 2011, we recognized $0.3 million from a new grant from the City of West Palm Beach, Florida.

\* \* \*

### Liquidity and Capital Resources

As of September 30, 2011, we had a deficit in working capital of $38.3 million. This is inclusive of debt principal outstanding on that date and due on September 30, 2012 aggregating $37.1 million.

On November 18, 2011, we conducted the initial public offering ("IPO") of our common stock. We began trading on the New York Stock Exchange under the ticker symbol "DDMG" on November 18, 2011. On that day, we sold 4.92 million shares of our common stock at the IPO offering price of $8.50 per share. The proceeds of the offering were $41.8 million, before payment of commissions and other then unpaid offering costs aggregating $3.4 million. Upon the completion of the IPO, convertible debt and warrants representing $128.4 million in debt and warrant liabilities on our balance sheet were automatically converted or exercised, as applicable, into shares of our common stock.

After the automatic conversion of our debt and warrant exercise upon the completion of the IPO discussed above, the remaining principal of our debt was $27.4 million, of which $19.4 million is due on September 30, 2012.

***We believe, based on our current operating plan, that our existing cash and cash equivalents and available borrowings under our credit facility will be sufficient to meet our anticipated cash needs for at least the next 12 months.***

(Emphasis added).

138.   The statements in ¶137 were materially false and misleading because they failed to disclose that the Company knew (i) Textor's investment during the IPO was backed by the Loan Agreement, which used previously held common stock and real estate as collateral, rather than Textor's personal investment, (ii) the Company was using the proceeds from the grants as the sole support for the Company's operations and without the grants, would not even be able to make payroll, (iii) the it did not have the ability to raise capital and fund its operations in the short and long terms, and (iv) it was facing a substantial "burn rate" which threatened DDMG's ability to continue as a going concern, and (v) the proceeds raised as a result of the IPO would not be sufficient to allow the Company to invest in a growth strategy.

### 2. Fourth Quarter and Full Year 2011 Financial Results

139.   On April 2, 2012, DDMG issued a press announcing its fourth quarter financial results.  The Company touted that it had "beat revenue and earnings estimates."  Textor stated:

> We are pleased to remain on plan as we report our first full quarter as a public company [and that] [w]e have made significant progress expanding beyond our traditional visual effects business with the opening of our original content family feature animation studio, the beginning of classroom instruction at the Digital Domain Institute and the exciting commencement of our first feature film co-production, the highly anticipated and globally recognized Ender's Game.
>
> * * *
>
> Again, we would like to highlight the fact that our grant receipts, which were secured to fund the Florida expansion, have substantially outpaced our Adjusted EBITDA losses, which show the upfront expense of this expansion.  For example, our Adjusted EBITDA loss for all of 2011 was $22.4 million, while we are still holding deferred grant revenue of $32.7 million.  This grant revenue paid for our expansion in Florida and will, we believe, be recognized into income, as pure profit flow-through, over the coming years.

140.   On the prior Friday, March 30, 2012, DDMG filed its 2011 10-K signed and certified by Textor and Nichols.  The 10-K stated, in relevant part:

**Government Grant Funding and Tax Incentives**

Over the past two years, we have worked closely with state and local government authorities in Florida to execute economic stimulus contracts designed to create jobs and stimulate Florida's economy.  As of the date of this filing, we have contracted to receive a total of approximately $135 million in such government stimulus financing, including $19.9 million in tax credits.  This financing consists of cash grants, land grants, low-interest financing and tax incentives.  All of these incentives have been structured over a three- to five-year period, with portions of these grants funded as we meet target thresholds of business initiation, capital expenditures and/or job creation.

The first stimulus package, signed in June 2009, provides for $20 million in cash grants from the State of Florida.  The second stimulus package was awarded to us by the City of Port St. Lucie, Florida in December 2009 and January 2010, and provides for an additional $10 million in cash grants, 15 acres of land appraised at $10.5 million and $39.9 million in low-interest building and equipment lease financing.  *We have deployed these incentives to construct our animated features film studio in Port St. Lucie, Florida*.

The third stimulus package, signed in November 2010 with the City of West Palm Beach, Florida Community Redevelopment Agency, provides for grants of $10 million in cash, title to 2.4 acres of land appraised at $9.8 million and $15 million in low-interest financing.  These grants are designed to incentivize us to build our educational facility at a site in the City of West Palm Beach.  The cash grant will be released as our educational institute achieves various benchmarks including commencement of construction, student enrollment targets and other business progress targets.

\* \* \*

**Use of Proceeds from Public Offering of Common Stock**

On November 23, 2011, we closed our IPO, in which we sold 4,920,000 shares of our Common Stock at a price to the public of $8.50 per share.  The aggregate sale price for shares sold in the offering was approximately $41.8 million.  The offer and sale of all of the shares in the IPO were registered under the Securities Act pursuant to a registration statement on Form S-1 (File No. 333-174248), which was declared effective by the SEC on November 14, 2011.  The offering commenced on November 18, 2011, and did not terminate before all of the securities registered in the registration statement were sold on November 18, 2011.  Roth Capital Partners LLC and Morgan Joseph TriArtisan LLC acted as the managing underwriters.  We raised approximately $38.4 million in net proceeds after deducting underwriting discounts and commissions of approximately $2.9 million and other then unpaid offering expenses of approximately $0.5 million.  No payments were made by us to directors, officers or persons owning ten percent or more of our common stock or to their associates,

or to our affiliates, other than payments in the ordinary course of business to officers for salaries.

*As of December 31, 2011, there has been no material change in the planned use of proceeds from our IPO as described in our final prospectus filed with the SEC on November 21, 2011,* pursuant to Rule 424(b) promulgated under the Securities Act, other than the contemplated use of certain such proceeds in a share repurchase program described in a Current Report on Form 8-K filed by the Company with the SEC on December 20, 2011.  Pending the use of such proceeds, we placed the funds received into operating bank accounts.

* * *

### Liquidity and Capital Resources

As of December 31, 2011, we had a deficit in working capital of $18.8 million. After the automatic conversion of our debt and warrant exercise upon the completion of the IPO discussed above, the remaining principal of our debt was $27.4 million, of which $19.4 million is due on September 30, 2012.

Our principal sources of liquidity at December 31, 2011 consisted of cash and cash equivalents of $29.4 million, cash held in trust of $6.7 million and contract receivables of $3.1 million.  We had a deficit in working capital of $18.8 million as of December 31, 2011 and a $140.7 million loss attributable to common stockholders, and we used $42.2 million to fund cash flows from operations for the year ended December 31, 2011.  As of December 31, 2011 we had $35.9 million in Stockholders' Equity. *Much of our use of cash from operations in 2011 stemmed from our implementation of our plans to participate in the ownership of live-action feature films, our development of our animation studio and the preparations for the launch of our school.  These businesses did not generate a significant amount of revenue during 2011.  It is important to note that a majority of these expenses were funded by our existing grants from the State of Florida, the City of Port St. Lucie, and the City of West Palm Beach.* While many of these grant proceeds were received between 2009 and the present, we only record a small amount of these receipts as revenue.  As of December 31, 2011 we had received $27.6 million of grant receipts and that we plan to recognize into revenue over the next 5 to 20 years.  In addition, we expect to receive $12.5 million in additional grant proceeds over the next several years under our existing grant agreements.  See "Grants and Other Incentives from Government Entities".

* * *

As we continue to build our feature animated film, co-production and education lines of business, we believe we will enter into contracts for our traditional VFX and animation services to feature film and commercials clients which will adequately fund operations for those services and provide additional liquidity to

support our newer lines of business. *We also believe that through our revenues from those VFX and animation services contracts; through the re-financing of debt; and through co-production arrangements for our animated feature film projects as described in "Financing and Co-Production Arrangements," we have sufficient sources of cash to support our operations in 2012.*

\* \* \*

**Co-Production in Feature Film Project**

On February 15, 2012, the Company entered into an Investment and Production Agreement with Ender's Game Holdings LLC ("EGH") and OddLot Entertainment LLC ("OLE") effective as of April 18, 2011, to provide financing and production services to co-produce the VFX action movie Ender's Game. Principal photography for Ender's Game began February 27, 2012, in New Orleans. The picture has a production budget slightly in excess of $100 million and is scheduled for theatrical release in Spring 2013. Distribution services are to be provided by Summit Entertainment. As of March 16, 2012 the Company and DD had collectively provided $12.1 million in financing. See Note 11 for further discussion.

\* \* \*

As part of the IPO, on November 18, 2011, [Textor] purchased 1,176,471 shares of the Company's common stock at $8.50 per share for a total investment of $10.0 million.

141. The statements in ¶¶139-140 were materially false and/or misleading because they failed to disclose that the Company knew (i) it did not have the ability to raise capital and fund its operations in the short and long terms, (ii) it was facing a substantial burn rate which threatened DDMG's ability to continue as a going concern, (iii) the Company was using the proceeds from the grants as the sole support for the Company's operations and without the grants, would not even be able to make payroll, (iv) Textor's investment during the IPO was backed by the Loan Agreement, which used previously held common stock and real estate as collateral, rather than Textor's personal investment, (v) the proceeds raised as a result of the IPO would not be sufficient to allow the Company to invest in a growth strategy and were used to address the Company's significant burn rate, and in fact, had already been exhausted by the time

the Company filed the 2011 10-K, and (vi) the co-production agreement for Ender's Game prevented the Company from receiving its typical 35% margin for the project and was actually draining DDMG of incoming revenue.

142.    The 2011 10-K further stated the following concerning Textor and Teaford's employment with BabyUniverse, Inc.:

> [Textor] also served as the Chairman of BabyUniverse, Inc., a leading e-tailer of baby-related products to new and expectant parents, from November 2002 and its Chief Executive Officer from April 2005 until its sale in October 2007.

> * * *

> Mr. Teaford was Executive Vice President and a member of the board of directors of BabyUniverse, Inc. from 1998 until its sale in October 2007.

143.    The statements in ¶142 were false and misleading because they failed to disclose that in or about December 29, 2009, BabyUniverse, Inc.'s successor The Parent Company declared bankruptcy.  Disclosure of the bankruptcy was required by Item 401 and was material to an evaluation of the ability or integrity of Textor and Teaford to serve as directors and executive officers of DDMG.

144.    On May 8, 2012, DDMG issued a press release disclosing that on May 7, 2012 the Company had completed a $35 million senior convertible note (the "Senior Notes") offering to a group of institutional investors led by Tenor Capital and issued an $8 million subordinated convertible note to Comvest Capital to refinance existing debt held by Comvest Capital.  These transactions retired existing senior notes that would otherwise have been due in 2012.  The Senior Notes contained a number of covenants, including one that required DDMG to maintain certain minimum levels of Available Cash (as defined in the Senior Notes) as of certain specified measurement dates (the "Available Cash Covenants").

145.     In the May 8, 2012 press release, Textor stated, "[w]e are obviously pleased to complete this transaction, which represents an attractive refinancing and reduction of our near-term debt obligations, and importantly also comes with a group of high-quality institutional investors." Textor further noted that "*[i]t also provides us with capital* to pursue additional feature film co-production opportunities as we continue move our business to a model driven by ownership of the content that we create."

146.     The statements in ¶145 were materially false and/or misleading because they failed to disclose that the Company knew the proceeds from the senior convertible note offering would not provide the Company with opportunities to grow the business, but rather would be used to help the Company cover its operating expenses.

### 3. First Quarter 2012 Financial Results

147.     On May 16, 2012, DDMG issued a press release announcing its first quarter financial results for 2012 again touting how it had "beat revenue and earnings estimates."  Textor stated in the press release that:

> In the first quarter, we made significant progress as we opened Tradition Studios, our original-content family feature animation studio, began classroom instruction at the Digital Domain Institute and started filming on our first feature film co-production, the highly anticipated and globally recognized *Ender's Game*.  More recently, the first product of our Virtual Performance business, a virtual Tupac Shakur who performed at the Coachella Music festival, launched an entirely new form of entertainment.
>
> * * *
>
> With a long list of transformational accomplishments in the first quarter, . . . *we are pleased to remain 'on plan' as we grow our business.  As we continue to deliver on the promises that we have made to both taxpayers and shareholders, we look forward to our continued migration to a content ownership business model and the expected near-term impact of exciting new forms of entertainment, such as our virtual performance business*.

(Emphasis added).

148.   Also, in the May 16, 2012 press release, Textor reassured, "[a]s we leverage our visual effects work-for-hire business as a platform to engage in other, more lucrative business opportunities, we have also used substantial grant funding from government relationships to mitigate the risk of our business expansion and associated launch expanses."

149.   On May 15, 2012, DDMG filed its 1Q 2012 10-Q signed and certified by Textor and Nichols.   The 1Q 2012 Form 10-Q noted that from January 1, 2012 through February 10, 2012, the Company had repurchased 406,630 shares of common stock at around $6.10 per share for a cost of approximately $2.5 million.   The 1Q 2012 Form 10-Q also stated:

> **Liquidity and Capital Resources —** The Company has a history of losses, including a $15.6 million and $144.2 million net loss before non-controlling interests, respectively, for the three months ended March 31, 2012 and the year ended December 31, 2011, respectively.   The Company has a limited operating history, had negative working capital of $33.4 million and stockholders' equity of $19.8 million as of March 31, 2012, and used $21.8 million to fund cash flows from operations during the three months ended March 31, 2012.   For the year ended December 31, 2011, the Company used $44.4 million in cash flows from operations.   ***The Company has worked to improve its working capital and its cash flow shortfalls through equity and debt funding and through the completion of its investment in the co-production of the feature film Ender's Game.***   The Company raised gross proceeds of $19.5 million in equity capital in a private placement in February and March 2011, gross proceeds of $26.0 million in another private placement consummated in August 2011, and gross proceeds of $41.8 million in its initial public offering completed in November 2011.   Furthermore, the Company invested $11.4 million in Ender's Game during the three months ended March 31, 2012.   Additionally, upon completion of the IPO, $94.0 million of convertible debt and warrant liabilities reflected on the Company's balance sheet were automatically converted or exercised, as applicable, into the Company's common stock.

> \* \* \*

> **Liquidity and Capital Resources**

> As of March 31, 2012, we had a deficit in working capital of $33.4 million.

> Our principal sources of liquidity at March 31, 2012 consisted of cash and cash equivalents of $2.5 million, cash held in trust of $6.6 million, contract receivables of $4.9 million and other receivables of $5.0 million.   We had a $15.6 million loss before non-controlling interests, and we used $21.8 million to fund cash flows

from operations for the three months ended March 31, 2012.  As of March 31, 2012 we had $19.8 million in Stockholders' Equity.  ***Much of our use of cash from operations in the first three months of 2012 stemmed from our implementation of our plans to participate in the ownership of live-action feature films, our development of our animation studio and the launch of our school.  These businesses did not generate a significant amount of revenue during the first three months of 2012.  A majority of the expenses incurred by these businesses was funded by our existing grants from the State of Florida, the City of Port St. Lucie, and the City of West Palm Beach.***  While many of these grant proceeds were received between 2009 and the present, we only record a small amount of these receipts as revenue.  As of March 31, 2012 we had received $29.9 million of grant receipts that we plan to recognize into revenue over the next 5 to 20 years.  In addition, we expect to receive $10.3 million in additional grant proceeds over the next several years under our existing grant agreements.

A key component of our working capital is our deferred revenue.  We typically receive a substantial portion of a contract for a feature film project up-front.  We signed two large feature film contracts in the first quarter of 2012 that contributed to the generation of $2.6 million in cash flow from operations due to increases in advance payments and deferred revenue during the first quarter of 2012.

* * *

As we continue to build our feature animated film, co-production and education line of business, we believe we will enter into contracts for our traditional VFX and animation services to feature film and commercials clients which will adequately fund operations for those services and provide additional liquidity to support our newer lines of business.  ***We also believe that through our revenues from those VFX and animation services contracts; through the re-financing of debt; and through co-production arrangements for our animated feature film projects, we have sufficient sources of cash to support our operations in 2012.***

(Emphasis added).

150.    The statements in ¶¶147-149 were materially false and/or misleading because they failed to disclose that Textor and the Company knew (i) the Company did not have the ability to raise capital and fund its operations in the short and long terms, (ii) the Company was facing a substantial burn rate which threatened DDMG's ability to continue as a going concern, and (iii) the Company was using the proceeds from the grants as the sole support for the Company's operations and without the grants, would not even be able to make payroll.

## VII.   THE TRUTH BEGINS TO BE REVEALED

151.   On August 1, 2012, at approximately 11:28 a.m. and during the NYSE trading day, DDMG issued a press release announcing that the Company would pursue strategic alternatives:

> ***The company is formally announcing its plans to evaluate a broad range of strategic and financial alternatives to support the company's growth initiatives and its efforts to maximize shareholder value.***   DDMG will engage in discussions with various parties that have contacted the company on an unsolicited basis.  The company will also work with its investment bankers and advisors to pursue strategies, and develop relationships, with segment-specific capital sources and strategic partners that have a desire to support the growth initiatives and maximize the shareholder value contribution of the company's specific business segments.
>
> The company will evaluate a variety of alternatives including, but not limited to, a strategic minority investment in the company or in a specific business segment, joint ventures and/or business combinations with strategic partners and industry participants, the sale or spin-off of certain of the company's assets or operating subsidiaries into publicly traded or privately held corporations, the outright sale of certain of the company's assets or operating subsidiaries, or the outright sale of the company.  DDMG also intends to be responsive to proposals received that seek to maximize the value of major operating subsidiaries through spin-offs into, or combinations with, publicly traded companies listed on major foreign exchanges that reflect the company's previously announced international expansion plans.

(Emphasis added).

152.   On August 1, 2012, shares of DDMG common stock fell $0.10 per share, or 2.35%, from their July 31, 2012 closing price of $4.24 per share to close at $4.14 per share.

153.   On August 13, 2012, DDMG issued a press release that it had retained Wells Fargo Securities, LLC as its exclusive financial advisor to assist the Company with its evaluation of strategic alternatives.

154.   The statements in ¶151 and ¶153 continued to be materially false and/or misleading because they failed to disclose that the Company was actually on the verge of

bankruptcy and would not be able to meet its Available Cash Covenant as required by the May 7, 2012 refinancing.

### A.     Second Quarter 2012 Financial Results

155.    On August 14, 2012, at approximately 4:50 p.m. and after trading on the NYSE market closed for the day, DDMG filed its 2Q 2012 10-Q signed and certified by Textor and Nichols.  DDMG further disclosed that:

> *Liquidity and Capital Resources*
>
> As of June 30, 2012, we had a deficit in working capital of $42.8 million.
>
> Our future capital requirements will depend on many factors, including our revenue growth, our ability to obtain advance payments from our customers, the timing and extent of the expansion of our involvement in feature film production and the timing of introductions of new products and enhancements to existing products.  Although we currently are not a party to any agreement or letter of intent with respect to potential material investments in, or acquisitions of, complementary businesses, services or technologies, we may enter into these type of arrangements in the future, which could also require us to seek additional capital in the form of debt, finance facilities, or equity capital.  Such funds may not be available on terms favorable to us or at all.  In addition, the Company announced that it will evaluate a variety of alternatives including, but not limited to, a strategic minority investment in the Company or in a specific business segment, joint ventures and/or business combinations with strategic partners, the sale or spin-off of the Company's assets or operating subsidiaries, or the outright sale of the Company.
>
> As we continue to build our feature animated film, co-production and education line of business, we believe we will enter into contracts for our traditional VFX and animation services to feature film and commercials clients which will adequately fund operations for those services and provide additional liquidity to support our newer lines of business.  ***We also believe that through our revenues from those VFX and animation services contracts; through the re-financing of debt; through the strategic alternatives discussed above; and through co-production arrangements for our animated feature film projects as described in "Financing and Co-Production Arrangements, as filed in our Annual Report as of December 31, 2011, we have sufficient sources of cash to support our operations in 2012.***
>
> (Emphasis added).

156.    On August 15, 2012, at approximately 9:14 a.m. and before trading on the NYSE market opened for the day, DDMG issued a press release announcing its second quarter financial results.  Textor stated, "On the revenue side, we are extremely pleased with continuing growth in our visual effects business, a growing backlog of traditional feature film business and a quickly expanding list of clients for our new virtual performance business."  Textor continued:

> On the expense side, we achieved a major milestone as we closed the second quarter by announcing the elimination of extraordinary unutilized labor in connection with our new studio launches.  This means that we have delivered on our promises to both communities and shareholders by converting start-up economic development grants into highly productive human resources that are now actively engaged in the production of revenue-producing, high-end animation and visual effects projects.

157.    The press release also stated:

> Pursuit of Strategic Alternatives:    DDMG believes the value of its existing and developing businesses exceed, by a substantial amount, the total of the company's current market capitalization.  The company also believes it is advisable to align capital and strategic partnerships with specific business segments to validate a 'sum of the parts' valuation that is both attractive to shareholders and efficient in supporting the growth of the respective businesses.  DDMG announced that it is evaluating a broad range of strategic and financial alternatives to support the company's growth initiatives and its efforts to maximize shareholder value.  ***These alternatives include, but are not limited to, a strategic minority investment in the company or in a specific business segment, joint ventures and/or business combinations with strategic partners and industry participants, the sale or spin-off of certain of the company's assets or operating subsidiaries into publicly-traded or privately-held corporations, the outright sale of certain of the company's assets or operating subsidiaries, or the outright sale of the company.***  The company has hired Wells Fargo Securities to be its exclusive advisor in support of this process.

<p style="text-align:center">* * *</p>

**Update on Grant Funding of Expansion Operations**

> "It is important to recognize that the costs we incur in training new employees at our new animation feature film studio, Tradition Studios, are funded by grants we secured to fund our Florida expansion," added Textor. "While we have received substantial grant proceeds, grant revenue is recognized over time while we recognize launch costs and operating costs currently.  Thus, even with extremely favorable grant packages in hand, there is a negative impact on our results of

operations in the short term.   However, we will continue to recognize grant inflows long after these employees have become productive employees, resulting in long-term profitability improvements associated with the recognition of grant revenue."

At June 30, 2012, we had in excess of $32 million in grants recorded on our balance sheet as deferred grant revenue which will be recognized into income, as pure profit flow-through, over the coming years.   In addition to grants of land aggregating $20.3 million, we have received cash grants of $29.9 million from inception to date.   These proceeds have been used to fund our Florida operations in both animation feature films and in education.

* * *

Notwithstanding the benefits of our grant-funded expansion approach, we remain focused on a path to profitability that is clearly defined by the reduction of unutilized labor to normalized levels in our core business and the conversion of unutilized training labor in our international and Florida initiatives into productive visual effects and animation resources.   This unutilized labor transformation is now complete.   We are now seeing high-quality animation and visual effects productivity, and the beginnings of revenue-generating projects supported by this newly trained labor.   The continuation of this trend is key to achieving operating cash flow levels in 2012.   Additional drivers of profitability are expected to come from our developing virtual performance business and the continued, successful implementation of our content ownership strategies in live-action co-productions and original-content, family-focused feature animation.   Anticipated new grant incentives associated with our $100 million Abu Dhabi project and reduced cost environments related to the international expansion of our core visual effects business and our education business are also expected to have a profound and positive impact on our profitability in the immediate years.

158.   The statements in ¶¶155-157 are a partial disclosure of defendants materially false and misleading statements and continued to be materially false and/or misleading because they failed to disclose that (i) the Company was actually on the verge of bankruptcy and would not be able to meet its Available Cash Covenant as required by the May 7, 2012 refinancing, and (ii) the proceeds received from the grant funding continued to be the sole support for the Company's operating expenses and without the grant proceeds, the Company would be unable even to make payroll.

159.    Also on August 15, 2012, at approximately 11:00 a.m. and while trading was open on the NYSE market, the Company held its second quarter 2012 earnings call.  During the call, Textor stated:

> But our operating cash burn is important to understand.  Because the Ender's Game thing is over and the animation feature films, if we remain on track and those are financed by the studios or the distribution partners like Galloping Horse have already proven, they will fund those, then we're feeling like we're [in] very good shape there.  As we go forward to the next six months with a lot of backlogs, with normalized margin, we are going to have some significant capital items there as well too.  ***But our operating cash burn is looking very, very good, when you look at the core business of services, bringing in revenues and taking the cost to deliver***.
>
> * * *
>
> So, we've got lenders that are friendly that are working with us, that understand. While it represents good returns for us, it's not the best structure for the company going forward.   And there is definitely a win-win scenario, I think that's developing.  We've been very active in identifying sources of capital to deal with that.  And we not only feel very good about inbound sources of capital for the company's operations, we feel very good about the opportunity to reform our capital structure in a profoundly accretive way to eliminate the overhand on our stock.  And I think it will be good for those lenders and it will certainly be good for the company.
>
> * * *
>
> Final summary, please dig into our numbers.  Being public is about making promises and keeping promises, and some of the ugly aspects of our P&L relate to some really favorable grand packages, which just take a little while to understand in terms of how they are accounted for.  It's a story of significant revenue growth, significant margin improvement, rationalization of expenses, significant backlog for the end of the year, cash flows that are much more manageable on a cash burn from operations than they would appear, challenges, of course to continue to fund the kind of major items for us going forward.
>
> But, a lot of sources of capital, good relationships with our lenders that we think can lead to accretive reformations or takeouts of our existing structure in win-win situations where they do well for helping us and we do well as a company, and then simply stated, a strategic process where we feel very confident we're going to prove this company is worth far more than today's trading price.  This stock represents a trader's view, not fundamental value and it's incumbent upon us to prove that for the benefit of our shareholders. . . .

(Emphasis added).

160.     The statements in ¶159 are a partial disclosure of defendants materially false and

misleading statements and continued to be materially false and/or misleading because they failed

to disclose that the Company knew (i) it did not have the ability to raise capital and fund its

operations in the short and long terms, (ii) it was facing a substantial "burn rate" which

threatened DDMG's ability to continue as a going concern, and (iii) that it would not be able to

meet its Available Cash Covenant as required by the May 7, 2012 refinancing.

161.     Following announcement of the Company's second quarter results, on August 15,

2012, DDMG common stock fell $0.17 per share, or 3.9%, from their August 14, 2012 closing

price of $4.39 per share to close at $4.22 per share.

162.     On August 29, 2012, at approximately 9:24 a.m. and before trading on the NYSE

opened for the day, Textor filed a Schedule 13D disclosing that since his last open market

acquisition of DDMG shares on May 18, 2012, the

> Company announced it was reviewing with its financial advisor a broad range of
> strategic and financial alternatives to maximize shareholder value, including
> seeking strategic minority investors in the entire company or various business
> segments; entering into joint ventures or business combinations; selling or
> spinning-off subsidiaries or assets; or selling the Company.   The Reporting
> Persons strongly support the Company's strategic review process because they
> believe it is likely to create additional value for the Company's shareholders.
> However, because the Reporting Persons believe (i) that the process is likely to
> take a few months and (ii) that the current market capitalization of the Company
> is significantly less than the value of its underlying assets, both of which are
> currently detrimental to the Company, *the Reporting Persons will likely engage*
> *legal and financial advisors to assist the Reporting Persons in determining*
> *whether a plan to acquire the Company by a group led by the Reporting*
> *Persons can be formulated in an attempt to increase shareholder value.*

(Emphasis added).

163.     In addition, the August 29, 2012 Form SC 13D disclosed for the first time the

Loan Agreement (as described above).

164.   Following news of Textor's intention to acquire the Company and disclosure of the Loan Agreement, on August 29, 2012, shares of DDMG common stock fell $0.22 per share, or 7%, from their August 28, 2012 closing price of $3.15 per share, to close at $2.93 per share.

165.   On September 4, 2012, at approximately 6:05 a.m. and before trading on the NYSE opened for the day, DDMG filed a Form 8-K disclosing that the Company had violated a covenant requiring the Company to maintain certain minimum levels of available cash.  As a result of the Company's failure to maintain the minimum level of cash, the holders declared a default which accelerated the amount due under $35 million in senior notes:

As previously disclosed on a Current Report on Form 8-K filed by Digital Domain Media Group, Inc. (the "Company") with the Securities and Exchange Commission (the "SEC") on May 8, 2012, the Company issued, on May 7, 2012, a total of six senior secured convertible notes, in the aggregate original principal amount of $35 million (collectively, the "Senior Notes"), to a group of institutional investors. ***The Senior Notes contain a number of affirmative and negative covenants, including a covenant (the "Available Cash Covenant") requiring the Company to maintain certain minimum levels of Available Cash (as defined in the Senior Notes) as of certain specified measurement dates (collectively, the "Measurement Dates").***

In a Current Report on Form 8-K filed by the Company with the SEC on August 15, 2012, the Company disclosed that it had, on August 14, 2012, effective as of July 31, 2012, entered into  separate Second Amendment Agreements with each of the holders of the Senior Notes (collectively, the "Second Amendment Agreement").  Pursuant to the terms of the Second Amendment Agreement, the Company and the holders of the Senior Notes amended the Senior Notes to change the second Measurement Date from July 31, 2012 to August 20, 2012.

***On August 21, 2012, each of the holders of the Senior Notes severally notified the Company in writing that the Senior Notes were in default, asserting, inter alia, that the Company had failed to satisfy the terms of the Available Cash Covenant applicable as of August 20, 2012, resulting in an immediate acceleration of all amounts owing under the Senior Notes, consisting of (i) aggregate outstanding principal of $35 million, and (ii) accrued interest, make-whole amounts (representing the amount of future interest payments foregone as the result of such acceleration), and other amounts owing thereunder aggregating an additional minimum amount of approximately $16 million, for a total minimum amount due thereunder of approximately $51 million.*** Simultaneously with the delivery of these notices of default, the holders of the Senior Notes severally advised the Company in writing that they were electing to

60

forbear from collecting any amounts owing under the Senior Notes until such time as those elections were withdrawn.  Each of those elections was withdrawn as of August 28, 2012.  ***The Company and the holders of the Senior Notes are continuing to negotiate the terms of an extended forbearance arrangement, while the Company explores its options with respect to refinancing all or a portion of its obligations under the Senior Notes.***  There can be no assurance that the Company will be successful in its attempt to secure extended forbearance agreements with the holders of the Senior Notes; in the event that the Company were not to be successful in this regard, the holders of the Senior Notes may elect to pursue all of their available remedies under the Senior Notes arising as the result of an Event of Default (as defined therein), including, without limitation, foreclosing on the first-priority security interest in all of the personal property of the Company and its subsidiaries held by the Collateral Agent (as defined in the Senior Notes) for the benefit of the holders of the Senior Notes.

The Company is currently evaluating (i), in conjunction with the holders of the Senior Notes, a term sheet received from an institutional investor proposing a senior secured debt financing transaction that would potentially refinance the Company's obligations under the Senior Notes as well as provide operating funds to the Company, and (ii) a term sheet received from a business partner of the Company relating to a significant equity investment in an operating subsidiary of the Company; there can be no assurance, however, that either of these transactions will be consummated, or, if consummated, that they will be on terms satisfactory to the Company.

(Emphasis added).

166.    Also, in the September 4, 2012 Form 8-K, the Company disclosed that it was

forced to establish a special committee review and evaluate strategic alternatives:

***On August 22, 2012, the Board voted unanimously to establish a special committee of the Board, consisting solely of disinterested and independent members thereof, to review and evaluate the full range of strategic alternatives available to maximize the value of the Company (the "Special Committee").*** . . .

* * *

The resolutions of the Board establishing the Special Committee expressly authorize and empower the Special Committee to take any and all actions, in connection with the Special Committee's review and evaluation of such strategic alternatives, that it may determine to be necessary, advisable or appropriate, and, to the full extent permitted by applicable law and the Company's Amended and Restated Articles of Incorporation and Amended and Restated Bylaws, to exercise the full authority of the Board in respect thereof.  In addition, the Board authorized the Special Committee to retain, at the sole cost and expense of the Company, such financial, legal, accounting, investment banking, consulting or

other advisors as the Special Committee may select to assist the Special Committee in its review and evaluation of strategic alternatives and to advise and assist it in connection with all other matters relating to the strategic alternative review process as the Special Committee determines to be necessary, advisable or appropriate. . . .

(Emphasis added).

167.    The Company further revealed that it was in crisis and that it had significant

liquidity issues which threatened its ability to continue:

*Liquidity Update*

 As previously disclosed in its public filings with the SEC, the Company has been operating, and continues to operate, with substantial negative working capital. ***The Company is working to locate additional external sources of debt and/or equity capital, while it continues to negotiate with the holders of the Senior Notes the terms of an extended forbearance agreement (as described in Item 2.04 of this Current Report on Form 8-K).*** The Company is currently evaluating (i), in conjunction with the holders of the Senior Notes, a term sheet received from an institutional investor proposing a senior secured debt financing transaction that would potentially refinance the Company's obligations under the Senior Notes as well as provide operating funds to the Company, and (ii) a term sheet received from a business partner of the Company relating to a significant equity investment in an operating subsidiary of the Company; there can be no assurance, however, that either of these transactions will be consummated, or, if consummated, that they will be on terms satisfactory to the Company***.  In addition to its ongoing attempts to raise additional capital, the Company is considering a broad set of solutions to improve its liquidity, including, in consultation with its newly appointed Interim Chief Operating Officer, measures to reduce costs and improve efficiency.*** The Company and the Special Committee are also currently evaluating a number of other strategic alternatives that would potentially generate cash, including, without limitation, the sale of all or a portion of certain operating units, and the sale of non-core assets such as the Company's patent portfolio.  Although the Company's intent is to improve its operating efficiencies and to obtain additional financing during the period that it is evaluating these strategic alternatives, there can be no assurance that it will be able to obtain such financing on satisfactory terms, if at all, or to sufficiently reduce costs so that it is in a position to fund its operating expenses with revenues from operations. ***An inability to quickly access additional sources of liquidity to fund the Company's current operating cash needs would materially adversely affect its financial condition and would require it to seek relief or protection from its creditors.***

(Emphasis added).

62

168.    After disclosure that the Company had violated the Available Cash Covenants in the Senior Notes, had defaulted on $35 million in Senior Notes, and was undergoing a liquidity crisis, on September 4, 2012, shares of DDMG common stock fell $0.66 per share, or 32%, from their August 31, 2012 closing price of $2.07 per share to close at $1.41 per share on heavy volume.

169.    On September 5, 2012, at approximately 3:23 p.m. and before trading closed on the NYSE market for the day, DDMG issued a press release announcing:

> PORT ST. LUCIE, Fla., September 5, 2012 — Digital Domain Media Group, Inc. (NYSE: DDMG) (the "Company") today announced that each of the holders of its six senior secured convertible notes in the aggregate original principal amount of $35 million issued by the Company on May 7, 2012 (collectively, the "Senior Notes") has agreed to forbear (each, a "Forbearance") from enforcing its remedies under its Senior Note (and the security and other agreements relating thereto) until such time as it elects to withdraw such Forbearance on not less than 48 hours' advance notice to the Company.
>
> As previously announced, the Company is continuing to evaluate its alternatives, including (i), in conjunction with the holders of the Senior Notes, a term sheet received from an institutional investor proposing a senior secured debt financing transaction that would potentially refinance the Company's obligations under the Senior Notes as well as provide operating funds to the Company, and (ii) a term sheet received from a business partner of the Company relating to a significant equity investment in an operating subsidiary of the Company.  There can be no assurance, however, that any transaction, will be consummated, or, if consummated, that any transaction will be on terms satisfactory to the Company.  As previously disclosed, an inability to quickly access additional sources of liquidity to fund the Company's current operating cash needs would materially adversely affect its financial condition and would require it to seek relief or protection from its creditors.
>
> As previously disclosed by the Company in a Current Report on Form 8-K filed by the Company with the Securities and Exchange Commission on September 4, 2012, each of the holders of the Senior Notes advised the Company on August 21, 2012 that its Senior Note is in default.  In the event that any holder of the Senior Notes withdraws its Forbearance, such holder may elect to pursue all of its available remedies under its Senior Note (and the security and other agreements relating thereto) arising as the result of an Event of Default (as defined in such Senior Note), including, without limitation, foreclosing on the first-priority security interest in all of the personal property of the Company and its

subsidiaries held by the Collateral Agent (as defined in such Senior Note) for the benefit of the holders of the Senior Notes.

170.    On September 5, 2012, shares of DDMG common stock fell $0.43 per share, or 30%, from their September 4, 2012 closing price of $1.41 per share to close at $0.98 per share on heavy volume .

171.    On September 7, 2012, at approximately 10:46 a.m. and after trading on the NYSE market had opened for the day, DDMG issued a press release disclosing that its Florida studio operations would close down and that Textor had resigned:

> PORT ST. LUCIE, Fla.—September 7, 2012— Digital Domain Media Group, Inc. (NYSE: DDMG) today announced that it has initiated a strategic realignment that will enable it to focus its resources on its core business, Digital Domain Productions, Inc., a company focused on creating digital visual effects, CG animation and digital production for the entertainment and advertising industries. As a key part of this strategic realignment, DDMG has begun the cessation of its Port St. Lucie operations by reducing virtually its entire Port St. Lucie workforce, retaining approximately 20 employees who will remain as part of the wind-down.
>
> DDMG's studios in California and Vancouver intend to continue to operate without interruption, as will the Digital Domain Institute, based in West Palm Beach, Florida.  Long-time Digital Domain executive Ed Ulbrich has been promoted to Chief Executive Officer of Digital Domain Productions.
>
> Digital Domain Productions is working closely with its clients, vendors and other critical constituencies throughout this process.
>
> DDMG is implementing this important operational change and will continue to evaluate various restructuring alternatives, as previously disclosed, as part of its effort to reduce its overhead and restructure its long-term debt.
>
> As previously announced, DDMG is continuing to work with the holders of its senior secured convertible notes, each of whom has agreed to forbear temporarily from exercising its remedies under such senior notes until such time as it elects to withdraw such forbearance on not less than 48 hours' advance notice to DDMG. An inability by DDMG to quickly access additional sources of liquidity to fund its current operating cash needs would materially adversely affect its financial condition and would require it to seek relief or protection from its creditors.
>
> John C. Textor has resigned, effective immediately, from his positions as Chief Executive Officer and Chairman of the Board of Directors of DDMG, as a

member of the Board of Directors of DDMG, and from all positions as an officer and director with all subsidiaries of DDMG.

172.    Also on September 7, 2012, at approximately 10:47 a.m. and after trading on the

NYSE market had opened for the day, DDMG disclosed in a Form 8-K filed with the SEC:

> Digital Domain Media Group, Inc. (the "Company") wishes to clarify certain statements made by John C. Textor, the Company's former Chairman and Chief Executive Officer, during a media interview on September 4, 2012.  Portions of the interview appeared on a local Port St. Lucie, FL, television newscast and were referenced in a news article posted on the same date on the television station's website.    During the interview, Mr. Textor expressed his personal views concerning the Company's financial situation including his views concerning the possibility of a bankruptcy filing on behalf of the Company.  In the interview, Mr. Textor also provided his personal interpretation and characterization of the Company's obligations under its agreements with the holders of its senior secured convertible notes (the "Senior Notes") and his view on the materiality of any amounts that may be due to such holders.  Mr. Textor's remarks do not reflect the views of the Company, its Board of Directors or the Special Committee of the Board of Directors.  While it is correct that the Company has not missed any payments due under the Senior Notes, as previously disclosed by the Company, each of the holders of the Senior Notes advised the Company on August 21, 2012 that its Senior Note is in default and has agreed to forbear from enforcing its remedies until such time as it elects to withdraw such forbearance on not less than 48 hours' advance notice to the Company.    As previously announced, any inability by the Company to quickly access additional sources of liquidity to fund the Company's current operating cash needs would materially adversely affect its financial condition and would require it to seek relief or protection from its creditors, which could include a bankruptcy filing.  The Company is evaluating certain proposals for transactions that would potentially provide liquidity to the Company, including through a reorganization under Chapter 11 of the U.S. Bankruptcy Code or otherwise.

173.    After disclosure that DDMG's Florida studio operations would close down,

Textor had resigned, and the Company had to clarify Textor's September 4, 2012 comments, on

September 7, 2012, shares of DDMG common stock fell $0.38 per share, or fell 39%, from their

September 6, 2012 closing price of $0.98 per share, to close at $0.60 per share, on heavy volume.

### B.       DDMG Files For Bankruptcy

174.     On September 11, 2012, DDMG filed for Chapter 11 bankruptcy protection in the District of Delaware.  The news of the bankruptcy was available on the news wires as early at 5:06 a.m. on September 11, 2012.

175.     At approximately 2:31 p.m. September 12, 2012, DDMG filed a Form 8-K disclosing that it had filed for bankruptcy:

> On September 11, 2012, Digital Domain Media Group, Inc. (the "Company") and all of its subsidiaries filed voluntary petitions for relief (the "Chapter 11 Filing") under Chapter 11 of Title 11 of the United States Bankruptcy Code, as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware in Wilmington, Delaware (the "Bankruptcy Court"), Case No. Ch-11 12-12568. The Company and its subsidiaries will continue to operate their businesses as "debtors-in-possession" under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and the orders of the Bankruptcy Court.
>
> Separately, on September 11, 2012, the Company brought a motion before the Supreme Court of British Columbia, Vancouver Registry, to seek creditor protection (the "CCAA Proceeding") under the Companies' Creditors Arrangement Act.
>
> In connection with the Chapter 11 Filing, the Company is seeking an interim financing order from the Bankruptcy Court to enter into a debtor-in-possession financing facility (the "DIP Facility") with the Company's senior noteholders, led by Hudson Bay Master Fund Ltd., consisting of up to $20 million.
>
> The Company also entered into a purchase agreement (the "Purchase Agreement") with Searchlight Capital Partners L.P. ("Searchlight") pursuant to which Searchlight agreed to acquire the businesses of Digital Domain Productions, Inc. and its operating subsidiaries in the United States and Canada ("DDPI"), subject to the receipt of higher and better offers and approval by the Bankruptcy Court. Under the terms of the Purchase Agreement, Searchlight will acquire the assets of DDPI free and clear of all claims and encumbrances pursuant to Section 363 of the Bankruptcy Code for the purchase price of $15 million. The sale will be subject to a public auction, and the Company is required to engage in a process of seeking the highest and best bid for these assets in accordance with the proposed bid procedures as filed with the Bankruptcy Court.

176.     On September 11, 2012, the staff of NYSE Regulation, Inc. determined to commence proceedings to delist the common stock of the Company and that the Company's

common stock would be immediately suspended from trading on the New York Stock Exchange ("NYSE").  The Staff indicated that this decision was reached as a result of the Company's announcement of the Chapter 11 Filing which is sufficient grounds for the commencement of delisting procedures under Section 802.01D of the NYSE's Listed Company Manual.  Currently, the stock trades on the OTC under the symbol "DDMGQ".

177.    When trading in DDMG common stock resumed (on the OTC Market under the symbol DDMGQ) on September 12, 2012, shares of DDMG common stock fell $0.46 per share, or 83.3%, from their September 10, 2012 closing price of $0.554 per share to close at $0.092 per share.

## VIII.   ADDITIONAL FACTUAL ALLEGATIONS RELATED TO THE EXCHANGE ACT CLAIMS

### A.       Additional Scienter Allegations

178.    As alleged herein, the Individual Defendants acted with scienter in that they:

(a) knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading;

(b) knew or recklessly disregarded that the documents or statements would be issued to the investing public; and

(c) knowingly and substantially participated or acquiesced in the issuance or dissemination of such documents or statements in violation of the Exchange Act.

179.    The Individual Defendants each ran DDMG as a manager, director and/or control person, dealing with important issues facing DDMG's business, and controlled the grossly inflated statements concerning DDMG's financial situation.  As described by numerous CWs, Textor, Teaford, and Nichols each received regular reports detailing DDMG's dire financial position, especially regarding cashflow, during the Class Period.  These reports contradicted the

positive statements made by DDMG and the Individual Defendants regarding DDMG's financial position at the same time.

180.    CW4 reported directly to former CEO Cliff Plumer, and after Plumer left reported directly to Textor.   CW4 stated that weekly and monthly reports were produced about the California operations and sent to Florida, and these reports included information on cash flow, labor, actual costs, profits and losses and capital spending.   No similar reports from the Florida office were sent to California according to CW4.   CW4 stated that Textor and Teaford handled financial reports for DDMG, including quarterly financial reports.   CW4 stated that the financial reports filed with the IPO were produced by Teaford without input from Digital Domains Productions, Inc. even though it was a significant source of DDMG's revenues.

181.    CW5 reported to Bernie Vanderfin, Corporate Controller, Teaford and Nichols. One of CW5's responsibilities was to prepare cash forecasts for senior management.  CW5 stated that these cash forecasts showed that DDMG had been having cash flow issues.  CW5 prepared weekly cash flow forecasts for senior management that were reviewed with the CFO who said he would show the report to the CEO.  Both Teaford and Nichols informed CW5 that these reports had been discussed with the CEO.  Beginning in September or October 2011, the weekly reports included actual numbers along with forecasts, according to CW5.  CW5 stated that these reports included information from each DDMG location.    CW5 also stated that the CEO and CFO would provide him with different financial scenarios to apply to his forecasts, such as potential private placement transactions or putting off a certain payable.  In the first half of 2012, CW5 understood that the Board was supposed to receive the reports.

182.     CW6 reported to Teaford and then Bernie Vanderfin.  CW6 noticed that DDMG was unable to pay bills from 2010 to September 2012.  According to CW6, Textor received reports from the California offices and the Florida office that showed revenues and spending.

183.     Finally the PBC Defendants, one of DDMG's largest shareholders stated in August 2012 that it "had no faith in the numbers that were coming from the company or in its ability to attract capital[.]"

184.     The Individual Defendants, by virtue of their high-level positions with DDMG and/or stock ownership, directly participated in the management of DDMG, were directly involved in the day-to-day operations of DDMG at the highest levels and were privy to confidential proprietary information concerning DDMG and its business, operations, products and services, growth, financial statements and financial condition and were aware of or deliberately disregarded that false and misleading statements were being made by and regarding the Company.  Because of their positions with DDMG and as set forth above, each of the Individual Defendants had access to the adverse undisclosed information about DDMG's business, financial condition and prospects and knew (or deliberately disregarded) that the adverse facts alleged herein rendered the positive representations made during the Class Period materially false and misleading.

185.     Moreover, facts critical to DDMG's "core operations" are presumably known by its key officers, including the Individual Defendants.  Further, the Individual Defendants, because of their senior management positions within the Company, possessed the power and authority to control the contents of DDMG's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be

misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material, non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false and misleading statements alleged herein.

186.    As officers and/or controlling persons of a publicly-held company whose shares are registered with the SEC and were traded on the NYSE, the Individual Defendants also had a duty to disseminate prompt, accurate and truthful information with respect to DDMG, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information.   The Individual Defendants each violated these specific requirements and obligations during the Class Period.

187.    Each Individual Defendant was personally familiar with the problems DDMG faced, including issues of revenue generation and spending, because they closely monitored DDMG's revenue and closely monitored the performance of DDMG's operations via weekly reports furnished by both CW4 and CW5, which were generated and provided to the Individual Defendants on a regular basis.  The fact that Defendants could make public statements regarding the Company's financial situation and forecasts means that they received data regarding these metrics.  As a result, they knew the adverse information regarding the Company's true financial situation during the Class Period.

188.    As set forth elsewhere herein in detail, Defendants knowingly concealed from the investing public DDMG's inability to generate enough revenues to cover costs, its large spending on payroll and its dependence on private investments and loans to keep the business running. The CWs stated that they were aware of DDMG's precarious financial situation well before the IPO in November 2011, and that the situation continued leading up to the Company's Chapter 11 bankruptcy filing in September 2012.

189.    Textor had a particular motive to artificially inflate the price of DDMG shares as he personally owed $10 million under the Loan Agreement and Security and Pledge Agreement that was partially secured by his DDMG stock and his personal residences.  A decline in the price of DDMG stock could lead to default under the terms of the Loan Agreement and the loss of Textor's residences.

190.    Each of the Individual Defendants participated in or failed to prevent the false reports regarding DDMG's operational and financial condition during the Class Period, and CW4 stated that Textor and Teaford had prepared the Company's public financial statements.

191.    In addition, the failure to disclose the Chapter 11 bankruptcy of The Parent Corporation, of which BabyUniverse, Inc. was a subsidiary, was a violation of Item 401.

### B.    Fraudulent Scheme and Course of Business

192.    Defendants are liable for:   (i) making false and/or misleading statements; (ii) failing to disclose adverse facts known to them about DDMG; and (iii) participating in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of DDMG publicly traded securities.  Defendants' fraud was a success, as it:  (i) deceived the investing public regarding DDMG's revenue, earnings, income from operations, net income, gross profit, net income per share, accounts receivable, interest income and stock-based

compensation expense; (ii) deceived the investing public regarding DDMG's accounting practices, revenue recognition practices and internal controls; (iii) artificially inflated the price of DDMG's securities; and (iv) caused Lead Plaintiffs and other members of the Class to purchase DDMG publicly traded securities at inflated prices and be damaged thereby.

### C.    Loss Causation

193.    By misrepresenting its financial results and condition, Defendants presented a misleading picture of DDMG's business and prospects.  Thus, instead of truthfully disclosing during the Class Period that DDMG did not generate enough revenue to cover costs and was dependent on loans and private investment to keep running, Defendants falsely reported the Company's business condition and financial results.

194.    These false financial results caused and maintained the artificial inflation in DDMG's stock price throughout the Class Period.

195.    Defendants' false and misleading statements had the intended effect and caused DDMG's stock to trade at artificially inflated levels throughout the Class Period, reaching a Class Period high of $9.00 per share.

196.    On August 1, 2012, at approximately 11:28 a.m. and while trading on the NYSE market was open for the day, DDMG issued its press release as described above announcing that the Company would pursue strategic alternatives.

197.    As a result of this disclosure, on August 1, 2012, DDMG common stock fell $0.10 per share, or 2.35%, from their July 31, 2012 closing price of $4.24 per share to close at $4.14 per share.  On August 1, 2012, the Standard & Poor's 500 Media Index (S5MEDA) (the "S&P Media Index") rose $1.18 from its July 31, 2012 closing price of $261.66 to close at $262.84. The Standard & Poor's 500 Movie & Entertainment Index (S5MOVI) (the "S&P Entertainment

Index") fell $0.39 (0.2%) from its July 31, 2012 closing price of $202.01 to close at $201.62. The Standard & Poor's 500 (the "S&P 500") fell $4.18 (0.3%) from its July 31, 2013 closing price of $1379.32 to close at $1375.14.

198.    On August 14, 2012, at approximately 4:50 p.m. and after trading on the NYSE market had closed for the day, DDMG filed its 2Q 2012 10-Q, as described above.  On August 15, 2012, at approximately 9:14 a.m. and before trading on the NYSE market opened for the day, DDMG issued its press release announcing its financial results for the second quarter of 2012. Also on August 15, 2012, at approximately 11:00 a.m. DDMG held a conference call to discuss its financial results for the second quarter of 2012, as described above.

199.    As a result of these disclosures, on August 15, 2012, shares of DDMG common stock fell $0.17 per share, or 3.9%, from their August 14, 2012 closing price of $4.39 per share to close at $4.22 per share.  On August 15, 2012, the S&P Media Index remained unchanged from its August 14, 2012 closing price of $273.19.  The S&P Entertainment Index rose $1.6 from its August 14, 2012 closing price of $208.19 to close at $209.25.  The S&P 500 rose $1.60 from its August 14, 2012 closing price of $1403.93 to close at $1405.53.

200.    On August 29, 2012, at approximately 9:24 a.m. and before trading on the NYSE market opened for the day, Textor filed his form SC 13D disclosing the Loan Agreement and that Textor was considering acquiring the Company, as described above.

201.    As a result of this disclosure, on August 29, 2012, shares of DDMG common stock fell $0.22 per share, or 7%, from their August 28, 2012 closing price of $3.15 per share, to close at $2.93 per share.  On August 29, 2012, the S&P Media Index rose $0.97 from its August 28, 2012 closing price of $272.39 to close at $273.36.  The S&P Entertainment Index rose $1.33

from its August 28, 2012 closing price of $207.72 to close at $209.05.  The S&P 500 rose $1.19 from its August 28, 2012 closing price of $1409.30 to close at $1410.49.

202.    On September 4, 2012, at approximately 6:05 a.m. and before trading on the NYSE market opened for the day, DDMG filed a Form 8-K disclosing that the Company had violated covenants in certain senior notes requiring DDMG to maintain certain minimum levels of available cash, and that the noteholders had notified DDMG that DDMG was in default.  Also, in the September 4, 2012 Form 8-K, the Company disclosed that it had significant liquidity issues which threatened its ability to continue and it was forced to establish a special committee review and evaluate strategic alternatives.

203.    As a result of these disclosures, on September 4, 2012, shares of DDMG common stock fell $0.66 per share, or 32%, from their August 31, 2012 closing price of $2.07 per share to close at $1.41 per share on heavy volume.  On September 4, 2012, the S&P Media Index rose $0.18 from its August 31, 2012 closing price of $271.78 to close at $271.96.   The S&P Entertainment Index rose $0.08 from its August 31, 2012 closing price of $207.55 to close at $207.63.  The S&P 500 fell $1.64 (0.1%) from its August 31, 2012 closing price of $1406.48 to close at $1404.94.

204.    On September 5, 2012, at approximately 3:23 p.m., and before trading closed on the NYSE, DDMG disclosed that it had reached a forbearance agreement with the holders of the senior notes, that DDMG continued to evaluate its alternatives related to the notes, but that there could be no assurance that any transaction would be consummated.

205.    As a result of these disclosures, on September 5, 2012, shares of DDMG common stock fell $0.43 per share, or 30%, from their September 4, 2012 closing price of $1.41 per share to close at $0.98 per share on heavy volume.  On September 5, 2012, the S&P Media Index rose

$2.59 from its September 4, 2012 closing price of $271.96 to close at $274.55. The S&P Entertainment Index rose $3.22 from its September 4, 2012 closing price of $207.63 to close at $210.85. The S&P 500 fell $1.50 (0.1%) from its September 4, 2012 closing price of $1404.94 to close at $1403.44.

206.    On September 7, 2012, at approximately 10:46 a.m. and while the NYSE market was open for the day, DDMG issued a press release announcing that Textor had resigned and the Florida studio operations would shut down, and also filed another Form 8-K correcting statements made by Textor on September 4 (as described above).

207.    As a result of these disclosures, on September 7, 2012, shares of DDMG common stock fell $0.38 per share, or fell 39%, from their September 6, 2012 closing price of $0.98 per share, to close at $0.60 per share, on heavy volume. On September 7, 2012, the S&P Media Index rose $0.34 from its September 6, 2012 closing price of $280.75 to close at $281.09. The S&P Entertainment Index rose $0.71 from its September 6, 2012 closing price of $215.81 to close at $216.52. The S&P 500 rose $5.80 from its September 6, 2012 closing price of $1432.12 to close at $1437.92.

208.    On September 11, 2012, DDMG filed for Chapter 11 bankruptcy protection in the District of Delaware. The news of the bankruptcy was available on the news wires as early as 5:06 a.m. on September 11, 2012. At approximately 2:31 p.m. September 12, 2012, DDMG filed a Form 8-K disclosing that it had filed for bankruptcy. Trading in DDMG common stock was suspended on September 11, 2012.

209.    As a result of the disclosures on September 11 and 12, 2012, and after trading in DDMG common stock resumed, on September 12, 2012, DDMG common stock fell $0.46 per share, or 83.3%, from their September 10, 2012 closing price of $0.554 per share to close at

$0.092 per share.  From September 10, 2012 through September 12, 2012, the S&P Media Index rose $1.27 from a September 10, 2012 closing price of $279.72 to a September 12, 2012 closing price of $280.99.  During that same period, the S&P Entertainment Index rose $0.36 from a September 10, 2012 closing price of $214.79 to a September 12, 2012 closing price of $215.15. During that same period, the S&P 500 rose $7.48 from a September 10, 2012 closing price of $1429.08 to a September 12, 2012 closing price of $1436.56.

210.    Altogether, the stock price fell 99.1% from the high of $9.00 per share on May 1, 2012 to $0.08 per share at closing on September 13, 2012.  During that same period, the S&P Media Index rose 15%, from $248.48 on May 2, 2012 to $286.09 on September 13, 2012.  The S&P Entertainment Index rose 19% from $184.16 on May 2, 2012 to $219.30 on September 13, 2012.

### D.    Applicability of Presumption of Reliance:  Fraud on the Market Doctrine

211.    At all relevant times, the market for DDMG securities was an efficient market for the following reasons, among others:

(a) DDMG securities met the requirements for listing, and was listed and actively traded on the NYSE Market, a highly efficient and automated market;

(b) As a regulated issuer, DDMG filed periodic reports with the SEC and the NYSE;

(c) DDMG regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) DDMG was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

212. As a result of the foregoing, the market for DDMG securities promptly digested current information regarding DDMG from all publicly available sources and reflected such information in the prices of the securities. Under these circumstances, all purchasers of DDMG securities during the Class Period suffered similar injury through their purchase of DDMG securities at artificially inflated prices, and a presumption of reliance applies.

## IX.    CLASS ACTION ALLEGATIONS

213. Lead Plaintiffs bring this action as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of all persons who (a) purchased DDMG common stock on the public markets during the Class Period and were damaged thereby due to Defendants violations of the Exchange Act, and/or (b) purchased DDMG common stock during the Class Period (i) in the IPO or (ii) on the public markets and traceable to the IPO, and were damaged thereby due to Defendants violations of the Securities Act (the "Class"). Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, any entity in which defendants have or had a controlling interest, employees of the Company, and any Company employee stock purchase or retirement plan.

214. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. DDMG sold 4.92 million shares of DDMG common stock in the

IPO (not including the over-allotment).  As of August 14, 2012, DDMG had approximately 43.6 million shares of common stock outstanding, millions of which were purchased on the public market during the Class Period, by hundreds if not thousands of persons.

215.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)  whether Defendants violated the Exchange Act;

(b)  whether the Defendants violated the Securities Act;

(c)  whether Defendants omitted and/or misrepresented material facts;

(d)  whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(e)  whether Defendants knew or deliberately disregarded that their statements were false and misleading;

(f)  whether the prices of DDMG publicly traded securities were artificially inflated; and

(g)  the extent of damage sustained by Class members and the appropriate measure of damages.

216.    Lead Plaintiffs' claims are typical of those of the Class because Lead Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

217.    Lead Plaintiffs will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Lead Plaintiffs have no interests which conflict with those of the Class.

218.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## X.   NO SAFE HARBOR

219.   The statutory safe harbor under the Private Securities Litigation Reform Act of 1995, which applies to forward-looking statements under certain circumstances, does not apply to any of the allegedly false and misleading statements pled in this complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not adequately identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker had actual knowledge that the particular forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of DDMG who knew that those statements were false, misleading or omitted necessary information when they were made.  Additionally, the safe harbor is statutorily inapplicable to (1) false, misleading, and incomplete financial statements of DDMG because they were reportedly prepared in accordance with generally accepted accounting principles, (2) statements made in connection with the IPO, and (3) statements made in a disclosure of beneficial ownership in a report required to be filed by the SEC pursuant to Section 13(d) of the Exchange Act.

## COUNT I

### (Against Textor, Teaford, the Director Nominee Defendants, SingerLewak and the Underwriter Defendants) Violations of Section 11 of the Securities Act

220.     Co-Lead Plaintiff Mr. Dziedzic repeats and re-alleges each and every allegation contained in each of the foregoing paragraphs numbered 1 to 126, 151 to 177, and 213 to 219, inclusive, as if set forth fully herein.

221.     This Count is asserted against Textor, Teaford, the Individual Director Nominee Defendants, SingerLewak, and the Underwriter Defendants for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all members of the Class who purchased DDMG common stock during the Class Period (i) in the IPO or (ii) on the public markets and traceable to the IPO.

222.     The Registration Statement for the IPO contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading.

223.     Textor and Teaford each signed the Registration Statement and were directors of when the Registration Statement became effective and are liable pursuant to 15 U.S.C. § 77k(a)(1)(2) and (3).

224.     The Underwriter Defendants were underwriters of the IPO Offering and are liable pursuant to 15 U.S.C. § 77k(a)(5).

225.     SingerLewak was an accountant, or person whose profession gives authority to a statement made by it, and consented to be named as having prepared or certified the May 13, 2011 Report of Independent Registered Public Accounting Firm, which was part of the Prospectus and Registration Statement, and also used in connection with the Prospectus and Registration Statement.  SingerLewak is liable pursuant to 15 U.S.C. § 77k(a)(4).

226.    The Director Nominee Defendants did were named, with their consent, in the Registration Statement and the Prospectus as about to become a director of DDMG upon consummation of the IPO and are liable pursuant to 15 U.S.C. § 77k(a)(3).

227.    This Count is not based on and does not sound in fraud.  Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.  For purposes of asserting this claim under the Securities Act, Co-Lead Plaintiff Mr. Dziedzic does not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.

228.    DDMG was the Registrant for the IPO, while Textor, Teaford, the Director Nominee Defendants, SingerLewak, and the Underwriter Defendants were responsible for the contents and dissemination of the Registration Statement.  Further, Textor and Teaford signed the Registration Statement.  Consequently, Textor, Teaford, the Director Nominee Defendants, SingerLewak, and the Underwriter Defendants issued, caused to be issued, and participated in the issuance of the Registration Statement and are subject to strict liability for violations of Section 11 of the Securities Act.

229.    Textor, Teaford, the Director Nominee Defendants, SingerLewak, and the Underwriter Defendants acted negligently and are liable to members of the Class who purchased DDMG common stock during the Class Period (i) in the IPO or (ii) on the public markets and traceable to the IPO.

230.    None of these defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and the Prospectus were true and without omissions of any material facts and were not misleading.

231.    Co-Lead Plaintiff Mr. Dziedzic and other members of the Class who purchased the securities in the IPO pursuant to the Registration Statement did not know of the misrepresentations alleged herein or of the facts concerning the untrue statements of material fact and omissions alleged herein, and could not have reasonably discovered such facts or conduct.

232.    Less than one year elapsed from the time that Co-Lead Plaintiff Mr. Dziedzic discovered or reasonably could have discovered the facts upon which this cause of action is based to the time that the first complaint was filed asserting claims arising out of the falsity of the Registration Statement.  Less than three years elapsed from the time that the securities upon which this cause of action is brought were bona fide offered to the public to the time that the first complaint was filed asserting claims arising out of the falsity of the Registration Statement.

233.    Co-Lead Plaintiff Mr. Dziedzic and the other members of the Class have sustained damages.  The value of DDMG's shares sold in the IPO has declined substantially subsequent to and due to Defendants' violations of Section 11 of the Securities Act.

234.    Co-Lead Plaintiff Mr. Dziedzic and the other members of the Class still owning DDMG common stock purchased in or traceable to the IPO hereby tender their stock upon return of the consideration that they paid, plus interest, and those Class members who have sold their shares purchased (i) in the IPO or (ii) on the public markets and traceable to the IPO, at less than the IPO price hereby tender the consideration that they received upon the return of the consideration that they paid, plus interest.

235.    By reason of the foregoing, the Defendants named in this Count are liable for violations of Section 11 of the Securities Act to Co-Lead Plaintiff Mr. Dziedzic and the other members of the Class who purchased DDMG common stock during the Class Period (i) in the

IPO or (ii) on the public markets and traceable to the IPO, pursuant to the Registration Statement and Offering Documents.

## COUNT II

**(Against Roth Capital and Morgan Joseph)**
**Violations of Section 12(a)(2)of the Securities Act**

236.    Co-Lead Plaintiff Mr. Dziedzic repeats and re-allege each and every allegations as set forth in paragraphs 1 to 126, 151 to 177, and 213 to 235, inclusive, as if fully set forth herein. For purposes of this Count, Co-Lead Plaintiff Mr. Dziedzic expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Securities Act.

237.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act, by Co-Lead Plaintiff Mr. Dziedzic and other members of the Class who purchased DDMG common stock during the Class Period (i) in the IPO or (ii) on the public markets and traceable to the IPO against the Underwriter Defendants.

238.    The Underwriter Defendants offered, solicited, promoted and/or sold DDMG common stock to Co-Lead Plaintiff Mr. Dziedzic by the use of means or instrumentalities of interstate commerce by means of defective Offering Documents, including the prospectuses, for their own financial gain.   By means of the defective Offering Documents, including the prospectuses, created and disseminated by the Underwriter Defendants in connection with the IPO, the Underwriter Defendants assisted in the offering of shares of DDMG stock to Co-Lead Plaintiff Mr. Dziedzic and other members of the Class.

239.    The Underwriter Defendants solicited the sale of DDMG common stock in the IPO to the Class.

240.    The Offering Documents, including the prospectuses, contained untrue statements of material fact and omitted to disclose material facts, as detailed above.  The facts misstated and omitted would have been material to a reasonable person reviewing the Offering Documents, including the prospectuses.

241.    The Underwriter Defendants owed Co-Lead Plaintiff Mr. Dziedzic and the other members of the Class who purchased DDMG stock pursuant to the Offering Documents, including the prospectuses, the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents, including the prospectuses, to ensure that such statements were true and that there were no omissions to state a material fact required to be stated in order to make the statements contained therein not misleading.

242.    The Underwriter Defendants did not make a reasonable and diligent investigation of the statements contained in the Offering, including the prospectuses, in connection with the Offerings and did not possess reasonable grounds for believing that the Offering Documents, including the prospectuses, in connection with the Offerings did not contain an untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.  The Underwriter Defendants, in the exercise of reasonable care, should have known of the untrue statements and omissions contained in the Offering Documents, including the prospectuses, as set forth above and/or should have updated investors regarding material information about the IPO.  Accordingly, the Underwriter Defendants are liable to Co-Lead Plaintiff Mr. Dziedzic and the other members of the Class who purchased DDMG's common stock in the IPO.

243.    Co-Lead Plaintiff Mr. Dziedzic purchased DDMG common stock pursuant to the defective Offering Documents, including the prospectuses.  Co-Lead Plaintiff Mr. Dziedzic did

not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Offering Documents, including the prospectuses, at the times Co-Lead Plaintiff Mr. Dziedzic purchased DDMG stock during the Class Period.

244.    By reason of the conduct alleged herein, the Underwriter Defendants violated §12(a)(2) of the Securities Act, and are liable to Co-Lead Plaintiff Mr. Dziedzic and other members of the Class who purchased DDMG's common stock pursuant to the defective Offering Documents, including the prospectuses.  As a direct and proximate result of such violations, Co-Lead Plaintiff Mr. Dziedzic and the other Class members who purchased DDMG stock pursuant to and/or traceable to the IPO and the Offering Documents sustained substantial damages.

245.    Less than one year has elapsed from the time Co-Lead Plaintiff Mr. Dziedzic discovered or reasonably could have discovered the facts upon which this cause of action is based and the time the action was filed.  Less than three years elapsed since the stock upon which this Count is brought was bona fide offered to Co-Lead Plaintiff Mr. Dziedzic and the Class.

## COUNT III

### (Against Textor, Teaford and the PBC Defendants)
### Violations of Section 15 of the Securities Act

246.    Co-Lead Plaintiff Mr. Dziedzic repeats and re-alleges each of the allegations set forth in paragraphs 1 to 126, 151 to 177, and 213 to 245, inclusive, as if fully set forth herein. This Count is asserted against Textor, Teaford and the PBC Defendants for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Co-Lead Plaintiff Mr. Dziedzic and the other members of the Class who purchased DDMG common stock during the Class Period (i) in the IPO or (ii) on the public markets and traceable to the IPO.

247.    The Registration Statement for the IPO contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading.  DDMG, as the issuer of the common stock, was required to sign the Registration Statement pursuant to 15 U.S.C. §77f(a), and is therefore liable for the untrue statements of material fact and the omitted facts necessary to make the statements not misleading under 15 U.S.C. §77k(a).

248.    At all relevant times, Textor and Teaford were controlling persons of the Company within the meaning of Section 15 of the Securities Act.  Textor and Teaford each served as an executive officer or director of DDMG prior to and at the time of the IPO.  Textor and Teaford at all relevant times participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of DDMG's business affairs.  As officers and directors of a publicly-owned company, Textor and Teaford each had a duty to disseminate accurate and truthful information with respect to DDMG's financial condition and results of operations.  By reason of the aforementioned conduct, Textor and Teaford each were culpable participants in the violation of Section 11 of the Securities Act by DDMG as set forth above by virtue of signing the registration statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

249.    At all relevant times, the PBC Defendants were controlling persons of the Company within the meaning of Section 15 of the Securities Act.  At the time of the IPO the PBC Defendants held 47.7% of the Company's stock, was able to appoint one member of DDMG's Board of Directors, and loaned Defendant Textor $10 million for him to purchase shares of the Company in the IPO.  Further, as of December 31, 2011, the PBC Defendants and Textor together beneficially owned more than 60% of DDMG's common stock. By virtue of Defendant Textor's holdings—which combined with the PBC Defendants' holdings made up a

majority of the shares of the Company—the PBC Defendants were directly and indirectly in control of a majority of the Company's shares during the Class Period.  Thus, in addition to the board member appointed by the PBC Defendants, Defendant Nichols, the PBC Defendants were able to indirectly control Defendant Textor by virtue of the Loan Agreement and holdings, thus providing it with *de facto* control of the Board.  In addition, the PBC Defendants further demonstrated their control over the Company by hiring FTI Consulting in August 2012 to assist in the restructuring of the Company.  These factors, individually and in conjunction with one another, allowed the PBC Defendants to directly and indirectly control the conduct of DDMG's business affairs.  By reason of the aforementioned conduct, the PBC Defendants were culpable participants in the violation of Section 11 of the Securities Act by DDMG as set forth above by virtue of their large shareholdings, control of the DDMG Board, and the Loans to Defendant Textor.

250.    Thus, Textor, Teaford and the PBC Defendants each is liable under Section 15 of the Securities Act, jointly and severally with, and to the same extent as, the Company would be liable under Section 11 of the Securities Act, to Co-Lead Plaintiff Mr. Dziedzic and the other members of the Class who purchased securities in the IPO.

## COUNT IV

**(Against Textor, Teaford and Nichols)**
**Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder**

251.    Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

252.    This Count is asserted against Textor, Teaford and Nichols and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

253.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of these defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for the Company's securities.   Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company's finances and business prospects.

254.     By virtue of their positions at the Company, Textor, Teaford and Nichols had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiffs and the other members of the Class, or, in the alternative, these defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to these defendants.   Said acts and omissions of Textor, Teaford and Nichols were committed willfully or with reckless disregard for the truth.   In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

255.     Information showing that these defendants acted knowingly or with reckless disregard for the truth is within these defendants' knowledge and control.   As the senior managers and/or directors of the Company, Textor, Teaford and Nichols each had knowledge of the details of the Company's internal affairs.

256.     Textor, Teaford and Nichols are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, Textor, Teaford and

Nichols were able to and did, directly or indirectly, control the content of the statements of the Company.  As officers and/or directors of a publicly-held company, Textor, Teaford and Nichols had a duty to disseminate timely, accurate, and truthful information with respect to the Company's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of the Company's securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning the Company's business and financial condition which were concealed by these defendants, Lead Plaintiffs and the other members of the Class purchased the Company's securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by these defendants, and were damaged thereby.

257.    During the Class Period, the Company's securities were traded on an active and efficient market.  Lead Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which these defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of the Company's securities at prices artificially inflated by these defendants' wrongful conduct.  Had Lead Plaintiffs and the other members of the Class known the truth, they would not have purchased said securities, or would not have purchased them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Lead Plaintiffs and the Class, the true value of the Company's securities was substantially lower than the prices paid by Lead Plaintiffs and the other members of the Class.  The market price of the Company's securities declined upon public disclosure of the facts alleged herein to the injury of Lead Plaintiffs and Class members.

258.     By reason of the foregoing, Textor, Teaford and Nichols knowingly or recklessly, directly or indirectly violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder in that they:  (a) employed devices, schemes and artifices to defraud; (b) failed to disclose material information; or (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Lead Plaintiffs and the other members of the Class in connection with their purchases of DDMG common stock during the Class Period.

259.     As a direct and proximate result of Textor, Teaford and Nichols' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT V

### (Against Textor, Teaford, Nichols and the PBC Defendants)
### Violations of Section 20(a) of the Exchange Act

260.     Lead Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

261.     By reason of the allegations listed herein, DDMG, by and through its executive officers and directors, knowingly or recklessly, directly or indirectly violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder in that they:  (a) employed devices, schemes and artifices to defraud; (b) failed to disclose material information; or (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Lead Plaintiffs and the other members of the Class in connection with their purchases of DDMG common stock during the Class Period.

262.    During the Class Period, Textor, Teaford and Nichols participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.  Because of their senior positions, they knew the adverse non-public information about the Company's misstatement of income and expenses and false financial statements.

263.    As officers and/or directors of a publicly owned company, Textor, Teaford and Nichols had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

264.    Because of their positions of control and authority as senior officers, the Textor, Teaford and Nichols were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations.

265.    At all relevant times, the PBC Defendants were controlling persons of the Company through their direct and indirect control of the Company.  At all relevant times the PBC Defendants held between 47.7%  and 37.7% of the Company's stock, was able to appoint one member of DDMG's three member Board of Directors, and loaned Defendant Textor $10 million for him to purchase shares of the Company in the IPO.  Further, as of December 31, 2011, the PBC Defendants and Textor together beneficially owned more than 60% of DDMG's common stock. By virtue of Defendant Textor's holdings—which combined with the PBC Defendants' holdings made up a majority of the shares of the Company—the PBC Defendants were directly and indirectly in control of a majority of the Company's shares during the Class Period.  Thus, in addition to the board member appointed by the PBC Defendants, Defendant

Nichols, the PBC Defendants were able to indirectly control Defendant Textor by virtue of the Loan Agreement and holdings, thus providing it with *de facto* control of the Board.  In addition, the PBC Defendants further demonstrated their control over the Company by hiring FTI Consulting in August 2012 to assist in the restructuring of the Company.   These factors, individually and in conjunction with one another, allowed the PBC Defendants to directly and indirectly control the conduct of DDMG's business affairs.   By reason of the aforementioned conduct, the PBC Defendants were culpable participants in the violation of Section 20(a) of the Exchange Act by DDMG as set forth above by virtue of their large shareholdings, control of the DDMG Board, and the Loans to Defendant Textor.

266.   Throughout the Class Period, the Individual Defendants and the PBC Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein.   The Individual Defendants and the PBC Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company securities.

267.   By reason of the above conduct, the Individual Defendants and the PBC Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

**PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiffs, on their own behalf and on behalf of the Class, pray for judgment as follows:

(a)   Determining this action to be a proper class action and certifying Lead Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Lead Plaintiffs and the other members of the Class against all Defendants, jointly and severally, for the damages sustained as a result of the wrongdoings of Defendants, together with interest thereon;

(c)    Awarding Lead Plaintiffs the fees and expenses incurred in this action including reasonable allowance of fees for Lead Plaintiffs' attorneys and experts;

(d)    Granting extraordinary equitable and/or injunctive relief as permitted by law, equity and federal and state statutory provisions sued on hereunder;

(e)    Awarding rescission damages as to claims under the Securities Act; and

(f)    Granting such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Lead Plaintiffs hereby demand a trial by jury.

Dated: July 31, 2013

Respectfully submitted,

**BERMAN DEVALERIO**

By:  /s/ Jay W. Eng_____
Jay W. Eng, Esq.
Fla. Bar No. 146676
Email:  jeng@bermandevalerio.com
3507 Kyoto Gardens Drive, Suite 200
Palm Beach Gardens, FL 33410
Telephone:  (561) 835-9400
Facsimile:  (561) 835-0322

Patrick T. Egan, Esq.
Admitted *Pro Hac Vice*
Email:  pegan@bermandevalerio.com
Berman DeValerio
One Liberty Square
Boston, MA 02109
Telephone:  (617) 542-8300
Facsimile:  (617) 542-1194

**WOLF POPPER LLP**
Patricia I. Avery, Esq.
Email:  pavery@wolfpopper.com
Admitted *Pro Hac Vice*
Joshua W. Ruthizer, Esq.
Fla. Bar No. 92528
Email:  jruthizer@wolfpopper.com
845 Third Avenue
New York, NY 10022
Telephone:  (212) 759-4600
Facsimile:  (212) 486-2093

**LEVI & KORSINSKY LLP**
Nicholas I. Porritt, Esq.
Admitted *Pro Hac Vice*
Email: nporritt@zlk.com
1101 30th Street, NW, Suite 115
Washington, DC 20007
Telephone: (202) 524-4290
Facsimile: (202) 333-2121

*Lead Counsel for Court-Appointed Lead
Plaintiffs Patricof Family Limited
Partnership, Edward Nusblatt and Robert
Dziedzic*

**OF COUNSEL**
Marian P. Rosner
Email:  mrosner@wolfpopper.com
Wolf Popper LLP
845 Third Avenue
New York, NY  10022
Telephone:  (212) 759-4600
Facsimile:  (212) 486-2093

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was served by the following

methods on the following dates on all counsel or parties of record on the Service List below.

By:   /s/ Jay W. Eng_____
Jay W. Eng, Esq.

## <u>SERVICE LIST</u>

By and through the Southern District of Florida's CM/ECF system on **July 31, 2013** upon:

Brian Paul Miller, Esq.
Email: brian.miller@akerman.com
Samantha J. Kavanaugh, Esq.
Email: Samantha.kavanaugh@akerman.com
Akerman Senterfitt
SunTrust International Center
1 S.E. 3rd Ave., 25th Floor
Miami, FL 33131
Tel: 305-374-5600
Fax: 305-374-5095
*Counsel for Defendant John M. Nichols*

Steven Jeffrey Brodie, Esq.
Email: sbrodie@carltonfields.com
Avi R. Kaufman, Esq.
Email: akaufman@carltonfields.com
Carlton Fields, P.A**.**
100 Southeast Second Street, Suite 4200
Miami, Florida 33131
Tel: (305) 530-0050
Fax: (305) 530-0055

Samuel J. Salario, Jr., Esq.
Email: ssalario@carltonfields.com
Carlton Fields, P.A**.**
4221 W. Boy Scout Blvd., Suite 1000
Corporate Center Three at
International Plaza
Tel: (813) 223-7000
Fax: (813) 229-4133
*Counsel for Defendant Jonathan Teaford*

Brian C. Frontino, Esq.
Email: bfrontino@stroock.com
Brendan S. Everman, Esq.
Email: beverman@stroock.com
Stroock & Stroock & Lavan LLP
200 South Biscayne Blvd. Suite 3100
Miami, FL 33131-5323
Tel: (305) 358-9900
Fax: (305) 789-9302

John R. Loftus, Esq.
Email: jloftus@stroock.com
Julia B. Strickland, Esq.
Email: jstrickland@stroock.com
Stroock & Stroock & Lavan
2029 Century Park East
Suite 1800
Los Angeles, CA 90067-3086
Tel: (310) 556-5800
Fax: (310) 556-5959
*Counsel for Roth Capital Partners, LLC and*
*Morgan Joseph TriArtisan, LLC*

Tracy Nichols, Esq.
Email: tracy.nichols@hklaw.com
Stephen Patrick Warren, Esq.
Email: Stephen.warren@hklaw.com
Holland & Knight
701 Brickell Ave., Suite 3000
Miami, FL 33131
Tel: 305-374-8500
Fax: 305-789-7799
*Counsel for Defendant John C. Textor*

95

Julie Prag Vianale
Email: jvianale@vianalelaw.com
Vianale & Vianale
2499 Glades Road, Suite 112
Boca Raton, FL 33431
Telephone: (561) 392-4750
Facsimile: (561) 392-4775
*Counsel for Movants Marilyn Larsen and
Frank LoVerso*

Brandon Thomas Grzandziel
Email: bgrzandziel@saxenawhite.com
Lester Rene Hooker
Email: lhooker@saxenawhite.com
Joseph E. White, III
Email: jwhite@saxenawhite.com
Saxena White PA
2424 N Federal Highway, Suite 257
Boca Raton, FL 33431
Telephone: 561-394-3399
Facsimile: 561-394-3082
*Counsel for Plaintiff Nathan Wilson*

Kenneth G. Gilman
Email: kgilman@gilmanpastor.com
Gilman Law LLP
3301 Bonita Beach Road, Suite 307
Bonita Springs, FL 34134
Telephone: (239) 221-8301
Facsimile: (239) 676-8224
*Counsel for Movants The Jacobson/Kraft
Group (Robert Jacobson and Bernard Kraft)*

Laurence Matthew Rosen
Email: lrosen@rosenlegal.com
The Rosen Law Firm
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: 212-686-1060
Facsimile: 212-202-3827
*Counsel for Plaintiff Frank Cacella and
Movants the Digital Domain Investor Group
(James and Suzanne Mason, Eric Michael
Harkins and Arthur M. Packard)*