# EXHIBIT L

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| eTOYS DIRECT 1, LLC, et al.,[1] | ) | Case No. 08-13412 |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## DECLARATION OF MICHAEL J. WAGNER
## IN SUPPORT OF FIRST DAY MOTIONS

I, Michael J. Wagner, hereby declare and state as follows:

1. With respect to each of the above-captioned debtors (the

"Debtors"), I am either the Chief Executive Officer and President or the Chief Executive

Officer and President of the managing member of the debtor. I have been employed by

the Debtors in this capacity since October 12, 2007. Prior to that time, I served as

President and Chief Executive Officer of eToys Direct, Inc. since its formation in May

2004. I was Senior Vice President and Chief Operating Officer for eToys Direct, Inc.'s

predecessor, KB Online Holdings LLC, from May 2000 until May 2004 and was the

Chief Financial Officer of KB Online Holdings, LLC, from June 1999 to May 2000.

From June 1994 to June 1999, I held a number of management positions at Consolidated

Stores Corporation (now Big Lots), most recently as Vice President of Strategic Planning

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, if applicable, are: eToys Direct 1, LLC (N/A); The Parent Company (7093); BabyUniverse, Inc. (7990); Dreamtime Baby, Inc. (8047); eToys Direct, Inc. (7296); PoshTots, Inc. (8660); eToys Direct 2, LLC (N/A); eToys Direct 3, LLC (N/A); Gift Acquisition, L.L.C. (0297); and My Twinn, Inc. (1842). The address for each of the Debtors is 717 17th Street, Suite 1300, Denver, CO 80202 The address for each of the Debtors is 717 17th Street, Suite 1300, Denver, CO 80202, with the exception of PoshTots, Inc., the address for which is 5500 Cox Road, Suite M, Glenn Allen, VA 23060.

DOCS_DE:143139.5

and Investor Relations.  I also served in a number of positions at Value Merchants Inc. from August 1984 to June 1994, most recently as Corporate Controller.  I have more than 20 years of financial and operational experience in the retail market, including 8 years of online and direct-to-consumer experience.  I am a Certified Public Accountant and hold a bachelor's degree in accounting from Marquette University.

2.      In my capacity as Chief Executive Officer of the Debtors, I am familiar with the Debtors' day-to-day operations, business affairs, and books and records.

3.      To minimize the adverse effects of filing for chapter 11 protection on the date of filing (the "Petition Date") and to enhance the Debtors' prospects of a successful reorganization, the Debtors are filing a number of motions requesting various types of "first day" relief (collectively, the "First Day Motions").  I am familiar with the contents of each First Day Motion (including the exhibits and other attachments thereto), and I believe that the relief sought in each First Day Motion: (i) is necessary to enable the Debtors to operate in chapter 11 with minimum disruption or loss of productivity or value; (ii) is critical to the Debtors' achievement of a successful reorganization; and (iii) best serves the Debtors' estate and interests of the Debtors' creditors.

4.      I submit this declaration in support of the First Day Motions.[2] Except as otherwise indicated, all statements set forth in this declaration are based upon: (i) my personal knowledge, including my knowledge of the online sales and retail industry, (ii) information supplied to me by other members of the Debtors' management

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Motion.

or its professionals, (iii) my review of relevant documents, or (iv) my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this declaration.

5. Part I of this declaration describes the Debtors' business, their capital structure, and the circumstances surrounding the commencement of these chapter 11 cases. Part II sets forth the relevant facts in support of each First Day Motion.

## PART I

## <u>OVERVIEW OF THE DEBTORS' BUSINESS OPERATIONS</u>

**A.      The Debtors' Businesses and History**

6. The Parent Company ("TPC") is a leading commerce, content, and new media company for growing families. TPC provides comprehensive eCommerce and eContent resources to help families plan, play, and grow, including seven eCommerce sites and three revenue generating eContent sites. TPC's toy business offers thousands of toys and children's products through its eToys.com and KBtoys.com web sites, catalogs, and strategic retail partnerships. Through its My Twinn brand, TPC markets personalized dolls—custom-built according to specifications, including hair color and style, eye color, skin tone, and face shape to resemble a customer's child—and related accessories. Through its baby business, TPC is a leading online retailer of brand-name baby, toddler, and maternity products sold through the BabyUniverse.com and DreamtimeBaby.com web sites.

7. TPC's luxury brands, PoshTots.com and PoshLiving.com, reach the country's most affluent consumers with luxury baby apparel and furnishings. With its eContent sites, BabyTV.com, PoshCravings.com and ePregnancy.com, TPC has established a recognized platform for the delivery of content and new media resources to a national audience of expectant parents. TPC is a market-leading digital content and eCommerce company focused on parents.

8. Collectively, the Debtors receive over 59 million annual web-site visits and sell to approximately 5.9 million unique customers. Through their various eCommerce venues, the Debtors' businesses offer over 35,000 products from more than 500 manufacturers. TPC is publicly traded on the NASDAQ under the ticker symbol KIDS.

9. The Debtors' history dates to 1997 and the incorporation of Everything But the Baby Inc. In 1999, the Debtors began marketing products under the BabyUniverse brand, and in 2001 the corporate name was changed to BabyUniverse, Inc. In 2004, the Debtors purchased the online assets of KB Toys, acquired the My Twinn doll company, and re-launched the My Twinn website. In 2006, the Debtors made an initial public offering of the stock of BabyUniverse, Inc., and also acquired Dreamtime Baby. In 2006, BabyUniverse, Inc., acquired PoshTots (and introduced PoshLiving and PoshCravings), acquired ePregnancy.com, and launched BabyTV.com. In 2007, BabyUniverse, Inc., completed a merger with eToys Direct, Inc. In 2008 BabyUniverse, Inc., changed its name to TPC, and a new subsidiary with the name BabyUniverse, Inc., was incorporated.

**B.    The Debtors' Organization and Business Operations**

10.    TPC is the direct or indirect 100% shareholder of each of the

Debtors.  TPC is the direct 100% shareholder of debtors BabyUniverse, Inc.; Dreamtime

Baby, Inc.; eToys Direct, Inc.; and PoshTots, Inc.  Etoys Direct, Inc., in turn is the 100%

shareholder of eToys Direct 1, LLC; eToys Direct 2, LLC; eToys Direct 3, LLC; Gift

Acquisition, L.L.C.; and MyTwinn, Inc.  A chart reflecting the Debtors' corporate

organization is attached hereto as Exhibit A.  The majority of TPC's common stock is

owned by D.E. Shaw Laminar Acquisition Holdings 3, L.L.C.

11.    The Debtors' headquarters and corporate offices are located in

Denver, Colorado.  The Debtors also lease office space in Glen Allen, Virginia, with

respect to PoshTots and maintain a merchant buyers' office in Pittsfield, Massachusetts.

The Debtors lease two distribution and fulfillment centers, one in Blairs, Virginia, which

holds inventory and ships product directly to customers and one in Ringgold, Virginia,

which is used primarily for ship-alone items and off-site storage.

12.    As of December 1, 2008, the Debtors employed approximately 946

people, including 742 temporary seasonal warehouse and customer service workers.  On

December 15, 2008, the Debtors commenced a reduction in force; on December 23,

2008, the Debtors further reduced their employment.  As of the Petition Date, the Debtors

employed approximately ninety full-time employees in salaried and administrative

positions, including customer service, and four independent contractors (collectively, the

"Employees").  None of the Employees is represented by a union or other labor

organization.

13.     The Debtors' sales are highly seasonal and reflect the general pattern of peak sales in the retail industry during the holiday shopping season. Historically, a substantial portion of the Debtors' sales occur in the fourth quarter; for the fiscal year ended February 2, 2008, approximately 71% of the Debtors' sales occurred in the fourth fiscal quarter.

14.     For fiscal year 2006, the Debtors' net sales were approximately $116 million and for fiscal year 2007 they were approximately $106 million. Net sales for the first half of 2008 were approximately $20 million. For fiscal year 2006, the Debtors' EBITDA reflected a loss of approximately $4 million, EBITDA for fiscal year 2007 reflected a loss of approximately $10.5 million, and EBITDA for the first half of fiscal 2008 reflected a loss of approximately $11 million.

15.     The directors of TPC are Todd Edebohls (Chairman), John C. Textor (Vice Chairman), Pamela N. Abrams, Blaine MacDougald,[3] Frank Rosales, John V. Schaefer, and Michael J. Wagner. The Debtors' executive team is lead by Michael J. Wagner (Chief Executive Officer) and includes Christopher H. Cummings (Senior Vice President and Chief Information Officer), Frederick Hurley (Senior Vice President and Chief Merchant), Craig Currie (Senior Vice President of BabyUniverse, Dreamtime Baby, and My Twinn), and Gloria-Jean Healy (Vice President, Human Resources and Administration).

---

[3] Mr. MacDougald is employed by D. E. Shaw & Co., L.P., an affiliate of D.E. Shaw Laminar Acquisition Holdings 3, L.L.C, the majority stock holder of TPC. He has been removed from all insolvency-related activities, including, but not limited to, negotiations with respect to debtor-in-possession financing.

## C.     Principal Debt and Capital Structure

16.     Until shortly before the Petition Date, the Debtors' principal

secured indebtedness consisted of: (a) $25 million revolving credit facility with The CIT

Group/Business Credit, Inc. ("CIT"),  pursuant to an October 2007 credit facility (the

"CIT Credit Facility"), secured by principally all of the Debtors' assets; and (b) a $25

million subordinated senior secured (second lien) term note with Laminar Direct Capital,

L.L.C. ("Laminar Direct"), an affiliate of the D.E. Shaw Laminar Acquisition Holdings 3,

L.L.C, the majority stock holder of TPC, of which $10 million has been funded, secured

by a second lien on principally all of the Debtors' assets (the "Term Loan") and due

December 27, 2010.  The Term Loan is also the subject of a guarantee by John C. Textor,

a member of TPC's board of directors.

17.     In February 2008, the CIT Credit Facility was amended to provide,

inter alia, for a limited guaranty of $15 million of the Debtors' obligations by D.E. Shaw

Laminar Lending, Inc. ("Laminar Lending"), an affiliate of the D.E. Shaw Laminar

Acquisition Holdings 3, L.L.C, the majority stock holder of TPC.  In connection

therewith, Laminar Lending deposited $15 million with HSBC Bank USA, National

Association, which amount was pledged to CIT and in which CIT was granted a lien and

security interest.

18.     On or about December 12, 2008, the Debtors, Laminar Lending,

and CIT entered into an Assignment and Acceptance Agreement (the "Assignment

Agreement") pursuant to which Laminar Lending acquired all outstanding indebtedness

under the CIT Credit Facility.  In connection therewith, Laminar Lending became the

administrative agent and collateral agent under the CIT Credit Facility and succeeded to CIT's rights thereunder, and the guaranty by Laminar Lending to CIT was terminated.

19.     Consequently, on the Petition Date, the Debtors' principal indebtedness consists of (a) the CIT Credit Facility, in principal amount of $8,641,236, as to which Laminar Lending is now the administrative and collateral agent and (b) the Term Loan, in principal amount of $10 million.  In addition, as of the Petition Date, the Debtors estimate that they owe approximately $15,772,000 in accounts payable (which figure includes both invoices vouched for payment and an amount for invoices not yet received or processed for payment), the largest single portion of which is owed for delivery services.  In total, the Debtors estimate the book value of their consolidated assets to be approximately $20,633,447, and the book value of their consolidated liabilities to be approximately $35,722,280.

**D.     Events Leading to Bankruptcy**

20.     Compared to prior years, TPC has been impacted by a sharp drop in sales due to reduced consumer recessionary spending and lower TPC inventory selection as a result of the TPC's tight liquidity position and reduced terms from its vendors.  In addition, after significant current and prior year losses, a lack of supporting collateral and poor capital market conditions, TPC's ability to raise new capital to restructure its operations is limited.

21.     The Debtors' restructuring efforts have been ongoing since the beginning of 2008.  The Debtors initially retained Gibson & Rechan, LLC ("G&R"), from July 10, 2008, to July 31, 2008, so that David Gibson could assess the Debtors'

business, financial condition, liquidity position, and long-term prospects. On August 21, 2008, Mr. Gibson was engaged (on a half-time basis) to review and assess liquidity, assist with development of a reporting package, and to review and assess cost reductions and working capital.

22.    In October 2008, the Debtors retained Oppenheimer & Co. Inc. as financial advisors and investment bankers to assist in a search for one or more purchasers for the Debtors' assets. In December 2008, the Debtors retained Clear Thinking Group LLC as financial advisors to actively lead the financial management of these Chapter 11 cases and perform related duties on behalf of the Debtors.

23.    On December 15, 2008, the Debtors amended the G&R retention to engage Mr. Gibson full-time and to revise the work scope to include the following tasks: review and assess the Debtors' liquidity position, assist with lender negotiations, and assist with bankruptcy planning. On December 24, 2008, the Debtors further revised the retention to engage Mr. Gibson as chief restructuring officer (the CRO"). As CRO, he will work with and direct the Debtors' employees and professionals with their operational wind-down and bankruptcy, assist the CEO and professionals in asset sales, assist in communications and/or negotiations with lenders, creditors and employees, and perform such other activities as reasonably requested by the board and approved by G&R and Mr. Gibson,

24.    On December 1, 2008, the Debtors' exposure under the CIT Credit Facility exceeded the borrowing base resulting in an overadvance and CIT's demand for immediate payment of the overadvance. The Debtors were unable to immediately repay

the overadvance, and, thereafter, the Debtors and CIT entered into a letter agreement to permit further borrowings. Thereafter, the Debtors, CIT, and Laminar Lending entered into the Assignment Agreement as described above, terminating CIT's role as a lender.

25. In December 2008, faced with the exhaustion of availability under the CIT Credit Agreement, declining sales, and limited prospects for additional financing, the Debtors commenced the reduction in force described above. Thereafter, the Debtors and D. E. Shaw Laminar Lending 3 (C), L.L.C., as Agent, and D. E. Shaw Laminar Portfolios L.L.C., as Lenders, reached an agreement to provide funding for the Debtors through a sale process.

26. Consequently, the Debtors commenced these Chapter 11 cases to avail themselves of the provisions of the Bankruptcy Code and preserve the status quo of their businesses through their Bankruptcy Cases while seeking sale by auction of substantially all of their assets.

## PART II

## FIRST DAY MOTIONS

**A.** **Debtors' Motion for Order Directing Joint Administration of Related Chapter 11 Cases**

27. By this Motion, the Debtors seek entry of an order directing the joint administration of their chapter 11 cases and the consolidation thereof for procedural purposes only. Joint administration of these chapter 11 cases (a) is warranted because the Debtors' financial affairs and business operations are closely related, (b) will ease the

administrative burden on the Court and the parties, and (c) protects creditors of different estates against potential conflicts of interest.

28.     The Debtors anticipate that numerous notices, applications, motions, other pleadings, hearings, and orders in these cases will affect all of the Debtors. With ten affiliated debtors, each with its own case docket, the failure to administer these cases jointly would result in numerous duplicative pleadings filed for each issue and served upon separate service lists. Such duplication of substantially identical documents would be extremely wasteful and would unnecessarily overburden the Clerk of this Court (the "Clerk") with the volume of paper.

29.     Joint administration will permit the Clerk to use a single general docket for all of the Debtors' cases and to combine notices to creditors and other parties in interest of the Debtors' respective estates.  Joint administration will also protect parties in interest by ensuring that such parties in interest in each of the Debtors' respective chapter 11 cases will be apprised of the various matters before the Court in all of these cases.

30.     The Debtors submit that use of the simplified caption, without reference in the caption itself to the ten affiliate Debtors and their states of incorporation, will eliminate cumbersome and confusing procedures and ensure uniformity of pleading identification.

31.     The rights of the respective creditors of each of the Debtors will not be adversely affected by joint administration of these cases inasmuch as the relief sought is purely procedural and is in no way intended to affect substantive rights. Each

creditor and party in interest will maintain whatever rights it has against the particular estate in which it allegedly has a claim or right. Indeed, the rights of all creditors will be enhanced by the reduction in costs resulting from joint administration. The Court will also be relieved of the burden of entering duplicative orders and keeping duplicative files. Supervision of the administrative aspects of these chapter 11 cases by the Office of the United States Trustee will also be simplified.

**B.**     **Application of Debtors Pursuant to 28 U.S.C. § 156(c) and Local Rule 2002-1(f) for Authorization to (1) Employ and Retain Omni Management Group, LLC as Claims, Balloting, Noticing and Administrative Agent for the Debtors and (2) Appoint Omni Management Group, LLC as Agent of the Bankruptcy Court *Nunc Pro Tunc* to the Petition Date**

    32.     By this Application, the Debtors seek an order (i) retaining Omni Management Group, LLC ("Omni"), at the expense of their estates and effective as of the Petition Date, as claims, balloting, noticing and administrative agent pursuant to 28 U.S.C. § 156(c), and (ii) appointing Omni as agent of the Bankruptcy Court. The proposed terms of Omni's employment are set forth in the engagement agreement between the Debtors and Omni (the "Engagement Letter"), a copy of which is attached to the Application as Exhibit B.

    33.     The creditor matrices in the Debtors' cases aggregate over 3,000 parties to whom certain notices must be sent. Such an extremely large number of creditors and parties in interest will undoubtedly impose heavy administrative and other burdens on the Court and the Office of the Clerk of the Court. The Debtors will also need assistance in managing and addressing the myriad of administrative issues that will

likely arise in these cases. In addition, in connection with any plan of reorganization proposed by the Debtors, the Debtors have determined that it will require the services of Omni to act as solicitation agent with respect to, *inter alia*, the mailing of a disclosure statement, the plan and related ballots, and maintaining and tallying ballots in connection with the voting on such plan. To relieve and assist with these burdens, the Debtors request the appointment of the Firm as claims, balloting, noticing and administrative agent in these Chapter 11 Cases

34.     Omni is one of the country's leading chapter 11 administrators with expertise in noticing, claims processing, claims reconciliation, and distribution and ballot tabulation. Omni has acted as claims and noticing agent in hundreds of bankruptcy cases and is well qualified to provide the Debtors with experienced services as claims, noticing, balloting, and administrative agent in connection with these chapter 11 cases and to assist the Debtors in the preparation of its Schedules of Assets and Liabilities and Statements of Financial Affairs.

35.     After considering its quality of performance in other cases, the Debtors concluded that Omni was the best choice for Claims and Noticing Agent in these cases. The Debtors believe that the Engagement Letter contemplates compensation at a level that is reasonable and appropriate for services of this nature, and is consistent with the compensation arrangement charged by Omni in other cases in which it has been retained to perform similar services. The Debtors need to employ a claims agent with proven competence and believe that Omni so qualifies. In light of the Omni's experience and the efficient and cost-effective methods that it has developed, the Debtors' estates and

creditors will clearly benefit from the appointment of Omni as the claims and noticing

agent in these Chapter 11 cases.

**C.** **Motion of Debtors for Order Under 11 U.S.C. §§ 105, 363, 503(b), 1107 and 1108 Authorizing (I) Maintenance of Certain Existing Bank Accounts, (II) Continued Use of Existing Business Forms, (III) Continued Use of Existing Cash Management System, (IV) Providing Administrative Priority Status to Postpetition Intercompany Claims, and (V) Waiver of Section 345(b) Deposit and Investment Requirements**

36.     By this Motion, the Debtors seek authorization (1) to maintain

their existing bank accounts with the exception of all five of the Debtors' bank accounts

at Wachovia Bank (the "Wachovia Accounts") and the bank account maintained at Bank

of America Corporation (the "Bank of America Account") (the Debtors' bank accounts

other than the Wachovia Accounts and the Bank of America Account being the

"Maintained Accounts"), and to pay any prepetition routine banking fees imposed by the

financial institutions of the Maintained Accounts, (2) to continue to use their existing

check stock and business forms, (3) to continue to use their existing cash management

system, (4) to provide administrative priority to postpetition intercompany claims, and

(5) for a limited waiver of the deposit and investment guidelines imposed under section

345(b) of the Bankruptcy Code.

37.     The Debtors' cash management system (the "Cash Management

System") is a network of bank accounts that facilitates the timely and efficient collection,

management and disbursement of funds used in the Debtors' business.  Because of the

nature of the Debtors' business and the disruption to the business that would result if they

were forced to close these accounts, it is critical that the Cash Management System remain in place.

38.    The Cash Management System consists of an integrated network of bank accounts maintained at UMB Bank NA ("UMB"), Branch Banking and Trust Company ("BB&T"), and Berkshire Bank ("Berkshire") (collectively, the "Banks"). A diagram showing the role of each account in the Cash Management System is attached to the Motion as Exhibit A. A description of all of the Debtors' bank accounts (the "Bank Accounts") appears in Exhibit B, attached to the Motion.

39.    The Debtors are no longer using the Wachovia Account and the Bank of America Account (collectively, the "Idle Accounts"), which used to be part of the Cash Management System. Accordingly, the Debtors intend to close the Idle Accounts on the Petition Date.

40.    The Debtors derive substantially all of their revenues from the sale of their products to their customers. All the Debtors' revenues are directly deposited into a lockbox account maintained at UMB (the "UMB Lockbox Account"). The UMB Lockbox Account is automatically swept daily through a lockbox clearing account for the Debtors' senior secured lenders, D.E.Shaw Laminar Portfolios, LLC ("Shaw"), and then credited against the then-outstanding balance under the Debtors' revolving credit facility (the "Revolver").

41.    The Debtors' main operating account  is maintained at UMB (the "Main Operating Account"). The Debtors use this account to fund operating items such as product and inventory purchases, payroll and banking fees. The Main Operating

Account also funds two zero balance accounts maintained at UMB that are used to pay the Debtors' accounts payable owing to vendors (the "Zero Balance Accounts"). Any financing from Shaw is deposited into the Main Operating Account. The Debtors' requests for financing to Shaw are based on the goal of maintaining a $50,000 balance in the Main Operating Account.

42.     One of the Zero Balance Accounts funds both the Berkshire bank account, which is the operating account for the warehouse located in Pittsfield, Massachusetts, and the BB&T account, which is the operating account for the warehouse located in Blairs, Virginia.

43.     The Debtors seek a waiver of the United States Trustee's requirement that the Maintained Accounts be closed and new postpetition bank accounts be opened at depositories authorized by the United States Trustee. If strictly enforced in these cases, the United States Trustee's requirement would cause a severe disruption in the Debtors' activities and would impair the Debtors' ability to operate under chapter 11. The Debtors intend to expeditiously pursue a sale or sales of their assets for the benefit of their creditors. Therefore, this relief may only be required for a relatively short time to enable the Debtors to consummate the proposed liquidation of their assets.

44.     Maintenance of the Maintained Accounts will greatly facilitate the Debtors' operations in chapter 11. As noted on Exhibit A to the Motion, all payments from the Debtors' customers are deposited into the UMB Lockbox Account, which is swept daily to Shaw, and then applied to amounts owed under the Revolver. If the Maintained Bank Accounts were closed, the Debtors would have to open new accounts

and then attempt to arrange alternative electronic and manual payment procedures with each of their customers and vendors, which would completely disrupt the flow of the Debtors' receipt of sales revenues and the Debtors' payment of debts incurred postpetition. In addition, closing the Maintained Bank Accounts would require the Debtors to cancel and reinstitute wire transfer instructions for various customers, all of which would be difficult to modify under these exigent circumstances. These disruptions would severely impact and could irreparably harm the Debtors' ability to operate their business and effectuate a sale of their assets for the benefit of their creditors.

45.     To avoid disruptions and delays in the operation of the Debtors' business, the Debtors should be permitted to continue to maintain their existing Maintained Accounts and, if necessary, to open new accounts or close unnecessary existing accounts.

46.     To guard against improper transfers resulting from the postpetition honoring of prepetition checks, the Debtors propose that banks may not honor checks drawn on the Debtors' accounts before the Petition Date, except upon limited court-approved exceptions. Subject to a prohibition against honoring prepetition checks or offsets without specific authorization from this Court, the Debtors request that they be authorized to maintain and continue the use of these accounts in the same manner and with the same account numbers, styles and document forms as those employed during the prepetition period.

47.     If the relief requested herein is granted, the Debtors will not pay, and each of the banks where the Maintained Accounts are maintained will be instructed

not to pay, any debts incurred before the Petition Date, other than as specifically authorized by this Court.

48.     The Debtors also seek authority to continue to use their Cash Management System, as such system may be modified pursuant to the requirements of any Court-approved debtor-in-possession financing facility and/or cash collateral usage, and related order of this Court.

49.     The Debtors' Cash Management System constitutes an essential business practice and was created and implemented by the management of the Debtors in the exercise of their business judgment. The widespread use of this particular Cash Management System, moreover, is attributable to the numerous benefits it provides, including the ability to (a) process and timely pay expenses; (b) allow a mechanism for deposits from sales revenues; (c) ensure cash availability; (d) control and monitor corporate funds; and (e) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate balance and presentment information. In addition, preserving a "business as usual" atmosphere and avoiding the unnecessary distractions that would inevitably be associated with a substantial disruption of the Cash Management System will facilitate and enhance the Debtors' efforts to continue to operate postpetition.

50.     To minimize expense to their estates, the Debtors also request authority (i) to continue to use all correspondence and business forms (including, but not limited to letterhead, purchase orders, invoices, etc.) until such time as the Debtors can effectuate the necessary changes to their pre-printed forms in order to add the "debtor in

possession" label, and (ii) to continue using their existing pre-printed check stock without reference to their "debtor in possession" status until the existing pre-printed stock has been exhausted, provided that the Debtors shall add the "debtor in possession" designation to any new checks ordered after the depletion of the existing stock. The Debtors' business and correspondence forms are pre-printed and the Debtors estimate that it may take up to three weeks to order and obtain new forms with the "debtor in possession" label.

51.     In addition, and in the ordinary course of the operation and maintenance of the Cash Management System, the Debtors incur routine bank charges and fees relating to the administration of the Cash Management System.  The Debtors seek authority, in their sole discretion, to pay any such routine prepetition banking fees owed to UMB, Berkshire and BB&T in an amount not to exceed $10,000.

52.     As described above, under the Cash Management System, funds generated by the business operations of each participating Debtor flow into various interconnected Bank Accounts.

53.     Prior to the Petition Date, certain of the Debtors, amongst themselves, engaged in intercompany financial transactions in the ordinary course of their businesses (collectively, the "Intercompany Transactions").  All of these Intercompany Transactions are made between and among certain Debtors in the ordinary course of the Debtors' business as part of their consolidated Cash Management System.

54.     To ensure each individual debtor will not, at the expense of its creditors, fund the operations of another entity, the Debtors respectfully request that,

pursuant to sections 503(b)(1) and 364(b) of the Bankruptcy Code, all intercompany claims against a Debtor by another Debtor arising after the Petition Date as a result of ordinary course intercompany transactions through the Cash Management System (collectively, "Intercompany Claims"), be accorded administrative priority expense status. If Intercompany Claims are accorded administrative priority expense status, each entity utilizing funds flowing through the Cash Management System should continue to bear ultimate repayment responsibility for such ordinary course transactions.

55.     Finally, the Debtors seek an interim waiver of section 345(b) of the Bankruptcy Code subject to final approval. The waiver would permit the Debtors to maintain their Maintained Accounts without posting a bond or other security, as would otherwise be required under section 345(b) whenever the funds on deposit exceed the amount permitted under section 345(b). As explained above, under the Cash Management System, funds deposited into the UMB Lockbox Account are swept daily for the benefit of Shaw. Similarly, the Debtors' requests for financing to Shaw are based on the goal of maintaining a $50,000 balance in the Main Operating Account. In this case, therefore, because neither account holds a substantial amount for an extended period, the risk of loss, which section 345 protects against, is minimal. Finally, all of the Maintained Accounts are maintained at UMB, Berkshire and BB&T, all of which are federally insured institutions.[4] Deposits in the Berkshire and BB&T accounts do not exceed federally insured amounts and are usually less than $5,000.

---

[4] The Debtors are informed that UMB is an approved depository for the Office of the United States Trustee for Region 3 (the "UST") and that it has already executed a blanket collateralization agreement with the UST.

**D.** **Debtors' Motion Pursuant to Bankruptcy Code Sections 105(a), 363, and 507(a) for an Order Authorizing the Debtors to (I) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation; (II) Remit Withholding Obligations; (III) Maintain Employee Compensation and Benefits Programs and Pay Related Administrative Obligations; and (IV) Have Applicable Banks and Other Financial Institutions Receive, Process, Honor, and Pay Certain Checks Presented for Payment and Honor Certain Fund Transfer Requests**

56.     As of the Petition Date, the Debtors employed approximately ninety full-time employees in salaried and administrative positions, including customer service, and four independent contractors (the "Employees"). The Employees work at the Debtors' offices in Denver, Colorado, and at the Debtors' offices located in Blairs, VA; Richmond VA; Glen Allen, VA; and Pittsfield MA. Sixty-three employees are involved in sales and sales support roles. The remaining Employees perform mainly office administrative and support services.

57.     By this Motion, the Debtors seek to minimize the personal hardship to the Employees as a result of the filing of these Chapter 11 Cases and to minimize the disruption to the Debtors' business, for the benefit of the Debtors' creditors and their estate, by requesting, in their discretion, the authority (a) to pay and/or honor, *inter alia*, certain prepetition claims for, among other items, wages and salaries (the "Wages"), employee benefits and other compensation or reimbursements (the "Benefits"), and to pay all costs incident to the foregoing (collectively, the "Wages and Benefits"), and (b) to continue to pay and/or honor such Wages and Benefits as they become due postpetition in the ordinary course of the Debtors' business. The Wages and Benefits for which this relief is sought are set forth in detail below and in the Motion.

58.     The Debtors have been paying and/or honoring the Wages and Benefits in the ordinary course of business up to the Petition Date.  The Debtors represent that they have (or will have) sufficient postpetition funding to pay promptly all Wages and Benefits, to the extent described herein, on an ongoing basis and in the ordinary course of business.  Consequently, there is no reason for the payment of the Wages and Benefits to the Employees to be disrupted, which disruption would directly harm the Employees and the Debtors' efforts in these Chapter 11 Cases.

<u>Wages and Salaries and Associated Withholding</u>

59.     Salaried Employees ("Salaried Employees") are paid in arrears bi-weekly through direct deposit or check.  Hourly employees ("Hourly Employees") are paid weekly, one week in arrears.  The independent contractors (the "1099 Workers") are paid weekly, one week in arrears.  The Debtors' average 2008 gross payroll every two weeks for Salaried Employees, Hourly Employees and 1099 Workers (the "Bi-Weekly Payroll"), namely (a) the average payroll for a bi-weekly payment to Salaried Employees plus (b) two weekly payrolls to Hourly Employees plus (c) the two weekly payments to the 1099 Workers, was approximately $480,000, which figure includes wages and salaries, taxes (including withholding taxes paid by Employees), and withholdings for various Employee benefits (described more fully below).  Accounting for the many recent layoffs, the Debtors estimate that average postpetition Bi-Weekly Payroll will be approximately $251,730.

60.     The last date on which the Debtors' Salaried Employees  were paid was December 26, 2008, for the period ended January 2, 2009.  The last date on which

the Debtors' Hourly Employees were paid was December 26, 2008, for the period ended

January 2, 2009. The last date on which the Debtors' 1099 Workers were paid was

December 23, 2008, for the period ended December 19, 2008.

61.     As of the Petition Date, the Debtors owe an estimated $8,500 to the

1099 Workers for earned but unpaid Wages. The Debtors also seek authority to pay up to

$12,500 to Hourly Employees in the event that the Debtors underestimated Wages for

Hourly Employees during this busy holiday season. The Debtors therefore seek authority

to pay the unpaid Wages up to a total and aggregate amount of $21,000. No Employee is

owed more than $10,950 in unpaid Wages.

62.     The Debtors' payroll is disbursed by ADP. The Debtors fund their

direct deposit and check payroll to ADP two days in advance of payroll. Salaried

Employees receive their direct deposits or checks through ADP every other Friday.

Hourly employees receive their direct deposits or checks through ADP every Friday. As

of the Petition Date, the Debtors owe ADP an estimated $3,000 in unpaid fees with

respect to ADP's processing of the Debtors' payroll and related administration (the

"Administration Fees"). The Debtors request authority to pay ADP the Administration

Fees up to $3,000 that ADP may be owed in connection with the foregoing services and

to continue to pay ADP postpetition in the ordinary course of the Debtors' business with

respect to the same.

63.     In the ordinary course of their businesses, the Debtors routinely

withhold from Wages certain amounts that the Debtors are required to transmit to third

parties for purposes such as Social Security and Medicare, federal and state or local

income taxes, contributions to the Debtors' benefit plans described more fully below, 401(k) contributions, garnishment, child support or similar obligations pursuant to court order or law (collectively, the "Withholding Obligations"). In addition to the Withholding Obligations, the pre-petition amount of which amounts to approximately $4,375 and is encompassed within the total figure for prepetition Wages described above, the Debtors estimate that, as of the Petition Date, approximately $1,750 of the Debtors' contributions to tax withholdings were incurred and unpaid in connection with as yet unpaid Wages (the "Employer Tax Obligations"). The Debtors request authority to pay the Employer Tax Obligations and to satisfy the other Withholding Obligations in connection with the payment of the Wages and to the extent described more fully below.

<u>Business Expense Reimbursements</u>

64.    The Debtors customarily reimburse Employees who incur business expenses in the ordinary course of performing their duties on behalf of the Debtors. Such expenses typically include, but are not limited to, business-related travel expenses, including air travel, auto travel and car rental, lodging, meal charges, business lunches and entertainment expenses, telephone charges, and miscellaneous other allowed travel expenses (the "General Reimbursement Obligations").

65.    It is difficult for the Debtors to determine the exact amounts of General Reimbursement Obligations that are due and owing for any particular time period since the expenses incurred by Employees on behalf of the Debtors throughout the year vary on a monthly basis and because there may be some delay between when an Employee incurs an expense and submits the corresponding expense report for

processing. Based on historical experience, the Debtors anticipate that, as of the Petition

Date, the Debtors owe an estimated $5,000 in General Reimbursement Obligations for all

Employees. The Debtors seek authority to pay any prepetition General Reimbursement

Obligations up to a total amount of $5,000, and to continue to honor General

Reimbursement Obligations incurred postpetition in the ordinary course of the Debtors'

business.

Health and Related Benefits

66.     The Debtors provide several health and related benefit plans to

their Employees, including medical and vision insurance, health care reimbursement

account, dental insurance, life insurance, accidental death and disability insurance, and

short and long-term disability insurance (collectively, the "Health Plans").

a.     **Medical and Vision Plans**

67.     The Debtors offer six different medical insurance plans, some of

which include vision coverage, through United Healthcare and Anthem (collectively, the

"Medical Plans"). The Debtors' contribution to premiums due under the Medical Plans

amount to approximately 52-67% of the cost of the Medical Plans, depending on the

Medical Plan, and total approximately $72,784 per month. Each pay period, Employees

make contributions through the Debtors, to the Medical Plans for themselves and their

eligible dependents depending upon which plan they select, and the Debtors pay the

balance of the contributions to the Medical Plans, in advance, on a monthly basis

(together, the "Medical Plan Contributions"). Because the Debtors pay their medical

premium amounts in advance, they do not believe any prepetition Medical Plan

Contributions are owed as of the Petition Date. The Debtors seek authority to continue to offer their Medical Plans postpetition in the ordinary case of business in their discretion.

### b. Dental Plan

68.     The Debtors also provide their eligible Employees with dental insurance under plans with MetLife (the "Dental Plans"). The Debtors pay approximately 46-80% of the premium costs, depending on the Dental Plan, while the Employees pay the remainder of the premium costs. The Debtors' contribution to the premiums of the Dental Plans is $7,642 per month. Because the Debtors pay their dental premium amounts one month in advance they do not believe any Dental Plan Contribution amounts are owed as of the Petition Date. The Debtors seek authority to continue to offer the Dental Plans postpetition in the ordinary course of business in their discretion.

### c. Exec-U-Care

69.     The Debtors offer executives a supplemental medical reimbursement policy called Exec-U-Care, which is run by Lincoln Financial Group ("Lincoln"). Exec-U-Care supplements the Debtors' medical plans by reimbursing executives and eligible dependents for health care expenses not covered by the medical plans (the "Exec Reimbursement Obligations"). The Exec Reimbursement Obligations are paid directly by Lincoln. As of the Petition Date, the Debtors do not believe that any amount is owed on account of Exec Reimbursement Obligations. The Debtors seek to continue to honor Exec Reimbursement Obligations incurred postpetition in the ordinary course of the Debtors' business.

### d. Flexible Spending Accounts

70. The Debtors also offer their Employees access to flexible spending accounts ("FSAs") to set aside pre-tax dollars to pay for eligible medical and dependent care costs. The FSAs are administered for the Debtors by ADP. An eligible Employee's FSA deduction is taken out of his or her paycheck each pay period and put in an account to be used for eligible expenses throughout the year. ADP receives claims for benefits and disburses payments on such claims, and the Debtors pay ADP a monthly fee based upon the number of participants and certain associated expenses. Because FSA contributions from Employees are part of payroll, which has been paid through January 2, 2009, there no accrued FSA contributions from Employees that remain unremitted as of the Petition Date. The Debtors owe ADP on the Petition Date certain fees to administer the FSAs, which amount is included in the $3,000 of Administration Fees remaining unpaid as of the Petition Date, as mentioned above. The Debtors seek authority to honor the FSA Contributions in connection with satisfaction of the Wages, to pay the Administration Fees, and to continue to provide the FSA program postpetition in the ordinary course of the Debtors' business.

### e. Life, Accidental Death and Dismemberment and Disability Insurance

71. The Debtors also provide their Employees with life insurance, short-term and long-term disability insurance, and with accidental death and disability insurance, all through MetLife at no cost to the Employees. The Debtors make payment for the described coverage on a monthly basis.

27

72. Specifically, the Debtors provide life insurance benefits to their Salaried Employees at 1.5 times the Employee's base salary, up to a maximum amount of $500,000 (the "Life Insurance").

73. The Debtors also provide accidental death and dismemberment insurance ("AD&D Insurance") to all Employees up to a maximum of $500,000.

74. The Debtors also provide all Employees with short and long-term disability coverage (the "Disability Insurance"). Short-term disability pays 66% of pre-disability pay per week, for a period of 12 weeks up to a maximum of $2,000 per week. Long-term disability pays 60% of pre-disability pay per month (to a maximum of $5,000 per month).

75. The Debtors' premium contributions to the Life Insurance, AD&D Insurance and Disability Insurance are paid monthly, in advance, at a total cost of approximately $7,216 per month. Because the Debtors pay their contributions to the Life Insurance, AD&D Insurance and Disability Insurance one month in advance they do not believe any amounts are owed as of the Petition Date. The Debtors seek authority to continue to offer the Life Insurance, AD&D Insurance and Disability Insurance postpetition in the ordinary course of business in their discretion.

**f. Holidays, Vacation, and Leave**

76. The Debtors provide their Salaried Employees with three forms of regular paid time off ("PTO") consisting of holidays, vacation, and sick leave time. In addition, Employees are eligible for other PTO, including, among other things, for

funeral leave, jury duty, time off to vote, and bereavement.  With respect to holidays, the
Debtors provide for eleven paid holidays, seven fixed and four floating.

77.    Vacation for all Salaried Employees is accrued starting as of the
Salaried Employee's respective hire date and is based upon length of service.  Employees
receive 80 hours of annual paid vacation during their first two years of service, 120 hours
of annual paid vacation during their third, fourth, fifth and sixth years of service, and 160
hours of annual paid vacation thereafter.  Unused vacation days are not paid out upon
year-end and may not be carried over to the next year.

78.    With respect to sick leave, Hourly Employees accrue 32 hours of
sick leave per year.  Used sick time may not be carried over from year to year.

79.    The Debtors believe there are no amounts owing on the Petition
Date for PTO.  The Debtors request authority to honor similar PTO policies regarding
vacation time, sick time, personal time, and holidays on a post-petition basis and in the
ordinary course of the Debtors' business.

g.    401(k) Plan

80.    The Debtors offer their eligible Employees a 401(k) retirement
plan (the "401(k) Plan") administered by Digital Retirement Services.  An Employee is
eligible for the 401(k) Plan 90 days following the Employee's hire date.  Employees are
eligible for a matching contribution to the 401(k) Plan from the Debtors of 100% for the
first 3% of the Employees' contribution, and of 50% for the 4th % and 5th % of the
Employees' contribution.  The Debtors, however, have terminated matching contributions
for 2009.

81.     The Employee contributions to the 401(k) Plan, including repayments of loans against the 401(k) Plan, are an estimated $38,400 per Bi-Weekly Payroll. The Debtors incur approximately $12,500 per year in administrative and auditing costs to administer the 401(k) Plan (the "401(k) Fees"). The Debtors estimate that, as of the Petition Date, there are no accrued 401(k) Plan contributions from Employees that remain unremitted. The Debtors further request authority, in their discretion, to continue their existing 401(k) Plan and pay any 401(k) Fees in the ordinary course of the Debtors' business. As mentioned above, the Debtors will no longer be matching Employee contributions in 2009.

### h.     Workers' Compensation Insurance

82.     Under the laws of various states, the Debtors are required to maintain workers' compensation insurance to provide their Employees with coverage for claims arising from or related to their employment with the Debtors. The Debtors currently maintain an annual workers' compensation policy (the "Workers' Compensation Insurance Policy") with The Hartford ("Hartford") pursuant to which Hartford provides workers' compensation insurance coverage up to the statutory limits and up to $500,000 per occurrence for employer liability.

83.     The current term of the Workers' Compensation Policy runs through May 8, 2009, and costs $149,074 on an annual basis. No amounts are owing as of the Petition Date. The next payment is owing in February 2009 in the amount of $29,808. The Debtors hereby seek authority to maintain their workers' compensation and

other liability insurance in accordance with applicable law postpetition and to pay all premium installments as they come due in the ordinary course of business.

### i.    Bonus Program

84.    Prepetition, the Debtors offered incentive and discretionary bonus programs to their Employees. The Debtors' incentive bonus program provided incentive bonus payments to Employees depending on the Debtors' revenue and EBITDA performance, as well as the Debtors' sales level. The Debtors also award bonuses based on the individual performance of the Employee. As of the Petition Date, the Debtors do not owe their Employees any unpaid amounts under their bonus programs. The Debtors reserve the right, however, to continue their prepetition bonus programs postpetition in the ordinary course of business and in their discretion.

**E.    Motion of the Debtors for an Order (I) Authorizing the Debtors to Pay Prepetition Sales and Use and Similar Sales Taxes in the Ordinary Course of Business and (II) Authorizing Banks and Financial Institutions to Honor and Process Checks and Transfers Related Thereto**

85.    By this Motion, the Debtors seek authority to pay, in the Debtors' sole discretion, prepetition Sales Taxes (as defined below) owed to the Taxing Authorities (as defined below), including, without limitation, Sales Taxes subsequently determined upon audit to be owed for periods prior to the Petition Date. Prior to the Petition Date, the Debtors paid an estimate of December 2008 Sales Taxes to Taxing Authorities, in the amount of $66,854 (the "Sales Tax Estimate Payment"). If the Sales Tax Estimate Payment turns out to be greater than actual December 2008 Sales Taxes, then the Debtors will offset the overpayment against January 2009 Sales Taxes. If the

Sales Tax Estimate Payment turns out to be lower than actual December 2008 Sales

Taxes, then the Debtors seek to pay the remaining balance pursuant to this Motion.

      86.    In addition, to the extent any check issued or electronic transfer

initiated prior to the Petition Date to satisfy any prepetition obligation on account of Sales

Taxes has not cleared the applicable banks or financial institutions (the "Banks") as of the

Petition Date, the Debtors request that the Court authorize the applicable Banks, when

requested by the Debtors in their sole discretion, to receive, process, honor, and pay such

checks or electronic transfers initiated prior to the Petition Date, provided that there are

sufficient funds available in the applicable accounts to make such payments. The

Debtors also seek authorization to issue replacement checks, or to provide for other

means of payment to the Taxing Authorities, to the extent necessary to pay Sales Taxes

outstanding and owing for periods prior to the Petition Date.

      87.    In connection with the normal operation of their business, the

Debtors pay an assortment of sales and use, and similar types of taxes (the "Sales Taxes")

to various federal, state, and local taxing authorities (collectively, the "Taxing

Authorities").

      88.    Sales and Use Taxes: In the normal course of their business in

States where the Debtors are required to collect such taxes, the Debtors collect and remit

or otherwise pay Sales Taxes to the Taxing Authorities. The Debtors incur Sales Taxes

from the sale of their merchandise to customers. Generally, the Debtors remit the Sales

Taxes on a monthly or quarterly basis to the applicable Taxing Authorities, depending on

the rules of each state. Such Sales Taxes could include both amounts not yet due and

amounts paid by checks sent prior to the Petition Date that have not cleared the Debtors'
bank accounts on the Petition Date, although the Debtors are not aware of any such
checks that have not cleared.

89.     As noted above, if the Sales Tax Estimate Payment turns out to be
lower than actual December 2008 Sales Taxes, then the Debtors seek authority, in their
discretion, to pay the remaining balance of the prepetition Sales Taxes.

**F.      Motion for Order Pursuant to 11 U.S.C. §§ 105(a) and  363 Authorizing
Debtors to Pay Prepetition Claims of Shippers and Granting Related Relief**

90.     By this Motion, the Debtors seek the authority to continue to pay,
in the ordinary course of business, the prepetition claims of Shippers (as defined below)
who have (or may have) non-bankruptcy law remedies available to secure payment of
their respective claims.  The Debtors propose to pay such claims, when, in the Debtors'
sole discretion, such creditor's exercise of such remedies would unduly disrupt the
Debtors' business.  The Debtors request the authority, but not the direction, to pay up to
$5,000 on account of such claims, as described further in the Motion.

91.     The electronic retail industry depends on reliable shipping of
products to the Debtors from their vendors and from the Debtors to their customers.  The
Debtors' successful operations therefore depend on the daily receipt and delivery of
products.  The Debtors contract with shippers and transporters and affiliated entities,
including specifically and without limitation, customs agents and brokers (the
"Shippers") to ship, transport, store, and deliver product, to and from the Debtors, the
Debtors' vendors, and the Debtors' customers.

92.     The Debtors expect that, as of the Petition Date, certain Shippers may have outstanding invoices for goods delivered to the Debtors or the Debtors' customers prior to the Petition Date, including customs charges and fees of the Debtors' customs agent Expeditors International, which assists in the receipt of goods from vendors in Asia (collectively, the "Shipping Charges"). The Debtors believe that such unpaid Shipping Charges as of the Petition Date are de minimis.[5] However, in the event that such charges remain unpaid, the Shippers likely will argue that they have possessory liens for transportation or storage costs, and may refuse to deliver or release goods in their possession until their claims are satisfied and their liens redeemed.

93.     The Debtors anticipate that some Shippers will demand immediate payment from the Debtors. Even absent a valid lien, a Shipper's mere possession (and retention) of the Debtors' goods and supplies could severely disrupt the Debtors' operations.

94.     Accordingly, by the Motion, the Debtors seek to prevent the breakdown of their supply and delivery network by requesting authority to pay certain prepetition claims relating to the Shippers that the Debtors determine are necessary or appropriate to (a) obtain release of critical or valuable goods that may be subject to liens, (b) maintain a reliable, efficient, and smooth distribution system, and (c) induce critical

---

[5] Prior to the Petition Date, the Debtors' principal shipper to its customers was United Parcel Service ("UPS"). UPS is one of the Debtors' largest unsecured creditors. However, the Debtors do not believe that UPS presently has in its possession a significant quantity of the Debtors' goods for delivery, and the Debtors have commenced a transition to use Federal Express as their post-petition principal shipper to customers. Consequently, the Debtors do not seek by this motion authority to pay any amounts to UPS.

Shippers to continue to carry goods and make timely delivery. Notably, the Debtors only seek authority, not the direction, to make such payments.

95.     The Debtors seek the authority to make payments to the Shippers relating to undisputed prepetition Shipping Charges that they, in their business judgment, (a) determine are necessary or appropriate and (b) believe the benefits to their estates and creditors from making such payments will exceed the costs that their estates would incur by bringing an action to compel the turnover of such goods, and the delays associated with such actions.[6] The Debtors do not expect such payments to exceed $5,000.

96.     The Debtors submit that the total proposed amount to be paid to the Shippers is minimal compared to the importance and necessity of the Shippers and the losses the Debtors may suffer if their operations are disrupted. Moreover, in most cases, the Debtors do not believe that there are viable timely alternatives to the Shippers to be paid pursuant to this Motion.

**G.     Motion of the Debtors for an Order Under Section 366 of the Bankruptcy Code (A) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance, and (C) Establishing Procedures for Determining Adequate Assurance of Payment**

97.     In the normal course of business, the Debtors have relationships with various utility companies and other providers (each a "Utility Provider" and, collectively, the "Utility Providers") for the provision of telephone, gas, electricity, web hosting and related services (the "Utility Services"). The Utility Providers include, without limitation, the entities set forth on the list attached to the Motion as Exhibit A.

---

[6] The value of the goods in the possession of the Shippers and the potential injury to the Debtors if the goods are not released is likely to greatly exceed the amount of such Shipping Charges.

The Debtors estimate that their average monthly postpetition payments to the Utility Providers will aggregate approximately $94,136.08.

98. Because uninterrupted Utility Services are critical to the Debtors' ongoing operations, the Debtors, by this Motion, seek the entry of an order: (a) prohibiting the Utility Providers from altering, refusing or discontinuing services; (b) deeming Utility Providers adequately assured of future performance; and (c) establishing procedures for determining adequate assurance of future payment.

99. In order to provide adequate assurance of payment for future services to the Utility Providers, the Debtors propose to make a deposit (a "Utility Deposit") equal to 50% of the Debtors' estimated cost of their monthly utility consumption to each Utility that the Debtors intend to continue to utilize during the course of these cases. The Debtors estimate that the Utility Deposits, in the aggregate, will total approximately $47,068.04. The Debtors propose to make Utility Deposits to each of the Utility Providers specified on Exhibit A to the Motion within ten days after the entry of an interim order granting the Motion, pending further order of the Court, for the purpose of providing each Utility Provider with adequate assurance of payment of its postpetition date services to the Debtors.

100. In addition, the Debtors seek to establish reasonable procedures (the "Procedures"), described more fully in the Motion. by which a Utility Provider may request additional adequate assurance of future payment, in the event that such Utility Provider believes that its Utility Deposit does not provide it with satisfactory adequate assurance.

101.     Under the circumstances of this case, the Debtors believe that the

proposed Utility Deposits constitute adequate assurance of payment under section 366(c)

of the Bankruptcy Code. Moreover, the Debtors propose to protect the Utility Providers

further by establishing the Procedures provided for in the Motion, whereby any Utility

Provider can request additional adequate assurance in the event that it believes there are

facts and circumstances with respect to its providing postpetition services to the Debtors

that would merit greater protection.

102.     The Debtors cannot continue to operate without continued Utility

Services. If any of the Utility Providers alter, refuse or discontinue service, even for a

brief period, the Debtors business operations would be severely disrupted. In contrast,

the Utility Providers will not be prejudiced by the continuation of their services and will

be paid all postpetition utility charges. It is therefore critical that Utility Services

continue uninterrupted.

## H.     Motion for Entry of an Order Pursuant to Sections 105(a), 363(c), 1107(a), and 1108 of the Bankruptcy Code Authorizing the Debtors to Honor Any Prepetition Obligations to Customers and to Otherwise Continue Customer Practices and Programs in the Ordinary Course of Business

103.     Prior to the Petition Date, and in the ordinary course of their

businesses, the Debtors engaged in certain programs or practices to maximize sales,

engender customer loyalty, and develop and sustain brand loyalty and a positive

reputation in the marketplace. These practices include but are not limited to the

following:

    a.     gift cards, including electronic gift certificates and My
Twinn Gift Packets, pursuant to which cash payment is
received in exchange for a gift certificate in a certain dollar

amount (the "Gift Cards"). Gift Cards work like debit cards, and can be reused until the balance reaches $0 and do not expire. However, from two years after date of purchase a monthly administration fee of $1.50 is debited. The Debtors estimate that the outstanding value of Gift Cards issues prepetition is approximately $1,812,500;

b. return programs, pursuant to which a customer may return for a refund, under certain conditions, goods purchased within thirty days of receipt; where an item is damaged or incorrect, the customer may return within thirty days of receipt and also receive a refund of shipping charges. In addition, the Debtors' MyTwinn.com website (but not the Debtors' other sales sites) permit the exchange of any item within thirty days of receipt (e.g., for a different size) and permit any personalized My Twinn doll or personalized My Twinn toddler to be returned in its original condition within 60 days receipt, less a $35.00 customization fee (the "Return Programs"). The Debtors estimate that the total cost of the Return Program arising from shipments prior to the Petition Date is approximately $1,000,000;

c. price matching programs, pursuant to which, if an item is marked down within thirty days of the order date, the Debtors will honor the Debtors' advertised sale price by issuing a refund. In addition, the Debtors' BabyUniverse website (but not the Debtors' other sales sites) provides a price guarantee program, pursuant to which the Debtors will match a lower advertised price offered by any of the top ten U.S.-based baby products online retail competitors on the same available brand and model (together, the "Price Matching Programs"). The Debtors estimate that the total cost of the Price Matching Programs arising from sales prior to the Petition Date is approximately $3,600;

d. promotional coupons, pursuant to which the Debtors issue coupons for discounts that may be redeemed upon a qualifying purchase (the "Coupons"). The Debtors estimate that the total cost of the Coupons arising from the period prior to the Petition Date is approximately $156,250;

e. a contest offered through My Twinn, commenced in 2008 and scheduled to end on January 31, 2009, pursuant to which contestants may submit a design for a new My Twinn doll outfit using a template on the website. The grand prize winner will receive a $400 My Twinn Gift Card (the "My Twinn Contest"). The Debtors estimate that the

total cost of the My Twinn Contest arising from the period prior to the Petition Date is approximately $500;

f.    *Cookie* magazine, which is a bonus offer for which customers qualify by making a purchase in excess of a certain amount. The Debtors provide a qualified customer list to Strategic Media, which interacts with the publisher. Prior to the Petition date, the Debtors removed this offer from their web sites. The Debtors incur no costs with respect to this program;

g.    appeasement programs, pursuant to which the Debtors will sometimes provide a credit refund, issue a gift card, issue an electronic gift certificate, or issue a prepaid shipping label for returns on some orders when an order fails to meet a customer's expectation UPS prepaid shipping labels for returns on some orders (the "Appeasement Programs"). The Debtors estimate that the total cost of the Appeasement Programs arising from transactions occurring prior to the Petition Date is $125,000.

(collectively, the "Customer Programs"). The foregoing estimates are based upon the Debtors' analysis of their books and records and historical returns, sales, and customer claims, which may be affected dramatically by the filing for bankruptcy protection. Consequently, the Debtors have included a margin of error calculation of approximately 25% with respect to each of the Customer Programs.

104.    The Customer Programs are designed to create incentives for continuing and increased sales to the Debtors' customers, and the common goals thereof are to meet competitive pressures, ensure customer satisfaction, and generate brand loyalty and goodwill for the Debtors, thereby retaining current customers, attracting new ones, and ultimately enhancing net revenue.

105.    During the postpetition period, the Debtors need to continue those Customer Programs to preserve critical business relationships, customer loyalty, and

goodwill for the benefit of their estates.   The loyalty and continued patronage of the

Debtors' customers is critical to the Debtors' goal of maximizing the value of their

estates.  For the reasons set forth herein, it is in the best interests of the Debtors, their

estates, and their creditors to honor, in the Debtors' discretion, their prepetition

obligations under the Customer Programs and to continue the Customer Programs in the

ordinary course of business.

**I.     Debtors' Emergency Motion for Interim and Final Relief (I) Authorizing
Post-Petition Financing; (II) Granting Liens, Security Interests and Super-
Priority Status; (III) Granting Adequate Protection to Certain Pre-Petition
Lenders; (IV) Scheduling a Final Hearing; and (V) Modifying the Automatic Stay**

106.    The Debtors have filed voluntary petitions for relief under chapter

11 for the purpose of preserving and maximizing the value of the property of the estates,

allowing the marketing and sale efforts that are underway to continue, and minimizing

the claims against the Debtors' estates.  Certain affiliates of the Debtors' pre-petition

secured lender have agreed to provide the Debtors with certain debtor in possession

financing in order to achieve these objectives in chapter 11.

107.    By this Motion, the Debtors seek authority to obtain post-petition

financing (the "DIP Credit  Facility"), on an interim basis for a period (the "Interim

Period") from the commencement of the Debtors' cases through and including the date of

the Final Hearing in such amounts as are necessary to avoid immediate and irreparable

harm,[7] in accordance with the budget reflected in the Projections (defined below) and as

such may hereafter be modified from time to time, the "Budget") by entering into that

---

[7]  The aggregate amount to be funded on an interim basis will be determined at the hearing on the
Motion, based upon the date on which the interim hearing is held and the date on which the final
hearing is scheduled by the Court.

certain Debtor-in-Possession Credit Agreement dated as of December 28, 2008 (as the same may be amended, supplemented, or otherwise modified from time to time, the "<u>DIP Credit Agreement</u>", a copy of which is attached to the Motion as <u>Exhibit "B"</u>), by and among the Debtors, as borrowers, certain non-debtor direct and indirect subsidiaries, as guarantors (the "<u>Guarantors</u>"),[8] D.E. Shaw Laminar Portfolios, L.L.C., as lender, and the other lenders party thereto (collectively, the "<u>Post-Petition Lenders</u>" or "<u>D.E. Shaw</u>"), D.E. Shaw Laminar Lending 3 (C), L.L.C., as administrative agent for the Post-Petition Lenders (the "<u>DIP Agent</u>"), and subject to the terms and conditions of the Interim Order and all related security and other agreements, documents, notes, and instruments executed or delivered pursuant thereto, or in connection therewith (collectively, with the DIP Credit Agreement, as any of the same shall be amended, restated, supplemented or otherwise modified from time to time, the "<u>DIP Financing Documents</u>"),[9] and granting certain related relief.

108.    The Debtors are indebted under certain pre-petition credit facilities as set forth below.

109.    Pre-Petition Senior Indebtedness: The Debtors are parties to that certain Amended and Restated Credit Agreement dated as of October 12, 2007 (as modified by that certain letter agreement dated as of December 14, 2007, as amended by that certain First Amendment to Amended and Restated Credit Agreement and Waiver

---

[8]  Each of the Debtors and Guarantors may be referred to herein individually as a "<u>Loan Party</u>" and collectively as the "<u>Loan Parties</u>."

[9]  Capitalized terms used but not defined herein shall have the meanings ascribed thereto in the DIP Credit Agreement.

dated as of January 8, 2008, as amended by that certain Second Amendment to Amended and Restated Credit Agreement dated as of February 1, 2008, as amended by that certain Third Amendment to Amended and Restated Credit Agreement dated as of March 10, 2008, as amended by that certain Fourth Amendment to Amended and Restated Credit Agreement dated as of July 10, 2008, as amended by that certain Fifth Amendment to Credit Agreement dated as of October 31, 2008, as modified by that certain Assignment and Acceptance Agreement referenced below and as further amended and modified from time to time, the "Pre-Petition Senior Credit Agreement") among the Borrowers, The CIT Group/Business Credit, Inc., as administrative agent and collateral agent and the lenders from time to time party thereto (collectively, the "Pre-Petition Senior Lenders"). Pursuant to the Pre-Petition Senior Credit Agreement, the Pre-Petition Senior Lenders originally agreed, upon certain terms and conditions, to make revolving loans to the Debtor in a total amount, subject to a borrowing base, of up to $25,000,000. The outstanding balance under the Pre-Petition Senior Credit Agreement plus all related indebtedness and obligations arising thereunder shall be referred to as the "Pre-Petition Senior Obligations." Pursuant to that certain Assignment and Acceptance Agreement dated as of December 12, 2008, D. E. Shaw Laminar Lending 3 (C), L.L.C., a Delaware limited liability company (in such capacity, the "Pre-Petition Senior Agent"), became the agent for the Pre-Petition Senior Lenders under the Pre-Petition Senior Credit Agreement by assuming the roles of "Administrative Agent" and "Collateral Agent" under the Pre-Petition Senior Credit Agreement and D. E. Shaw purchased the outstanding indebtedness.

110. Pursuant to an Amended and Restated Security and Pledge Agreement dated October 12, 2007, Amended and Restated Patent Agreement dated October 12, 2007, and Amended and Restated Trademark Security Agreement dated October 12, 2007 (together with certain control agreements, website consent agreements, processor control agreements and related instruments, the "Pre-Petition Senior Security Documents" and, together with the Pre-Petition Senior Credit Agreement and all other instruments and documents entered into by the parties, the "Pre-Petition Senior Credit Documents"), the Pre-Petition Senior Obligations are secured by a first priority lien on substantially all of the Debtors' assets, including, but not limited to, all of the Debtors' accounts, chattel paper, copyrights, patents and trademarks, documents, equipment, fixtures, general intangibles, goods, instruments, inventory, investment property, cash, cash equivalents, letters of credit, letter-of-credit rights, deposit accounts, commercial tort claims, assigned contracts, personal property, and all accessions to, substitutions for and replacements, proceeds (including stock rights), insurance proceeds and products of the foregoing, in each case whether then owned or existing or thereafter acquired or arising. All collateral granted or pledged by the Debtors pursuant to the Pre-Petition Senior Security Documents are collectively referred to herein as the "Pre-Petition Senior Collateral."

111. The Debtors believe that all the Pre-Petition Senior Credit Documents executed and delivered by the Debtors are valid and enforceable by the Pre-Petition Senior Agent on behalf of the Pre-Petition Senior Lenders against each of the Debtors. The Pre-Petition Senior Agent's prepetition liens upon and security interests in

the Pre-Petition Senior Collateral by, among other things, filing financing statements, and, where necessary, by possession of relevant instruments, certificates, or other property. All of such financing statements were validly executed by authorized representatives of the Debtors.

112. The Debtors believe that the liens and security interests of the Pre-Petition Senior Agent in the Pre-Petition Senior Collateral, as security for the Pre-Petition Senior Obligations, constitute valid, binding, enforceable and perfected first lien priority liens and security interests and are not subject to avoidance, disallowance, subordination or recharacterization pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

113. The Debtors further believe that (i) the Pre-Petition Senior Obligations constitute legal, valid and binding obligations of each of the Debtors, (ii) no offsets, defenses or counterclaims to the Pre-Petition Senior Obligations exist, and (iii) no portion of the Pre-Petition Senior Obligations is subject to avoidance, disallowance, reduction, subordination or recharacterization pursuant to the Bankruptcy Code or applicable non-bankruptcy law. The Debtors irrevocably waive any right to challenge or contest the liens of Pre-Petition Senior Agent in the Pre-Petition Senior Collateral or the validity of the Pre-Petition Senior Obligations.

114. The Debtors further believe that they have no valid claims (as such term is defined in section 101(5) of the Bankruptcy Code) or causes of action against the Pre-Petition Senior Agent or any of the Pre-Petition Senior Lenders with respect to the Pre-Petition Senior Credit Agreement or any other Pre-Petition Senior Credit Documents, whether arising at law or at equity, including, without limitation, any re-characterization,

subordination, avoidance, or other debtor claims arising under or pursuant to sections
105, 510 or 542 through 553, inclusive, of the Bankruptcy Code.

115.    As indicated, the Debtors further believe that, as of the Petition
Date, they were truly and justly indebted to the Pre-Petition Senior Lenders pursuant to
the Pre-Petition Senior Credit Documents, without defense, counterclaim or offset of any
kind, in the aggregate principal amount of approximately $8.64 million, plus all accrued
or hereafter accruing and unpaid interest thereon and any additional fees and expenses
(including any professional fees and expenses that are chargeable or reimbursable under
the Pre-Petition Senior Credit Documents) now or hereafter due under the Pre-Petition
Senior Credit Agreement and the other Pre-Petition Senior Credit Documents.

116.    Second Lien Indebtedness: The Debtors are parties to that certain
Investment Agreement dated as of July 10, 2008 (as amended or modified from time to
time, the "Pre-Petition Investment Agreement"; together with the Pre-Petition Senior
Credit Agreement, the "Pre-Petition Loan Agreements") among the Debtors, Laminar
Direct Capital, L.L.C., a Delaware limited liability company, as lender and collateral
agent (in such capacity, the "Pre-Petition Second Lien Agent"; together with the Pre-
Petition Senior Agent, the "Pre-Petition Agents") and the other lenders from time to time
party thereto (collectively, the "Pre-Petition Second Lien Lenders"; together with the Pre-
Petition Senior Lenders, the "Pre-Petition Lenders").  Pursuant to the Pre-Petition
Investment Agreement, the Pre-Petition Second Lien Lenders made term loans to the
Debtors in a total amount of $10,000,000.  The outstanding balance under the Pre-
Petition Investment Agreement plus all related indebtedness and obligations arising

thereunder shall be referred to as the "Total Pre-Petition Second Lien Obligations," and,
together with the Pre-Petition Senior Obligations, the "Pre-Petition Obligations."

117.    Pursuant to the terms of the Pre-Petition Investment Agreement,
the Debtors executed and delivered certain collateral documents, including without
limitation a pledge and security agreement, intellectual property security agreements,
processor control agreements and related instruments (the "Pre-Petition Second Lien
Security Documents" and together with the Pre-Petition Investment Agreement and other
documents and instruments entered into by the parties thereto, the "Pre-Petition Second
Lien Documents"), granting to the Pre-Petition Second Lien Agent, for the ratable benefit
of the Pre-Petition Second Lien Lenders, first priority liens on and security interests on
substantially all of the Debtors' assets, including, but not limited to, all of the Debtors'
accounts, chattel paper, copyrights, patents and trademarks, documents, equipment,
fixtures, general intangibles, goods, instruments, inventory, investment property, cash,
cash equivalents, letters of credit, letter-of-credit rights, deposit accounts, commercial tort
claims, assigned contracts, personal property, and all accessions to, substitutions for and
replacements, proceeds (including stock rights), insurance proceeds and products of the
foregoing, in each case whether then owned or existing or thereafter acquired or arising
(the "Pre-Petition Second Lien Collateral") as collateral security for the Total Pre-
Petition Second Lien Obligations.

118.    Pursuant to the terms of each Pre-Petition Loan Agreement, each
Pre-Petition Agent, on behalf of their respective Pre-Petition Lenders, and the Debtors

entered into that certain Subordination and Intercreditor Agreement dated as of July 10,
2008 (the "Intercreditor Agreement").

119.    The Debtors believe that the liens and security interests of the Pre-
Petition Second Lien Agent in the Pre-Petition Second Lien Collateral, as security for the
Total Pre-Petition Second Lien Obligations, constitute valid, binding, enforceable and
perfected first lien priority liens and security interests and are not subject to avoidance,
disallowance, subordination or recharacterization pursuant to the Bankruptcy Code or
applicable non-bankruptcy law.

120.    The Debtors further believe that (i) the Total Pre-Petition Second
Lien Obligations constitute legal, valid and binding obligations of each of the Debtors,
(ii) no offsets, defenses or counterclaims to the Total Pre-Petition Second Lien
Obligations exist, and (iii) no portion of the Total Pre-Petition Second Lien Obligations is
subject to avoidance, disallowance, reduction, subordination or recharacterization
pursuant to the Bankruptcy Code or applicable non-bankruptcy law. The Debtors
irrevocably waive any right to challenge or contest the liens of Pre-Petition Second Lien
Agent in the Pre-Petition Second Lien Lenders or the validity of the Total Pre-Petition
Second Lien Obligations.

121.    The Debtors further believe that they have no valid claims (as such
term is defined in section 101(5) of the Bankruptcy Code) or causes of action against the
Pre-Petition Second Lien Agent or any of the Pre-Petition Second Lien Lenders with
respect to the Pre-Petition Investment Agreement or any other Pre-Petition Second Lien
Documents, whether arising at law or at equity, including, without limitation, any re-

characterization, subordination, avoidance, or other debtor claims arising under or pursuant to sections 105, 510 or 542 through 553, inclusive, of the Bankruptcy Code.

122.    As indicated, the Debtors further believe that, as of the Petition Date, they were truly and justly indebted to the Pre-Petition Second Lien Lenders pursuant to the Pre-Petition Second Lien Documents, without defense, counterclaim or offset of any kind, in the aggregate principal amount of $10,000,000 million, plus all accrued or hereafter accruing and unpaid interest thereon and any additional fees and expenses (including any professional fees and expenses that are chargeable or reimbursable under the Pre-Petition Second Lien Documents) now or hereafter due under the Pre-Petition Investment Agreement and the other Pre-Petition Second Lien Documents.

### The Debtors' Urgent Need for Post-Petition Financing

123.    The continued operations of the Debtors require that the Debtors have liquidity, among other things, to pay compensation to the Debtors' employees, pay the other costs and expenses of maintaining their corporate headquarters and fund an orderly disposition of the Debtors' assets. As of the Petition Date, however, the Debtors had only a minimal amount of cash.

124.    Simply put, the Debtors require a line of credit to operate. Without the necessary liquidity to meet the above-described costs, the Debtors will not be able to continue operations. An interruption in the ability of the Debtors to pay employees and to meet orders to customers – even if temporary – would likely cause immediate and irreparable harm to their businesses and the value of the Debtors' assets.

125.     With these circumstances in mind, the Debtors negotiated with
D.E. Shaw to obtain the DIP Credit Facility so that the Debtors may continue operating
while they pursue a sale of assets in chapter 11.  The Debtors' need for approval of the
DIP Credit Facility is critical and immediate to prevent irreparable harm to the Debtors
and their estates.  The terms of the DIP Credit Facility have been reviewed and approved
unanimously by the board of directors for each of the Debtors.[10]

126.     In anticipation of these chapter 11 cases, the Debtors developed
cash flow projections (together with the "Notes" thereto, "Projections") reflecting
anticipated revenue and expenditures through the week ended February 7, 2009
("Projection Period"), a copy of which is attached as Exhibit "C" to the Motion.  The
Projections attempt to account for the effect of these bankruptcy filings on the Debtors'
financial performance.  However, if the Debtors are unable to obtain immediate
financing, the anticipated results could decline materially.

127.     As of the Petition Date, the Debtors anticipate having only
minimal cash to fund their operations.  The Projections show that the Debtors expect to
continue receiving revenue from the sale of inventory.  The Projections show, however,
that the Debtors require additional funding to avoid liquidity shortfalls and maintain
smooth operations.

---

[10] One of the board members of debtor The Parent Company, Blaine MacDougald, is employed
by D. E. Shaw & Co., L.P., an affiliate of D.E. Shaw Laminar Acquisition Holdings 3, L.L.C, the
majority stock holder of TPC.  He has been removed from all insolvency-related activities,
including, but not limited to, negotiations with respect to debtor-in-possession financing.

128.    D.E. Shaw has committed to fund up to $10,900,000 (the "Commitment Amount") under the DIP Credit Facility, which is substantially equivalent to the Debtors' projected borrowing needs through the week ended February 7, 2009. The maturity of the DIP Credit Facility is February 6, 2009.

129.    The Projections reveal that the Debtors require emergency interim approval of the DIP Credit Facility in order to maintain their operations. The Projections show that through the week ended January 24, 2009, the Debtors need to make cash disbursements of approximately $3,532,000, all of which must be borrowed under the DIP Credit Facility to pay salaries, wages, and benefits, inventory purchases, and other operating expenses.

130.    In sum, without immediate access to post-petition financing, the Debtors would be unable to continue operations and would suffer immediate and irreparable harm to their estates and creditors. In addition, because the Debtors will not have sufficient funds to meet expenses necessary to conduct the above-referenced tasks before a final hearing can be held, it is essential that they obtain interim financing.

### Negotiation of the Dip Credit Agreement

131.    The Debtors are unable to satisfy their financing needs with unsecured, administrative priority loans as such funding is simply not available. The Debtors attempted to negotiate a debtor-in-possession arrangement with CIT, who provided the Debtors' revolving credit facility pursuant to the Pre-Petition Senior Credit Agreement until the assignment of that facility to D.E. Shaw Laminar Lending 3(C), L.L.C. on December 12, 2008. CIT was unwilling to enter into an arrangement with the

Debtors.  The Debtors, with the advice of Clear Thinking Group, LLC ("Clear Thinking")

who the Debtors retained as their financial advisors, concluded that the Debtors' inability

to pledge collateral to support asset-based financing, decreasing cash flow year over year,

and significant cash burn every year of the Debtors' 5-year history rendered debtor-in-

possession financing from another lender on better terms impossible.  In sum, the Debtors

are unable to obtain the credit they need on any basis other than by granting the liens and

super-priority claims proposed under the DIP Credit Facility.

132.    The DIP Credit Facility embodies the best terms available to the

Debtors under the circumstances, and is fair and reasonable.  The agreement was heavily

negotiated between the Debtors and D.E. Shaw, in good-faith and at arm's length.

Significant concessions were made by each of the parties.  The Debtors were represented

in these negotiations by Lee A. Diercks of Clear Thinking, and the Debtors' financial

advisor and anticipated CRO, David Gibson of Gibson & Rechan LLC, with assistance of

bankruptcy counsel at Pachulski Stang Ziehl & Jones LLP (Jeffrey Dulberg).  D.E. Shaw

was represented by counsel at Klee, Tuchin, Bogdanoff & Stern LLP.  At no time have

the Debtors' representatives or professionals sought anything other than to maximize the

interests of the Debtors in negotiating the terms of the DIP Credit Facility.

133.    Although there is no guarantee that the funding commitment of

D.E. Shaw will be sufficient to achieve all of the Debtors objectives, or do so prior to the

existing maturity date of the DIP Credit Facility, entering into the DIP Credit Facility is a

far better than the alternative – an abrupt termination of operations and liquidation.  As

noted, the Debtors have insufficient cash to fund their own operations and there is no

other lender willing to advance what the Debtors require to continue their operations.

D.E. Shaw is prepared to advance $3,532,000 on an interim basis and another $7,368,000

upon entry of the Final Order under the DIP Facility.

134. By entering into the DIP Credit Facility, the Debtors will be

permitted to continue their efforts to facilitate the sale of their businesses. Alternatively,

if the Debtors do not enter into the DIP Credit Facility and are not able to continue

paying employees and other operating expenses, the operations of the retail businesses

would be significantly disrupted. An abrupt and disorderly termination of operations

would harm the value of the businesses to potential buyers or investors and would

obviously impose a hardship on employees.

135. Thus, notwithstanding the current limitations on the funding

commitment, the Debtors have determined, in the exercise of their sound business

judgment, that the DIP Credit Facility would be beneficial to the estates, and in the best

interests of employees, vendors, and other stakeholders. While the Debtors are well

aware of the fact that the "roll-up" (upon approval at the Final Hearing) to D.E. Shaw is

extraordinary relief, the facts and circumstances surrounding these cases justify such

relief. Despite prepetition efforts, the Debtors were simply unable to secure financing

from any party other than D.E. Shaw that would have enabled them to continue to operate

and conduct the other numerous tasks necessary to safely wind down the certain

operations prepetition. The Debtors agreed, in exchange for receipt of this desperately

needed financing, to seek to have the prepetition loan from D.E. Shaw "rolled-up" in

D.E. Shaw's post-petition loan. Further, the Debtors have an immediate need for the

post-petition financing provided by D.E. Shaw and, as evidenced by the Budget, which is
critical to paying the necessary administrative and other costs necessary for these cases,
and preserving the value of their businesses as the Debtors pursue a sale of assets in
chapter 11. Accordingly, the terms of the DIP Credit Agreement and the other DIP
Financing Documents should be approved.

[remainder of page intentionally left blank]

I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

Executed this _28_ day of December 2008, at Denver, Colorado.

Michael J. Wagner
Chief Executive Officer and President